**In the Matter of:**

**The LCF Group, Inc.**
**v.**
**Piedmont Power Sports, Inc.**

**Jack L. Rickett, Jr.**

May 31, 2023



Court Reporting
Videography
Videoconferencing

Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
 2                  Charlottesville Division

 3   -------------------------------------+
     THE LCF GROUP, INC.,                 :
 4                   Plaintiff,           :
                                          :CASE NUMBER:
 5   vs.                                  :3:22-cv-57
                                          :
 6                                        :
     PIEDMONT POWER SPORTS, INC.,         :
 7   et al.,                              :
                     Defendants.          :
 8   -------------------------------------+

 9                            Wednesday, May 31, 2023

10

11                  JACK L. RICKETT, JR.

12   called for examination by counsel on behalf of

13   Plaintiff, LCF Group, Inc., pursuant to Notice taken via

14   Zoom, at approximately 10:00 a.m., before Janie Arriaga,

15   a certified Verbatim Reporter and a Notary Public in and

16   for the Commonwealth of Virginia, when there were

17   present on behalf of the respective parties.

18

19

20

21

22
```

```
 1    APPEARANCES:

 2                   On behalf of the Plaintiff:

 3                   CHRISTOPHER T. ROBERTSON, ESQUIRE

 4                   Chap Petersen & Associates, PLC

 5                   3970 Chain Bridge Road

 6                   Fairfax, VA 22030

 7                   cr@petersenfirm.com

 8

 9                   On behalf of the Defendants:

10                   LINDSAY K. BUNTING EUBANKS, ESQUIRE

11                   Sands Anderson PC

12                   111 East Main Street

13                   Suite 2400

14                   Richmond, Virginia 23218

15                   lbuntingeubanks@sandsanderson.com

16

17

18

19

20

21

22
```

1                 C O N T E N T S

2    WITNESS                                          PAGE

3    JACK L. RICKETT, JR.

4         Examination by Mr. Robertson              5

5         Examination by Ms. Eubanks               63

6         Further Examination by Mr. Robertson     65

7

8                      E X H I B I T S

9    Rickett Exhibit 1    E-signature               20

10   Rickett Exhibit 2    Splash Advance application   23

11   Rickett Exhibit 3    E-signature               28

12   Rickett Exhibit 4    Email                     33

13   Rickett Exhibit 5    E-signature               35

14   Rickett Exhibit 6    Offer                     38

15   Rickett Exhibit 7    Photos                    42

16   Rickett Exhibit 11   Balance                   46

17   Rickett Exhibit 12   Wire transfer             47

18   Rickett Exhibit 9    Wire transfer             49

19   Rickett Exhibit 8    Email                     50

20   Rickett Exhibit 13   Email                     53

21   Rickett Exhibit 14   Email                     54

22

4 (4)

Jack L. Rickett, Jr.                                                5/31/2023

```
 1   (Continued)

 2   Rickett Exhibit 15  Withdrawal challenge          58

 3   Rickett Exhibit 16  Truist letter                 59

 4   Rickett Exhibit 17  FBI letter                    60

 5

 6

 7

 8

 9

10

11

12

13   (EXHIBITS RETAINED WITH COUNSEL)

14

15

16

17

18

19

20

21

22
```

Page 5

P R O C E E D I N G S

1
2    (Thereupon, JACK L. RICKETT, JR., having been
3    first duly sworn by the court reporter and notary
4    public, was examined and testified, as follows:)
5    EXAMINATION BY COUNSEL FOR PLAINTIFF:
6    BY MR. ROBERTSON:
7    Q    Thank you for being here today.  My name is
8    Chris Robertson, and I will take your deposition.  I
9    will ask you a series of questions, and I will ask that
10   you answer them verbally, avoid nodding or shaking your
11   head, because that would not be reflected in the court
12   reporter's record.
13       If you need to take a break at any point
14   during the deposition, just let me know, and I will do
15   my best to wrap up my question or questions that I'm
16   working on, and we can take a break.
17       Do you have any questions about the deposition
18   process?
19   A    No, sir.
20   Q    Could you please tell me your name, and spell
21   it for the record.
22   A    Jack, Jackie, J-A-C-K-I-E, Lynn, L-Y-N-N,

Page 6

1    Rickett, R-I-C-K-E-T-T, and junior, JR.
2    Q    And Mr. Rickett, have you ever been deposed
3    before?
4    A    I have.
5    Q    When was that?
6    A    It's been four or five years.
7    Q    What was that case about?
8    A    It was an individual -- basically, I was going
9    after a customer that owed me money, and they said they
10   didn't.  It was another case, I guess to say.
11   Q    What was the result of that case?
12   A    I don't think -- I don't know we really had a
13   result.  I think it just ended up being we were done.
14   Q    So did you reach a settlement?
15   A    We did not.
16   Q    Okay.  Is that the only other time you have
17   been deposed?
18   A    Yes.
19   Q    And did you prepare for this deposition today?
20   A    I did.
21   Q    Did you speak with anyone other than your
22   attorney prior to your deposition?

Page 7

1    A    I did not.
2    Q    Did you review any documents in preparation?
3    A    I did.
4    Q    Which documents?
5    A    The documents from the case from New York, and
6    then the ones from here in Virginia.
7    Q    So just the pleadings that have been filed in
8    both cases?
9    A    Yes, sir.
10   Q    Okay.  Anything else besides the pleadings
11   that were filed in the court?
12   A    I went back and revisited some of the text
13   messages and communications that I had with the
14   different parties involved in the case.
15   Q    And did you have -- was that text messages
16   with employees for LCF Group?
17   A    Some were, yes.
18   Q    What were the other text messages?  Who were
19   those with?
20   A    The individual, Jeremy Snyder, that was
21   representing Funding Circle.
22       MR. ROBERTSON:  Lindsay, were those text

Page 8

1    messages with the individual calling themselves Jerry
2    Snyder, were those produced, because I think I've only
3    seen the ones with LCF?
4        MS. EUBANKS:  I'm only aware of emails with
5    Jeremy Snyder.
6        MR. ROBERTSON:  Okay.  Well, if you can just
7    check and see if there's text messages with Jeremy
8    Snyder, and that those be produced?
9        MS. EUBANKS:  I'll check.
10   BY MR. ROBERTSON:
11   Q    So Mr. Rickett, what is your profession?
12   A    I am in sales.
13   Q    What do you sell?
14   A    Farm equipment, zero terms, handheld power
15   equipment, ATVs.
16   Q    And are those all sold by Piedmont Power
17   Sports?
18   A    Yes.
19   Q    What is your position with Piedmont Power
20   Sports?
21   A    Owner.
22   Q    Are you the sole owner for Piedmont Power

Page 9

1  Sports?

2  A   I am not.

3  Q   What percentage do you own?

4  A   Today it's 51 percent.

5  Q   And who owns the remainder?

6  A   Randy Soderquist.

7  Q   He owns 49 percent?

8  A   Yes, sir.

9  Q   And has that always been the case?  The split

10 in ownership?

11 A   No, sir.

12 Q   When did that occur?

13 A   I want to say the end of 2022, not exactly

14 sure of the time frame.

15 Q   So Randy Soderquist, is he an employee or how

16 do you know Mr. Soderquist?

17 A   He owns stock.  He's not an employee.

18 Q   So prior to the end of 2022, did you own 100

19 percent of the business?

20 A   Prior to the --

21 Q   Well, you said that Mr. Soderquist purchased

22 49 percent or gained 49 percent interest in the business

Page 10

1  at the end of 2022.  But prior to that, did you own 100

2  percent of the business?

3  A   Prior to Mr. Soderquist buying stock in the

4  company, I was the sole owner.

5  Q   Okay.  What was the reason for -- did you sell

6  it to him?

7  A   Did I sell stock?

8  Q   Yes.

9  A   Yes.

10 Q   What was the reason you decided to sell stock

11 at the time?

12 A   Growth and expansion opportunity.

13 Q   Do you have an ownership interest or are you

14 employed by any other company besides Piedmont Power

15 Sports?

16 A   I own a construction company, and that's it.

17 Q   What is the name of the construction company?

18 A   Applied General Contractors, A-P-P-L-I-E-D.

19 Q   Is that an entirely separate entity from

20 Piedmont Power Sports?

21 A   Yes, sir.

22 Q   You're a 100 percent owner of that business?

Page 11

1  A   Yes, sir.

2  Q   Can you tell me what is New River Kubota?

3  A   I'm not understanding you.  Where?

4  Q   Give me just one second.

5       Do you have any ownership interest in a

6  business called New River Kubota, Inc.?

7  A   I created a company called New River Kubota

8  with the -- basically, I was looking for growth and

9  expansion.  I created a company, and it never came to

10 fruition.  The company never got off the ground, never

11 did anything.

12 Q   So that business has no assets?

13 A   That business has nothing, no, sir.

14 Q   Were you the founder of Piedmont Power Sports?

15 A   I was.

16 Q   When was that founded?

17 A   2006.

18 Q   In addition to owner, have you been acting as

19 the -- actually running the day-to-day operations of the

20 business since 2006?

21 A   I am an employee of Piedmont Power.

22 Q   Are you the employee in charge of Piedmont

Page 12

1  Power Sports?

2  A   Yes, sir.

3  Q   Okay.  So Applied General Contractors, when

4  was that business founded?

5  A   I am not exactly positive of the date, but I

6  want to say 2004.

7  Q   And do you manage the day-to-day operations of

8  Applied General Contractors?

9  A   I do, but that company is not, what I would

10 call active.  It was something that I did, you know,

11 early on in the 2000s, where I did some contracting, and

12 it's just a company I kept because --

13 Q   Does it do work sporadically?

14 A   I am a classic contractor in the State of

15 Virginia, and in order to get that license, it's quite

16 difficult, so I keep the company going to keep that

17 license.

18 Q   Okay.  When was the last time you serviced a

19 contract?

20 A   2011, plus or minus, in that neighborhood.

21 Q   Okay.  So prior to 2022, has Piedmont Power

22 Sports obtained any business loans or anything similar?

7 (13 - 16)

**Jack L. Rickett, Jr.**

5/31/2023

Page 13

1  A  So have we ever?

2  Q  Yes.

3  A  Absolutely.  Yes.

4  Q  Do you know how many?

5  A  I do not know off the top of my head.  I could

6  not speculate.

7  Q  Between five and ten?  Do you think that is

8  fair?

9  A  Well, I guess my question is, when you say

10  business loans, so like we have a rental component, and

11  I have units that are under a contract?

12  Q  Yes.

13  A  Are you considering that a business loan?

14  Q  No.  I just mean, for example, the one that

15  you received that's a business loan that you took from a

16  bank or a third party to, you know, fund the ongoing

17  operations of the business or expansion, that sort of

18  thing, rather than just purchasing a piece of equipment.

19  MS. EUBANKS:  Can I just object as to form,

20  insomuch as Jack doesn't always know, and can not always

21  speak about Piedmont, but whatever he knows individually

22  in his own capacity.  Go ahead.

Page 14

1  BY MR. ROBERTSON:

2  Q  Okay.  I could reask the question if that

3  makes life easier, Mr. Rickett.

4  A  Go ahead.  I apologize.  I am -- I was

5  listening to what Lindsay said, and then I was listening

6  to what you said.  Go ahead and ask me.

7  Q  I know.  I know.  It gets confusing at times.

8  So I was just asking, you know -- so for the

9  purposes of the question, I'm defining business loans

10  as, you know, loans received from third parties,

11  including banks or other companies, taken by the

12  business in order to fund day-to-day operations or

13  expansion of the business.

14  So predicated on that definition, has Piedmont

15  Power Sports received any business loans prior to 2022?

16  A  Yes.

17  Q  And about how many of those?

18  A  I think you had basically said less than five,

19  more than five, was that your -- was that your --

20  Q  Well, I was asking just for a range if you

21  didn't know the exact number.

22  A  Yeah, I don't know the exact number.  I would

Page 15

1  say less than five.

2  Q  Okay.  Do you recall, you know, what companies

3  you received those loans from?

4  A  I do not.  The most obvious one is Funding

5  Circle.

6  Q  Okay.  But you had received business loans

7  prior to that?

8  A  2022.

9  Q  But before you received the loan from Funding

10  Circle, you had received others before that; is that

11  correct?

12  MS. EUBANKS:  When you say "you," can you

13  please define that, because Jack is testifying in his

14  individual capacity, not on behalf of the company.

15  MR. ROBERTSON:  You know, still, in his

16  individual capacity, he's also here testifying as to his

17  position with Piedmont Power Sports.  He can testify to

18  his personal knowledge.

19  MS. EUBANKS:  Sure.  But you are saying, you

20  received loans.  He didn't receive personal loans.

21  MR. ROBERTSON:  Okay.  I can rephrase it.  I

22  can rephrase it for clarity.

Page 16

1  BY MR. ROBERTSON:

2  Q  So Mr. Rickett, did Piedmont Power Sports take

3  out any business loans prior to the one that it received

4  from Funding Circle?

5  A  I believe the original -- the original one

6  that I was trying to refinance was the first one.  So I

7  do not believe there was one prior to that.

8  Q  So Funding Circle was the first one that you

9  received?

10  A  In the -- how you define it, yes.

11  Q  Okay.  And so the other loans that you were

12  referring to, is that just to purchase equipment

13  primarily?

14  A  I would say there were a number of reasons,

15  you know, through the years, from, you know, building

16  improvements to purchasing used equipment.  That's what

17  I recall.  I would struggle to define it any differently

18  based on -- I'm not sure exactly what the specific one

19  is.

20  Q  Okay.  So I think sort of an overview question

21  is, during the time that you have been running Piedmont

22  Power Sports, how many loans has been taken out of any

**Jack L. Rickett, Jr.**

Page 17

1  kind during that time that are business related?

2  A  I have no idea.  I couldn't even speculate on

3  a number.

4  Q  Okay.  Is it safe to say in the double

5  digits?

6  MS. EUBANKS:  Objection.  Asked and answered.

7  BY MR. ROBERTSON:

8  Q  You can answer.

9  MS. EUBANKS:  You can answer.

10  A  I'm sorry, I didn't catch that last part.

11  BY MR. ROBERTSON:

12  Q  She just said you can answer the question if

13  you can.

14  A  Okay.  I would not say it's safe to say it

15  would be double digits.  I really don't know.

16  Q  Okay.  That's fair.

17  When did you first secure a loan from -- or

18  when did Piedmont Power Sports first secure a loan from

19  Funding Circle?

20  A  I believe it was 20 -- I don't know that one

21  off the top of my head.  I want to say it was 2018.  But

22  I --

Page 18

1  Q  Did you --

2  A  I could be wrong.

3  Q  Okay.  Did you obtain multiple loans from

4  Funding Circle?

5  A  Just the one -- just the one I was trying to

6  refinance.

7  Q  Okay.  I'm going to attempt to share this.  Do

8  you have a full screen?

9  A  I can see you on my full screen, yes.

10  Q  Can you see the document that I just shared?

11  A  I can.

12  Q  Is this a copy of the original loan that you

13  secured with Funding Circle?  I can scroll if it helps.

14  A  That does look like the one, yes, that amount

15  looks -- yes.

16  Q  All right.

17  A  What is the date?

18  Q  So it says here --

19  A  2020.

20  Q  Okay.  Does that refresh your recollection?

21  A  Yes.

22  Q  Okay.  Did you approach Funding Circle about

Page 19

1  this loan?

2  A  I don't recall whether they contacted me or I

3  contacted them.

4  Q  And did you negotiate the terms of this loan?

5  A  Yes.  I submitted documents, and they gave me

6  back what you see there.  And I -- yes.

7  Q  Okay.  Did you tell them how much you wanted,

8  or in a range, how much money you needed?

9  A  I did.

10  Q  And so it says here that there was an

11  origination fee of 17,970.  Was it your understanding

12  that that was paid?

13  A  I believe that was paid, yes, sir.

14  Q  Okay.  So for monthly payments, during the --

15  since this loan was taken out, have you been making

16  monthly payments in the amount of 7,946.50, or has

17  Piedmont?

18  A  Yes, sir.

19  Q  On the last page here, the last one that we

20  are going to look at for this purpose --

21  MR. ROBERTSON:  By the way, for the court

22  reporter, this is Plaintiff's Exhibit 1.

Page 20

1  (Rickett Exhibit Number 1 marked for

2  identification.)

3  BY MR. ROBERTSON:

4  Q  Is that your E signature on the end?

5  A  I would believe so, yes.

6  Q  You know when you do E signatures, it allows

7  you to either generate one or you can sort of draw in.

8  Is that one you drew in?

9  A  That one looks like one that was drawn in,

10  yes.

11  Q  And as part of this, there was a guarantee.

12  Do you recall signing this as well?

13  A  I would say yes.

14  Q  Okay.  And it looks like that's the same

15  signature.  Is that the program it just saves it, and

16  you just click to the next one, and it just fills it in

17  with the same signature?

18  A  I couldn't -- I'm not trying to be coy.  That

19  was almost four years ago.  I really -- I really can't

20  tell you.

21  Q  I understand.  I think -- I mean, if you want

22  to take a look at it and then go to the other one, does

**Jack L. Rickett, Jr.**

Page 21

1  it look like it's the same signature?  You can just look
2  at this one, and then go back to the other one.
3      A    I mean, it looks similar, yes.  It's J.
4  Rickett.
5      Q    Okay.
6      A    Yes.
7      Q    All right.  Did you or any other Piedmont
8  employee, to your knowledge, receive quotes from any
9  other loan companies before going with Funding Circle?
10      A    Not that I recall.
11      Q    Were you the individual on behalf of Piedmont
12  that was communicating with Funding Circle through all
13  of this?
14      A    In reference to this particular document?
15      Q    Yes, in reference to this original agreement.
16      A    Yes.
17      Q    Was there a certain individual at Funding
18  Circle that you spoke to?
19      A    I'm going to tell you I do not remember.
20      Q    Okay.  And prior to the events in this case,
21  so prior to June 2022, and after this agreement was
22  signed, were there any reasons that you had to reach out

Page 22

1  to Funding Circle?
2      A    So before all of this started?
3      Q    Between this time -- so it looks like this was
4  signed in March 2020.  Between then and June 2022, did
5  you have any reason to reach out to Funding Circle?
6      A    Not that I recall.
7      Q    Okay.  Did you seek out any further business
8  loans after you received the one from Funding Circle?
9      A    Did I seek any out?  That's what you said?
10      Q    Yes.  Did you -- on behalf of Piedmont Power
11  Sports did you apply for any other business loan after
12  the one from Funding Circle?
13      A    I cannot sit here and say definitely.  No, I
14  cannot sit here and definitively say yes.  I would think
15  more than likely there was.  This was the period of
16  time -- you know this was COVID, you know, we were all
17  in the middle of COVID.
18      Q    Did you get a PPE loan during COVID, Piedmont?
19      A    Piedmont got a PPE loan during COVID, yes.
20      Q    Did that loan end up getting forgiven?
21      A    Yes, sir.
22      Q    How much was the PPE loan that Piedmont

Page 23

1  received?
2      A    I knew you were going to ask me.  I don't
3  remember.  I really don't remember off the top of my
4  head.
5      Q    Do you have a ballpark?
6      A    I want to say it was in the 125, 150 range.
7      Q    Okay.
8      A    COVID impacted us much differently than it did
9  others.
10      Q    It's understandable.
11          (Rickett Exhibit Number 2 marked for
12          identification.)
13  BY MR. ROBERTSON:
14      Q    I'm going to show you a document that we have
15  marked as Plaintiff's Exhibit 2.  Give me a second to
16  share it.
17          Do you see this document?
18      A    I do see it, yes.
19      Q    Do you know what Splash Advance is?
20      A    I never heard of them, I don't believe.  I
21  have no idea who they are.  I will just answer your
22  question, sorry.

Page 24

1      Q    Okay.  Do you recall filling out an
2  application for a loan from Splash Advance?
3      A    I do not.
4      Q    Do you know if any other employee of Piedmont
5  filled one out on behalf of Piedmont?
6      A    I do not.
7      Q    The date on this is October 12, 2021.  Do you
8  know whether you were seeking -- whether Piedmont was
9  seeking another loan around that time?
10      A    I do not.  I've never done business with a --
11  can you -- I'm sorry, you scrolled down and I can't read
12  the top.
13          I've never done business with Splash Advance.
14      Q    Give me one minute.  I am seeing if I can do
15  two things at once.  I am not the best with Zoom.  I am
16  seeing what I can do here.
17          Well, it's still sharing this.  I can sort of
18  flip back between these two.  Does it look like the same
19  general -- let me see if I can get it.
20          I'm just asking you to look at the signature
21  there and the signature here.  It decided it wants to be
22  difficult for me.

Jack L. Rickett, Jr.

Page 25

1  So does that look like your signature here on
2  the Splash Advance?
3      A   I mean, that's not my signature.  It doesn't
4  look like my signature.  I mean, it reads the same way
5  that the other one does, which is J. Rickett.
6      Q   Let me see if I can open it back up again.
7      Do you believe that this application for a
8  loan is fraudulent?
9      MS. EUBANKS:  Objection; calls for
10  speculation.
11      MR. ROBERTSON:  I am just asking what he
12  believes.
13  BY MR. ROBERTSON:
14      Q   You can answer.
15      A   Yeah.  I -- I really don't know how to answer
16  that.  Do I believe that it's fraudulent?  No.  Do I
17  recall doing it?  No.
18      Q   So you cannot say whether or not you sent out
19  this application?
20      A   I cannot say that.  I mean, one of the reasons
21  why we are on the call today is fraud.  The things that
22  I believed before last June are quite different than

Page 26

1  what I believe today.
2      Q   Do you want to explain that?
3      A   I would never believe that the depth of fraud
4  would go as we've seen.  It would never have believed --
5  again, I live in a town of 5,000 people.  I sell to
6  farmers who raise cows.
7      Q   Can you tell me, what is the company Samson
8  MCA in relation to Piedmont Power Sports?
9      A   That was a company that I did a business loan
10  with.
11      Q   Do you know when you received a business loan?
12      A   I do not remember.
13      Q   Do you recall around when you secured that
14  loan?
15      A   I do not.
16      Q   Was that before or after Funding Circle?
17      A   The Funding Circle -- the one you just showed
18  me, that was after.
19      Q   The Exhibit 1, the first one I showed you?
20      A   Yes.
21      Q   So the Funding Circle one was after or you are
22  saying the Samson one was after that one?

Page 27

1      A   The Samson one was after.
2      Q   Do you recall how much money Piedmont received
3  from Samson MCA?
4      A   I do not.
5      Q   Was it over 100,000?
6      A   If it was, it was either just under or just
7  over, if I were to guess.
8      Q   Okay.  But around 100,000; is that correct?
9      A   Again, I really don't -- I really don't
10  remember.
11      Q   Okay.  How much were you making in payments on
12  that loan -- or was Piedmont making?
13      A   I don't recall.  I just remember -- I remember
14  the rate being high at that particular time.  Both of
15  those were COVID driven and the rates were high.  That
16  is what I remember about them.
17      Q   So we're just looking at Exhibit 1 again.  It
18  looks like this loan had an interest rate of around 20
19  percent, APR almost 23 percent.  Is that what you are
20  talking about, about it being high?
21      A   Yes, sir.
22      Q   Was the Samson MCA loan, was it similar?  I am

Page 28

1  not asking if it was exactly the same, but a similar
2  percentage.
3      A   I would definitely say that it was in that
4  general area.  I just remember both of those being
5  higher than, you know, what I was comfortable with at
6  the time.
7      Q   Prior to the events of this case, so prior to
8  June of 2022, did Piedmont ever attempt to refinance
9  either of those loans, the one with Samson or the one
10  with Funding Circle?
11      A   Prior to Mr. Snyder contacting me?  That is
12  what you meant?
13      Q   Yes.
14      A   I did not.
15      Q   Do you know an Eric Schaeffer?
16      A   The only reason I know his name is through all
17  of this legal situation we are all in.  I do not know
18  him.  I never heard of him prior to all of this
19  starting.
20      (Rickett Exhibit Number 3 marked for
21      identification.)
22  BY MR. ROBERTSON:

Page 29

1    Q   I'm showing you what has been marked as
2 Plaintiff's Exhibit 3.  Do you recognize this document?
3    A   I do not.
4    Q   So you did not sign here at the bottom?
5    A   I don't recognize the document at all.
6 It doesn't look -- I mean, the first thing that jumps
7 out at me is the email address, info@piedmont.  Piedmont
8 Sports.  Yeah, never -- I never heard of that.
9    Q   Are these correct phone numbers?
10    A   Phone numbers -- the phone numbers -- I
11 believe it says 614, yeah.  I've never been affiliated
12 with that.
13    Q   Is the date of birth and SSI correct?
14    A   Date of birth is correct.
15    Q   Home address, is that correct?
16    A   Home address, that is correct.
17    Q   It says here, business ownership, 90 percent
18 as of, it looks like, June 7, 2022.  Did you own 90
19 percent of the business or 100?
20    A   100.
21    Q   Is it safe to say that you did not fill out
22 this application?

Page 30

1    A   All I can tell you is that I never seen this
2 application before, so I would -- you know, like the
3 other one that you showed me, I have never seen that one
4 before.  I've never heard of a Schaeffer, like the other
5 one.  I've never heard of them.
6    Q   Okay.  When did you first communicate with the
7 individual calling themselves Jeremy Snyder?
8    A   I would have to -- I'm sorry.
9        THE WITNESS:  Lindsay, are you chiming in?
10        MS. EUBANKS:  No.
11    A   I want to believe he reached out mid to the
12 end of May.
13 BY MR. ROBERTSON:
14    Q   Did he reach out by phone or by email?
15    A   Email.
16    Q   What did he say to you in the first message?
17    A   My company is eligible, you know, based on
18 payment history to refinance at a lower rate.
19        MR. ROBERTSON:  Lindsay, just as an aside, the
20 earliest email we have from Snyder is June 8th, so any
21 prior ones, if you can just produce those.
22        MS. EUBANKS:  Okay.

Page 31

1 BY MR. ROBERTSON:
2    Q   So he reached out first?
3    A   I'm sorry?
4    Q   So Mr. Snyder reached out to you first?
5    A   Yes, sir.
6    Q   And did he have the full offer of what the
7 refinance would look like in that email to you?
8    A   As I recall, it was very generic, you know, up
9 to a certain dollar amount, and it had a range, an
10 interest rate range of, I want to say, four to nine or
11 four to ten percent, as I recall.
12    Q   So that interest rate, it sounds like the
13 range was much lower than what you were paying before?
14    A   Yes, sir.
15    Q   Okay.  Did you respond to that email?
16    A   Yes, I did.
17    Q   What did you say in the email?
18    A   I want to say it was roughly -- you know,
19 interested, you know, in the offer, what steps are
20 necessary to get a formal offer.
21    Q   And how did he respond or did he respond to
22 your email?

Page 32

1    A   He responded to the email, started requesting
2 some documents -- requested some documents.  I believe
3 there were three requests -- two or three requests.  Two
4 or three requests, and I sent them.
5    Q   Okay.  What documents was it that you sent?
6    A   I want to say tax returns, credit card.  I
7 think it was a credit card transaction sheet.
8    Q   Who is your credit card carrier?  What bank do
9 you have your credit card from?
10    A   It's not a bank.  It's a provider.  I don't
11 recall the name right off the top of my head.  I want to
12 say it's Card Point, maybe.  I would have to look.
13    Q   I think I saw something previously, Decision
14 Point.  That's not it, is it?  I think that's a
15 different bank.
16    A   I could -- I mean, I really don't remember off
17 the top of my head.  I know -- I know we got it in all
18 the documents, and I know your client knows.  I mean,
19 those accounts were locked up for months cycling money.
20    Q   Was that part of the New York litigation?
21    A   Yes, it was.
22    Q   And with Mr. Snyder, do you recall about how

Jack L. Rickett, Jr.

Page 33

1 many emails you exchanged with him prior to getting an
2 offer?
3     A   Less than a dozen.
4     Q   During that time period, did you also speak
5 with him on the phone?
6     A   I did.
7     Q   Do you know about how many times you spoke to
8 him on the phone?
9     A   I would put the interaction in the same
10 category, you know, dozen, plus or minus.
11     Q   Okay.  And you were also texting with him
12 during that time period?
13     A   I believe so.  But I looked, and I was trying
14 to find some of the text messages, and I couldn't find
15 them.  So I'm not sure.  It might have just been emails
16 and phone calls.  I really struggle to recall on that
17 one.
18     Q   You can talk to your lawyer about that
19 afterwards.  We will deal with the text messages later.
20         (Rickett Exhibit Number 4 marked for
21         identification.)
22 BY MR. ROBERTSON:

Page 34

1     Q   Let me show you Exhibit 4.  What I'm showing
2 you here -- I am showing you an email here.  Is this an
3 email that you received?
4     A   This is an email -- it looks like the email I
5 received, yes.
6     Q   Is this the first offer you received from
7 Mr. Snyder?
8     A   This was the offer, yes.
9     Q   It looks like they're offering you a loan with
10 4.29 percent.  So that's much lower than what you
11 previously had with them; is that right?
12     A   Absolutely.
13     Q   Did that strike you as suspiciously low?
14     A   Not suspiciously low.  You know, the original
15 one -- the original one, as I alluded to earlier, was
16 during COVID.  I felt a little frustrated as a small
17 business owner that some of these banks and financial
18 institutions were taking advantage of, you know, small
19 business.  Basically, we're in a rock and a hard place.
20         Now, at this time, we were starting to kind of
21 see the light at the end of the tunnel, per se, and they
22 were like, okay, this guy has excellent pay history.

Page 35

1 That's what I remember thinking.
2     Q   So what did Mr. Snyder, when he reached out to
3 you, why did he say he was offering refinancing or that
4 Funding Circle was offering refinancing?
5     A   Why were they doing it?
6     Q   Yes.
7     A   Based on the history I had built with them.
8         And it has here at the bottom listed four
9 different documents -- or tasks that they need you to
10 take care of.  Do you recall, are these documents that
11 you provided or -- it looks like also providing a bank
12 verification link.
13     A   Correct.
14         MR. ROBERTSON:  Let's take a quick five-minute
15 break before I move into the next document.  Come back
16 at 11:13.
17         (Rickett Exhibit Number 5 marked for
18         identification.)
19 BY MR. ROBERTSON:
20     Q   Let me show you what is marked as Plaintiff's
21 Exhibit 5.  Do you recognize this document?
22     A   No.

Page 36

1     Q   Did you see it before the litigation in this
2 case?
3     A   I did not.
4     Q   Again, I see that there was -- it looks like
5 it says, Jackie Rickett under the initials.  And here at
6 the bottom, did you sign this agreement?
7     A   I did not sign this agreement.  I don't
8 remember seeing this agreement.  So I -- no, I did not
9 sign any of this.
10     Q   Okay.  When did you first hear about my
11 client, LCF Group?
12     A   A withdrawal was done on the bank account.  I
13 want to say it was on -- I want to say it was like the
14 13th or the 14th of June.  I asked a person I work with,
15 Cyndi, to figure out where that came from, where did
16 that draw come from.  And she did some research, and
17 that was the name that came up.  That's the first I had
18 heard of it.
19     Q   So is there -- for the withdrawal, did it say
20 who had withdrawn that amount?
21     A   I don't recall that it said that in the bank
22 transaction.  I believe we had to call the bank and get

Jack L. Rickett, Jr.                    5/31/2023

Page 37

1  a phone number from the bank and reach out to the
2  director.
3      Q    And so did you speak with -- you or Cyndi --
4  well, which one of you spoke with LCF?
5      A    The original conversation was Cyndi.  She got
6  the number from the bank and called directly and had a
7  conversation.  I don't remember who she spoke with
8  directly.  I believe it's in her notes who the original
9  conversation -- who the conversation was with.
10     Q    Just for the court reporter's benefit, how do
11  you spell Cyndi's name, first name?
12     A    C-Y-N-D-I.
13     Q    What is her last name?
14     A    Smith.
15     Q    Okay.  So did Cyndi speak with LCF Group that
16  same day that the withdrawal came out of the account?
17     A    I believe it was that Monday.  Yes, that was
18  in her notes.  I believe it was the 13th or 14th, at the
19  latest.
20     Q    Whichever was --
21     A    It was either a Monday or a Tuesday.
22     Q    Okay.

Page 38

1      A    It's referenced in her notes.
2      Q    Okay.  It looks like June 13, 2022 was a
3  Monday, and then the 14th was that Tuesday.  So one of
4  those days?
5      A    Yes, sir.
6          (Rickett Exhibit Number 6 marked for
7          identification.)
8  BY MR. ROBERTSON:
9      Q    I'm going to show you what has been marked as
10  Plaintiff's Exhibit 6.  Do you recognize this document?
11     A    That looks like the offer that you had showed
12  me earlier.
13     Q    The one I showed you earlier was the one from
14  2020.  Is this the one that you received in June 2022 I
15  believe you had showed me this just a moment ago,
16  because you had asked me about the interest rate and you
17  wanted to know if I -- asked if I thought that that
18  was odd, that it was too low.
19     Q    I'm just bringing -- I'm bringing up Exhibit 4
20  now.  I think this is what we were looking at before; is
21  that right?
22     A    Yes.  I'm sorry, yeah.  It looked the same to

Page 39

1  me.
2      Q    But this exhibit, what we've marked as
3  Exhibit 6, is this the, I guess, formal offer that you
4  received from Jeremy Snyder?
5      A    A formal offer, yes.
6      Q    It says here the lender is Legend Trading LCF
7  Group.  Is that the first time you had heard of either
8  of those entities -- or it looks like they are putting
9  it as one entity.  Is that the first time you heard
10  those names?
11     A    I didn't hear those names until after that
12  Monday, like I said before.
13     Q    Did you review this information when
14  Mr. Snyder sent it over to you?
15     A    I had the other one that you had shown.  I
16  don't remember seeing this and referencing anything to
17  do with, like, what you had pointed out.
18     Q    Did you sign a new business loan and security
19  agreement as part of the refinancing?
20     A    Did I sign one?
21     Q    Yes.
22     A    Yes, I believe I did, yes.

Page 40

1      Q    Is this a copy of that agreement, to the best
2  of your knowledge?
3      A    I really couldn't tell you.  I know I took the
4  agreement, and I have, you know, given to everybody on
5  the call, including your client, what I had signed.
6      Q    Do you recall E signing this agreement?
7      A    I don't recall E signing it, no.
8      Q    Do you have any reason to doubt that you E
9  signed this agreement?
10     A    I do not.
11     Q    Do you recall signing this agreement or an
12  agreement on or about June 9, 2022?
13     A    I do not recall.  The agreement I had in my
14  possession is the one that I have, you know, given.
15     Q    Okay.  And so this was a document that you or
16  Piedmont Power Sports produced.  So this -- is it your
17  understanding that this is the agreement you signed, the
18  one that was produced to us?
19     A    If it is the one I gave, that is the one I
20  signed.
21     Q    Okay.  Is this your handwriting?
22     A    It is not.

Page 41

1   Q   Do you recognize it as Cyndi's handwriting?

2   A   If I were to guess or speculate, that is what

3   I would say.

4   Q   And so is it your understanding the wire for

5   207,000 was sent on June 13th?

6   A   Correct.

7   Q   So prior to signing this agreement, did you

8   Google or look into Legend Trading or LCF Group?

9   A   I never heard of them.

10   Q   So at the time, did you ask Mr. Snyder why you

11   had to make a transfer of 207,000, rather than them just

12   retaining it to pay off the loan?

13   A   I did.  But I believe the response was -- this

14   is -- I believe it's in an email.  I believe the

15   response was it made it easier for their accounting

16   department to give credit for my loan being paid off,

17   something to do with the accounting side, as I recall.

18   Q   Did that explanation make sense to you at the

19   time?

20   A   It made sense to me.  It seemed odd, but it

21   made sense to me.

22   Q   It looks like this one has an origination fee

Page 42

1   $429.  Is that what you recall?

2   A   Yeah.  I'm going to say I don't recall reading

3   the origination fee, but that is what it says.

4       (Rickett Exhibit Number 7 marked for

5       identification.)

6   BY MR. ROBERTSON:

7   Q   Let me show you what has been marked as

8   Plaintiff's Exhibit 7.

9       Are these photos that you sent to Mr. Snyder,

10   the individual calling himself Mr. Snyder, on June 10th?

11   A   I did.

12   Q   And I know there is different copies of these

13   photos where it looks like different things are written

14   on the cards.  Are these, to your knowledge, the

15   original photos taken?

16   A   This was the original, the first one.  I did

17   it in my garage.  That's my garage in the back.  It had

18   a little Post-It note with my name, you know, company

19   name and the address.  I had a Sharpie in my garage.  I

20   remember that one.  And then --

21   Q   Is this the second one?

22   A   -- I had an email from him saying I needed to

Page 43

1   be on a bigger piece of paper.  So basically, just got a

2   whole piece of paper and did the same thing over.

3   Q   Did he tell you why he needed that?

4   A   Something about the compliance officer.  I

5   believe that's also in an email.  The compliance

6   officer -- because it was a smaller piece of paper, it

7   was like rounded or it didn't -- it wasn't all the way

8   out and I guess you couldn't see it.

9   Q   Did you have to do that the last time you got

10   a loan from Funding Circle?

11   A   I did not.

12   Q   Did it strike you as odd?

13   A   Actually it did not.

14   Q   So from May to June 2022, we'll just say until

15   June 10, 2022, did you speak to any other employees of

16   Funding Circle, other than the individual calling

17   himself Jeremy Snyder?

18   A   Well, I ended up speaking to customer service

19   at Funding Circle, but that was after the fact, after

20   everything occurred.  Prior to that, it was just Jeremy

21   Snyder.  I think I listed the names, you know, how they

22   were getting indications from people of fraud and so

Page 44

1   forth.

2   Q   Okay.  So did Piedmont Power Sports receive a

3   deposit into its account of funds that were believed to

4   be from a loan refinancing?

5   A   Right.  We received the -- right.  We received

6   the deposit, which I believe was from Funding Circle,

7   correct?

8   Q   So that was in the amount of $349,570?

9   A   Yes.

10   Q   Do you recall when the deposit was received?

11   A   I want to say it was late afternoon, on the

12   10th of June.  I believe was a Friday.

13   Q   Did you happen to see the bank records showing

14   that the loan had been deposited?  Did you receive an

15   email with the record of just that deposit?

16   A   I don't recall.  Well, I don't get emails when

17   we do deposits.  That doesn't occur.

18       I don't -- I believe it was pretty late in the

19   day.  It was a Friday.  I don't remember checking before

20   I left.  It wasn't until Monday morning.

21   Q   Before you left the office on June 10th, were

22   you able to at least confirm that the money had been

**Jack L. Rickett, Jr.**

Page 45

1  received?

2      A   That's what I just said.  I don't recall

3  checking the actual bank account.  I know I received an

4  email from him that the funding from Mr. Snyder -- that

5  the funding was in process.

6      Q   And "him" you mean Jeremy Snyder?

7      A   Yes.  I hate calling him mister.

8      Q   I know.  I know.

9      A   Anyway.

10     Q   Well, if it -- so do you have a record of the

11  deposit now?  Is there a record of that money being

12  deposited into Piedmont's bank account?

13     A   I'm sure there is.  Anyway, yes.

14     MR. ROBERTSON:  Lindsay, we have not received

15  a copy of that.  So if we can get copy of the record

16  showing the deposit.

17     MS. EUBANKS:  I don't know what you are asking

18  for.  I know you guys produced to us all of his bank

19  records showing all the deposits and withdrawals.  Is

20  that what you're looking for, the bank statement?

21     MR. ROBERTSON:  It looks like those are bank

22  records.  I will go through and make sure, and we will

Page 46

1  deal with it later.

2  BY MR. ROBERTSON:

3      Q   Around the same time we are talking, early to

4  mid June of 2022, did you request a loan payoff letter

5  from Samson MCA?

6      A   I did.

7         (Rickett Exhibit Number 11 marked for

8         identification.)

9  BY MR. ROBERTSON:

10     Q   I'm showing you what has been marked as

11  Plaintiff's Exhibit 11.

12        Do you recall when you requested that payoff

13  letter?

14     A   I do not.

15     Q   This is Plaintiff's Exhibit 11.  Do you

16  recognize this document?

17     A   That looks like the -- what you said.  That is

18  the balance.

19     Q   So Samson MCA, it looks like -- it says the

20  contract was dated October 27, 2021.  Does that refresh

21  your recollection on when you entered into that

22  contract?

Page 47

1      A   I mean, it doesn't refresh, you know, my

2  recollection, but I would assume the date is correct.

3      Q   Do you have any reason to believe that it was

4  a different date that you entered into that or that

5  Piedmont entered into the contract with Samson?

6      A   Do I have any reason to believe differently?

7  No.

8      Q   Okay.

9         (Rickett Exhibit Number 12 marked for

10        identification.)

11  BY MR. ROBERTSON:

12     Q   I'm showing you what has been marked as

13  Plaintiff's Exhibit 12.  It looks like this is a record

14  of a wire transfer from Piedmont Power Sports to Samson

15  MCA.

16        Do you recognize this transaction?

17     A   Yes.  It looks like the wire transfer that I

18  did to pay off -- pay off that loan, get that lower

19  rate.

20     Q   So that was paying off the balance of the loan

21  with Samson, that 88,341.37; is that right?

22     A   Correct.

Page 48

1      Q   Did you request and approve this wire

2  transfer?

3      A   I did.

4      Q   And at the time, did you also intend to use

5  the refinancing proceeds to pay off the remainder of the

6  prior loan with Funding Circle?

7      A   That's what the loan was for, correct.

8      Q   And did Mr. Snyder or the individual calling

9  himself Mr. Snyder provide you with this payoff letter

10  for the loan?

11     A   I'm sure he did.  It should be in the email.

12     Q   So it contained ACH or just wire instructions.

13  It said that the account beneficiaries is Legend

14  Trading, Inc.  Did you look at these instructions at

15  that time?

16     A   I looked at the instructions.  I'm going to

17  say it didn't -- that didn't jump out at me.  I saw the

18  Funding Circle at the top.  I saw the correct amount,

19  and then the information seemed correct.  That's what I

20  remember.

21     Q   Did you at the time look into what Legend

22  Trading, Inc. was?

Page 49

1    A   Have I looked in to see what Legend Trading --
2  who they are?
3    Q   Well, did you at the time?
4    A   No.  At this point, I still had no idea.  I
5  hadn't even -- again, I had no idea who Legend Trading
6  was.  I saw the Funding Circle and I moved forward.
7        (Rickett Exhibit Number 9 marked for
8        identification.)
9  BY MR. ROBERTSON:
10   Q   I'm going to show you what is marked as
11 Plaintiff's Exhibit 9.
12       Do you recognize this document?
13   A   It looks like the wire transfer, you know, to
14 pay off the loan.  The numbers match, the 207216.
15   Q   And did you request and approve this wire
16 transfer on June 13th?
17   A   If the wire -- if that's -- if that's the one,
18 I approved it.
19   Q   And that was for 207,216.21?
20   A   Yes, sir.
21   Q   And the beneficiary was Legend Trading, Inc.;
22 is that true?

Page 50

1    A   Yes.
2    Q   Did you fill out the wire transfer request?
3    A   I took the paper that I received, that you
4  showed me earlier, I took it to the bank.  They typed it
5  in, and we did the wire transfer.
6    Q   When they do that, they will usually show you
7  the screen after they type everything in and just say,
8  is this correct.  Did that happen at that time?
9    A   I don't remember them showing me a screen, by
10 any means.  I handed them the Funding Circle documents
11 and the Samson documents with the payoff and the wire
12 instructions.  I handed it to them, and they did it.
13       (Rickett Exhibit Number 8 marked for
14       identification.)
15 BY MR. ROBERTSON:
16   Q   I'm showing you what is marked as Plaintiff's
17 Exhibit 8.  Do you recognize this document?
18   A   I don't recall ever seeing this document.
19   Q   This is something that you guys produced to
20 us.  I think the request was sent to you, so something
21 that was produced to us.  Do you know who Ellen Taylor
22 is?

Page 51

1    A   I do not.
2    Q   So Ellen Taylor, that's not one of your
3  employees?
4    A   That's not one of my employees.
5    Q   So it looks like -- the debit account number
6  that the wire transfer went from, did that end in 4682?
7  Is that your bank account?
8    A   Yeah.  I mean, without seeing the full -- my
9  bank account ends in the number that, you know, we had
10 discussed before, which I believe is 4682.
11       MS. EUBANKS:  I'd like you to be more specific
12 when you use the term "your."
13       MR. ROBERTSON:  Yes.  Yes.  I've been trying
14 to remember.
15 BY MR. ROBERTSON:
16   Q   So you're not aware of who is receiving this
17 email, who Ellen Taylor is or why; is that right?
18   A   I don't recall ever receiving this email, and
19 I don't recall knowing or understanding who an Ellen
20 Taylor is.  I'm not seeing where it's coming from.  It
21 says, WPI.  I don't know what that is.
22   Q   Okay.  So when did you first begin to be

Page 52

1  suspicious of the situation?
2    A   When we had the withdrawal on the account on
3  that Monday.  And then I had Cyndi, you know, basically
4  doing what I call the leg work.  We found out, you know,
5  the name LCF, and she ended up calling and, you know,
6  ended up getting the story, well, you know, we're the
7  ones that you just signed a loan with.
8        And you know, she was telling them, you know,
9  we've never heard of you.
10       So we started to get suspicious.  I send
11 Jeremy an email.  He responded back.  This is one of
12 his -- I can't remember exactly how he -- what he
13 called -- one of our lending partners, I believe, was
14 his reference.
15       And then, you know, by that time the red flags
16 in my head had gone off, and I contacted the bank trying
17 to rescind -- stop the wire transfers, went there,
18 called, emailed, trying to do everything we could, you
19 know, to stop it from occurring.
20   Q   So did you call Jeremy Snyder after you spoke
21 with LCF or Cyndi spoke with LCF?
22   A   I don't recall calling him.  I recall trying

Page 53

1  to get a hold of someone, ended up, you know, speaking
2  to an individual -- I believe it was Oscar, maybe -- you
3  know, trying to get some confirmation of who was who and
4  who worked for what company.
5      And then I ended up sending him an email, and
6  that's when he responded back that that was -- Funding
7  Circle had lending partners, and LCF was one of them.
8  The terms might not be favorable, I believe was the
9  email.  And then after that, the phone -- his phone
10 didn't work after that.
11     (Rickett Exhibit Number 13 marked for
12     identification.)
13 BY MR. ROBERTSON:
14     Q   I'm showing you what is marked as Plaintiff's
15 13.
16     It says this email is from Jackie Rickett.  Is
17 this an email that you sent to LCF Group?
18     A   I don't recall ever emailing the LCF Group,
19 and I don't use Jackie Rickett as an email.  It's
20 jack@piedmontpower.  I don't know of an
21 info@piedmontpowersports.com.  I definitely don't do
22 Outlook.

Page 54

1      Q   So it says, you know, from -- all of these
2  emails that Ms. Lindsay is sending emails to, do you
3  recognize any of those email addresses?
4      A   I do not.
5      Q   To your knowledge, are any of those email
6  addresses associated with Piedmont Power Sports?
7      A   Not that I'm aware of.  I mean, we've never
8  used Outlook.  And everything we had since 2010 is
9  Piedmont Power.  We don't use sports from 2010 on.  I
10 don't remember ever speaking to a Lindsay.
11     (Rickett Exhibit Number 14 marked for
12     identification.)
13 BY MR. ROBERTSON:
14     Q   I'm showing you what is marked as Plaintiff's
15 Exhibit 14.
16     Is this the last email that you had with
17 Mr. Rickett -- I'm sorry, the individual calling himself
18 Jeremy Snyder?
19     A   That looks like the last one.
20     Q   It says:  However, weekly loan with Samson
21 went on notice at the time of our approval, and LCF
22 wanted to reconstructure the 13,148.15 on a weekly

Page 55

1  basis.
2      So did you try and email Jeremy Snyder again
3  after this?
4      A   I believe after I got this one, I called the
5  police.
6      Q   And did you file a police report at the time?
7      A   Yes.  I even reached out to the FBI.  Yeah, at
8  this point, I was in complete, you know, oh, my God
9  mode.
10     Q   You said any calls to Jeremy Snyder after that
11 time no longer worked?
12     A   I don't -- yeah.  As I recall, anything after
13 that like Tuesday or Wednesday, the phone was dead.  A
14 short period of time.
15     Q   And did you get a copy of that police report?
16     A   I'm sure I did.
17     MR. ROBERTSON:  Lindsay, I don't think we
18 received that.  So if you can produce a copy of it, if
19 you have it.
20     MS. EUBANKS:  I will look for it.  I know we
21 sent you an FBI report.
22     MR. ROBERTSON:  I have an FBI letter that we

Page 56

1  are going to look at in a minute.
2  BY MR. ROBERTSON:
3      Q   I think you had testified that you started
4  getting suspicious once you had the withdrawal from the
5  account, your account, for the 13,000; is that right?
6      A   Yes.  I mean, I would definitely say that that
7  threw up a red flag.  I don't think at that particular
8  time I equated it with what was going on until these
9  emails started coming back from, you know, Jeremy, and I
10 was asking him.
11     And then I sent him an email asking him about
12 the withdrawal and did he know anything about it.  I
13 mean, within that couple of three hours, it went from,
14 all right, this is really weird to full on this is a
15 problem.
16     Q   Okay.  So after you received that deposit on
17 Friday, from -- you know, the deposit in the amount of
18 349,000 into Piedmont's account, did you receive a lot
19 of phone calls from Jeremy Snyder, and emails?
20     A   I don't recall, you know, thinking there was
21 an excessive amount of phone calls.  I mean I think the
22 last phone call that I had was him confirming, you know,

Page 57

1  the approval and the process was going through.
2        And then I believe we spoke -- I want to say I
3  believe we spoke on that Monday -- or I emailed him
4  confirming the wire maybe.
5     Q   So is this an email that you wrote -- is this
6  your email, jack@piedmontpower.com?
7     A   Yes. I'm sorry, I was reading and I didn't
8  listen. That's my email -- that's my email address,
9  yes, jack@piedmontpower, yes.
10    Q   You do recall sending out this email on
11 Monday, about 1:00 p.m.?
12    A   Yes. I don't believe that timestamp is
13 correct because I believe the wire was done early in the
14 morning. But I ended up going into the office on that
15 day.
16        I think at this particular point, I had
17 contacted -- you know, we were in the process of
18 contacting the police, and, you know, we were trying to
19 keep them, you know, going, and I was still trying to
20 get the bank to pull it back, as I recall. I think that
21 was that Tuesday. That was the 14th.
22    Q   Okay. Earlier you had said -- I think you had

Page 58

1  testified that after you had received that June 15th
2  email, this one, is when you had called the police. But
3  you had called the police sooner?
4     A   Yes. I would have looked at the police report
5  to know the exact date. I just remember thinking that
6  when I got the -- so Wednesday, the 15th, when I got
7  this email, that's when everything kind of, to me, came
8  full circle of, all right, the bank -- the bank has not
9  been able to pull the wire back.
10        And then I got this email, and it was like --
11 yeah, I mean, just -- I don't even know how to describe
12 the feeling that it -- I was sick.
13        (Rickett Exhibit Number 15 marked for
14        identification.)
15 BY MR. ROBERTSON:
16    Q   I'm showing you what is marked as Plaintiff's
17 Exhibit 15.
18        And so you filed this. It looks like -- is
19 this how you were challenging the withdrawal that came
20 from your account -- from Piedmont Power Sports'
21 account?
22    A   At this particular point, on the 15th, which

Page 59

1  that's the Wednesday, correct? I believe so.
2        At this particular point, I didn't know -- I
3  felt like I didn't know which way was up, who was who,
4  who worked for who, who was doing what. So I just
5  stopped everything out of this banking account and was
6  trying to figure out -- and excuse my French -- what the
7  hell was going on -- at this particular point. So we
8  just stopped everything.
9     Q   So this is your signature here?
10    A   That is.
11        (Rickett Exhibit Number 16 marked for
12        identification.)
13 BY MR. ROBERTSON:
14    Q   I'm showing you what is marked as Plaintiff's
15 Exhibit 16.
16        So this is it, it looks like, a letter from
17 Truist talking about you, Piedmont, trying to stop
18 payment on a wire. Is this your effort to pull back the
19 wire for 207,000?
20    A   I was actually trying -- yes, this is my
21 effort to stop it, yes.
22    Q   Is this your signature here on the second

Page 60

1  page?
2     A   It is.
3     Q   So what was the result of challenging the wire
4  for 207,000?
5     A   What was the result?
6     Q   Yes. Were they able to stop it?
7     A   No. I don't believe we would be here today if
8  they were. Not that you are not a nice guy, but I don't
9  think we would have met.
10    Q   Never nice when you have to talk to a lawyer,
11 I get it.
12        MR. ROBERTSON: Give me -- let's take a quick
13 ten. I may be done. If we could come back at 12:10.
14        (Brief recess held.)
15        (Rickett Exhibit Number 17 marked for
16        identification.)
17 BY MR. ROBERTSON:
18    Q   I'm going to share with you what has been
19 marked as Plaintiff's Exhibit 17. Is this a letter that
20 you received from the FBI?
21    A   Yes.
22    Q   So this is dated September 26, 2022. And did

19 (61 - 64)

**Jack L. Rickett, Jr.**

5/31/2023

Page 61

1  you make a complaint directly to the FBI prior to that?
2      A   I did not make a complaint directly to the
3  FBI. So here in -- well, you're in Virginia. So we
4  have a town and a county. We have a town police and
5  county police. I dealt with the county police. The
6  county police has an FBI relationship. I asked them to
7  reach out to the FBI relationship to, you know, see if
8  they can help. That was in process.
9          And then I got a phone call -- if you could go
10  down so I can recall the gentleman's name. No, that's
11  not the name I recall.
12          I got a phone call from an individual that
13  worked for the FBI out of the Connecticut office. He
14  said that he was exploring a number of cases involving
15  Funding Circle and some of the other pieces that were, I
16  guess, similar in my particular case, and he asked, you
17  know, some questions about what had occurred.
18          So we went through that conversation, and then
19  I ended up receiving a letter. And then I turned all of
20  that information over to my attorney.
21      Q   Did you -- you spoke to him before you
22  received this letter?

Page 62

1      A   I can -- I cannot tell you, one way or the
2  other with 100 percent certainty. I remember he called
3  and he left a voicemail. I called him right back. We
4  had a conversation. I cannot recall if I had gotten the
5  mail before or after.
6      Q   Is that the only time you spoke with the FBI
7  about this?
8      A   That's the only time that I recall. I turned
9  all the information over to my -- to Lindsay, my
10  attorney.
11      Q   Was it your intention, as owner of Piedmont
12  Power Sports, to use the funds from the refinance to pay
13  off your prior Funding Circle loan and this Samson loan?
14      A   That was the reasoning behind doing the
15  refinance, yes.
16          MR. ROBERTSON: I don't have any further
17  questions.
18          MS. EUBANKS: Can you hear me. I would like
19  to ask a couple of questions. I believe they are
20  relevant to Exhibit 7, which is the pictures.
21          MR. ROBERTSON: Do you want me to bring that
22  up for you?

Page 63

1          MS. EUBANKS: Yes, if you can. Yes, that's
2  it.
3          EXAMINATION BY COUNSEL FOR DEFENDANT:
4  BY MS. EUBANKS.
5      Q   Jack, just a couple of questions about these
6  pictures.
7          Did you send the pictures to anybody other
8  than Jeremy Snyder at Funding Circle?
9      A   Just him.
10      Q   How about -- have you seen versions of these
11  pictures that are different?
12      A   Oh, yes, I have. Quite different.
13      Q   How did you come to acknowledge those
14  different pictures?
15      A   The -- his name is Michael Silva. He had sent
16  me one of the pictures that had been doctored and
17  changed and photoshopped. I don't even know what you
18  call it.
19          He had sent that, and then he was the one that
20  alluded to, you know, how everything became, like,
21  crypto -- like crypto currency and so forth. I mean,
22  that's when I -- --

Page 64

1      Q   Who is Michael Silva?
2      A   He works for LCF.
3      Q   And in these pictures, you testified earlier,
4  I believe, that you were asked to make the paper bigger?
5      A   Correct.
6      Q   Did you write anything else on these pieces of
7  paper?
8      A   No. Exactly what the picture showed, which is
9  my name, full name, Jack Rickett, Piedmont Power Sports,
10  Inc., and then the date of 6/10/22, exactly the same on
11  the first as the second.
12          MS. EUBANKS: Can you scroll down to the
13  second?
14          MR. ROBERTSON: Yes.
15  BY MS. EUBANKS:
16      Q   So are these the only two pictures that you
17  took like this?
18      A   It's the only two that I took.
19      Q   And this is the only place you sent those
20  pictures?
21      A   The only place I sent them.
22      Q   Did you -- well, did you ever interact with

Jack L. Rickett, Jr.

Page 65

1   Legend Trading?

2       A    Never interacted with Legend Trading, and did

3   not know the name existed until some of the

4   conversations we were having a little earlier.

5       Q    So you never interacted with Legend Trading on

6   behalf of Piedmont?

7       A    In anything, correct.

8       Q    Or on behalf of yourself.

9            Never sent them an email?  Never phone called

10  them?

11      A    Never sent them an email, never phone called

12  them.  I didn't even know who they were.

13      Q    I'm assuming then -- I'll ask you the

14  question.  Did you ever authorize an account to be

15  opened with Legend Trading?

16      A    No.

17           MS. EUBANKS:  No further questions.

18      FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF:

19  BY MR. ROBERTSON:

20      Q    I just have one question based on what Lindsay

21  was asking you.

22           So you said you had no interaction with legend

Page 66

1   Trading.  By that, do you mean communications with them?

2       A    Correct, communications, interactions,

3   anything at all.

4       Q    But you testified earlier that you requested

5   and authorized the wire transfer that went to legend

6   Trading; is that right?

7       A    I completely believed that that interaction

8   was with Funding Circle, that it was not with Legend

9   Trading.  I still at that point had no idea who it was.

10           MR. ROBERTSON:  I don't have any more

11  questions for now.

12           Lindsay, I will assert our right to leave this

13  open, only to the extent of the additional documents we

14  talked about.  I think there was the potential Snyder

15  texts and emails with Mr. Snyder from prior to June 8th.

16           And I will look if we have it, but the

17  deposit, a record of the deposit, I didn't see that when

18  I was going through the records in preparation for this.

19  But, you know, I will look through again and make sure

20  it's not something we have.  And if not, include that in

21  the list of things that we're just leaving open

22  potentially.

Page 67

1            I don't think we will need to do it again, but

2   I just want to --

3            MS. EUBANKS:  I assume you mean just the bank

4   statement?

5            MR. ROBERTSON:  Yes.  I mean, it will just

6   usually have some sort of -- like, the wire transfers --

7   some sort of transaction.

8            MS. EUBANKS:  I will confer with my client and

9   let you know.  I will say that I did go back through.

10  We have emails from prior to June 8th.  I don't know if

11  I saw them go back to May.  But I did see some from

12  prior to June 8th, that we've already produced.  But

13  I'll make sure there is nothing missing.

14           MR. ROBERTSON:  I think it was June 7th, the

15  earliest we have.  I will look again, but I did not see

16  anything before that.

17           For the court reporter and Lindsay, I'll go

18  ahead and email a copy of the exhibits.  I can do a link

19  where you can download the exhibits for the day.

20           COURT REPORTER:  Did you want to order the

21  transcript?

22           MR. ROBERTSON:  Yes.

Page 68

1            MS. EUBANKS:  Yes, please.  And we can read

2   and sign.

3            (Thereupon, at 12:30 p.m., the deposition

4            concluded)

**Jack L. Rickett, Jr.**

Page 69

1 ERRATA SHEET.

2 Job No. 95893

3 Case Caption: LCF GROUP vs. PIEDMONT POWER SPORTS

4 Deposition Date: Wednesday, May 31, 2023

5     DECLARATION UNDER PENALTY OF PERJURY

6     I declare under penalty of perjury that I have

7 read the entire transcript of my Deposition taken in the

8 captioned matter or the same has been read to me, and

9 the same is true and accurate, save and except for

10 changes and/or corrections, if any, as indicated by me

11 on the DEPOSITION ERRATA SHEET, hereof, with the

12 understanding that I offer these changes as if still

13 under oath.

14     Signed on the ___ day of_____, 20____.

15

16     _____

17     Subscribed to and sworn before me this ___ day

18 of _____, 20__, in _____.

19 _____

20 Notary Public

21 My commission expires: July 31, 2022.

22

Page 70

1 Notary Public Registration No 703972

2     DEPOSITION ERRATA SHEET

3     Page No._____Line No._____Change

4 to:_____

5

6 Reason for change:_____

7 Page No._____Line No._____Change to:_____

8

9 Reason for change:_____

10 Page No._____Line No._____Change to:_____

11

12 Reason for change:_____

13 Page No._____Line No._____Change to:_____

14

15 Reason for change:_____

16 Page No._____Line No._____Change to:_____

17

18 Reason for change:_____

19 Page No._____Line No._____Change to:_____

20

21 Reason for change:_____

22 SIGNATURE:_____DATE:_____

Page 71

1

2     DEPOSITION ERRATA SHEET

3 Page No._____Line No._____Change to:_____

4 _____

5 Reason for change:_____

6 Page No._____Line No._____Change to:_____

7 _____

8 Reason for change:_____

9 Page No._____Line No._____Change to:_____

10 _____

11 Reason for change:_____

12 Page No._____Line No._____Change to:_____

13 _____

14 Reason for change:_____

15 Page No._____Line No._____Change to:_____

16 _____

17 Reason for change:_____

18 Page No._____Line No._____Change to:_____

19 _____

20 Reason for change:_____

21 SIGNATURE:_____DATE:_____ 24

22

Page 72

1     CERTIFICATE OF NOTARY PUBLIC

2     I, Janie Arriaga, Court Reporter, before

3 whom the foregoing deposition was taken, do hereby

4 certify that the witness whose testimony appears in

5 the foregoing deposition, was duly sworn by me; that

6 the testimony of said witness was taken by me

7 stenographically, and that I, thereafter, reduced it

8 to typewriting; that said deposition is a true

9 record of the testimony given by said witness; that

10 I am neither counsel for, related to, nor employed

11 by any of the parties to the action in which this

12 deposition was taken; and further, that I am not a

13 relative or employee of any attorney or counsel

14 employed by the parties thereto; nor financially or

15 otherwise interested in the outcome of the action.

16 _____

17 Janie Arriaga

18 Notary Public in and for the

19 Commonwealth of Virginia

20

21

22

1

Jack L. Rickett, Jr.

5/31/2023

### WORD INDEX

**< $ >**
**$349,570** 44:8
**$429** 42:1

**< 1 >**
**1** 3:9 19:22 20:1
26:19 27:17
**1:00** 57:11
**10** 43:15
**10:00** 1:14
**100** 9:18 10:1, 22
29:19, 20 62:2
**100,000** 27:5, 8
**10th** 42:10 44:12,
21
**11** 3:16 46:7, 11,
15
**11:13** 35:16
**111** 2:12
**12** 3:17 24:7
47:9, 13
**12:10** 60:13
**12:30** 68:3
**125** 23:6
**13** 3:20 38:2
53:11, 15
**13,000** 56:5
**13,148.15** 54:22
**13th** 36:14 37:18
41:5 49:16
**14** 3:21 54:11, 15
**14th** 36:14 37:18
38:3 57:21
**15** 4:2 58:13, 17
**150** 23:6
**15th** 58:1, 6, 22
**16** 4:3 59:11, 15
**17** 4:4 60:15, 19
**17,970** 19:11

**< 2 >**
**2** 3:10 23:11, 15
**20** 3:9 17:20

**27**:18 69:14, 18
**2000s** 12:11
**2004** 12:6
**2006** 11:17, 20
**2010** 54:8, 9
**2011** 12:20
**2018** 17:21
**2020** 18:19 22:4
38:14
**2021** 24:7 46:20
**2022** 9:13, 18
10:1 12:21 14:15
15:8 21:21 22:4
28:8 29:18 38:2,
14 40:12 43:14,
15 46:4 60:22
69:21
**2023** 1:9 69:4
**207,000** 41:5, 11
59:19 60:4
**207,216.21** 49:19
**207216** 49:14
**22030** 2:6
**23** 3:10 27:19
**23218** 2:14
**24** 71:21
**2400** 2:13
**26** 60:22
**27** 46:20
**28** 3:11

**< 3 >**
**3** 3:11 28:20
29:2
**3:22-cv-57** 1:5
**31** 1:9 69:4, 21
**33** 3:12
**349,000** 56:18
**35** 3:13
**38** 3:14
**3970** 2:5

**< 4 >**
**4** 3:12 33:20
34:1 38:19

**4.29** 34:10
**42** 3:15
**46** 3:16
**4682** 51:6, 10
**47** 3:17
**49** 3:18 9:7, 22

**< 5 >**
**5** 3:4, 13 35:17,
21
**5,000** 26:5
**50** 3:19
**51** 9:4
**53** 3:20
**54** 3:21
**58** 4:2
**59** 4:3

**< 6 >**
**6** 3:14 38:6, 10
39:3
**6/10/22** 64:10
**60** 4:4
**614** 29:11
**63** 3:5
**65** 3:6

**< 7 >**
**7** 3:15 29:18
42:4, 8 62:20
**7,946.50** 19:16
**703972** 70:1
**7th** 67:14

**< 8 >**
**8** 3:19 50:13, 17
**88,341.37** 47:21
**8th** 30:20 66:15
67:10, 12

**< 9 >**
**9** 3:18 40:12
49:7, 11
**90** 29:17, 18
**95893** 69:2

**< A >**
**a.m** 1:14
**able** 44:22 58:9
60:6
**Absolutely** 13:3
34:12
**account** 36:12
37:16 44:3 45:3,
12 48:13 51:5, 7,
9 52:2 56:5, 18
58:20, 21 59:5
65:14
**accounting** 41:15,
17
**accounts** 32:19
**accurate** 69:9
**ACH** 48:12
**acknowledge**
63:13
**acting** 11:18
**action** 72:11, 15
**active** 12:10
**actual** 45:3
**addition** 11:18
**additional** 66:13
**address** 29:7, 15,
16 42:19 57:8
**addresses** 54:3, 6
**Advance** 3:10
23:19 24:2, 13
25:2
**advantage** 34:18
**affiliated** 29:11
**afternoon** 44:11
**ago** 20:19 38:15
**agreement** 21:15,
21 36:6, 7, 8
39:19 40:1, 4, 6, 9,
11, 12, 13, 17 41:7
**ahead** 13:22 14:4,
6 67:18
**al** 1:7
**allows** 20:6
**alluded** 34:15
63:20

amount 18:*14*
19:*16* 31:*9* 36:*20*
44:*8* 48:*18* 56:*17,
21*
and/or 69:*10*
Anderson 2:*11*
answer 5:*10* 17:*8,
9*, *12* 23:*21* 25:*14,
15*
answered 17:*6*
anybody 63:*7*
Anyway 45:*9, 13*
apologize 14:*4*
APPEARANCES
2:*1*
appears 72:*4*
application 3:*10*
24:*2* 25:*7, 19*
29:*22* 30:*2*
Applied 10:*18*
12:*3, 8*
A-P-P-L-I-E-D
10:*18*
apply 22:*11*
approach 18:*22*
approval 54:*21*
57:*1*
approve 48:*1*
49:*15*
approved 49:*18*
approximately
1:*14*
APR 27:*19*
area 28:*4*
Arriaga 1:*14*
72:*2, 17*
aside 30:*19*
Asked 17:*6*
36:*14* 38:*16, 17*
61:*6, 16* 64:*4*
asking 14:*8, 20*
24:*20* 25:*11* 28:*1*
45:*17* 56:*10, 11*
65:*21*
assert 66:*12*

assets 11:*12*
associated 54:*6*
Associates 2:*4*
assume 47:*2* 67:*3*
assuming 65:*13*
attempt 18:*7* 28:*8*
attorney 6:*22*
61:*20* 62:*10*
72:*13*
ATVs 8:*15*
authorize 65:*14*
authorized 66:*5*
avoid 5:*10*
aware 8:*4* 51:*16*
54:*7*

< B >
back 7:*12* 19:*6*
21:*2* 24:*18* 25:*6*
35:*15* 42:*17*
52:*11* 53:*6* 56:*9*
57:*20* 58:*9* 59:*18*
60:*13* 62:*3* 67:*9,
11*
Balance 3:*16*
46:*18* 47:*20*
ballpark 23:*5*
bank 13:*16* 32:*8,
10*, *15* 35:*11*
36:*12, 21, 22* 37:*1,
6* 44:*13* 45:*3, 12,
18*, *20, 21* 50:*4*
51:*7, 9* 52:*16*
57:*20* 58:*8* 67:*3*
banking 59:*5*
banks 14:*11*
34:*17*
based 16:*18*
30:*17* 35:*7* 65:*20*
basically 6:*8*
11:*8* 14:*18* 34:*19*
43:*1* 52:*3*
basis 55:*1*
behalf 1:*12, 17*
2:*2, 9* 15:*14*

21:*11* 22:*10* 24:*5*
65:*6, 8*
believe 16:*5, 7*
17:*20* 19:*13* 20:*5*
23:*20* 25:*7, 16*
26:*1, 3* 29:*11*
30:*11* 32:*2* 33:*13*
36:*22* 37:*8, 17, 18*
38:*15* 39:*22*
41:*13, 14* 43:*5*
44:*6, 12, 18* 47:*3,
6* 51:*10* 52:*13*
53:*2, 8* 55:*4* 57:*2,
3, 12, 13* 59:*1*
60:*7* 62:*19* 64:*4*
believed 25:*22*
26:*4* 44:*3* 66:*7*
believes 25:*12*
beneficiaries 48:*13*
beneficiary 49:*21*
benefit 37:*10*
best 5:*15* 24:*15*
40:*1*
bigger 43:*1* 64:*4*
birth 29:*13, 14*
bottom 29:*4* 35:*8*
36:*6*
break 5:*13, 16*
35:*15*
Bridge 2:*5*
Brief 60:*14*
bring 62:*21*
bringing 38:*19*
building 16:*15*
built 35:*7*
BUNTING 2:*10*
business 9:*19, 22*
10:*2, 22* 11:*6, 12,
13, 20* 12:*4, 22*
13:*10, 13, 15, 17*
14:*9, 12, 13, 15*
15:*6* 16:*3* 17:*1*
22:*7, 11* 24:*10, 13*
26:*9, 11* 29:*17, 19*
34:*17, 19* 39:*18*

buying 10:*3*

< C >
call 12:*10* 25:*21*
36:*22* 40:*5* 52:*4,
20* 56:*22* 61:*9, 12*
63:*18*
called 1:*12* 11:*6,
7* 37:*6* 52:*13, 18*
55:*4* 58:*2, 3* 62:*2,
3* 65:*9, 11*
calling 8:*1* 30:*7*
42:*10* 43:*16* 45:*7*
48:*8* 52:*5, 22*
54:*17*
calls 25:*9* 33:*16*
55:*10* 56:*19, 21*
capacity 13:*22*
15:*14, 16*
Caption 69:*3*
captioned 69:*8*
card 32:*6, 7, 8, 9,
12*
cards 42:*14*
care 35:*10*
carrier 32:*8*
CASE 1:*4* 6:*7,
10, 11* 7:*5, 14* 9:*9*
21:*20* 28:*7* 36:*2*
61:*16* 69:*3*
cases 7:*8* 61:*14*
catch 17:*10*
category 33:*10*
certain 21:*17*
31:*9*
certainty 62:*2*
CERTIFICATE
72:*1*
certified 1:*15*
certify 72:*4*
Chain 2:*5*
challenge 4:*2*
challenging 58:*19*
60:*3*

change  70:6, 9, 12, 15, 18, 21  71:5, 8, 11, 14, 17, 20
changed  63:17
changes  69:10, 12
Chap  2:4
charge  11:22
Charlottesville  1:2
check  8:7, 9
checking  44:19 45:3
chiming  30:9
Chris  5:8
CHRISTOPHER 2:3
Circle  7:21  15:5, 10  16:4, 8  17:19 18:4, 13, 22  21:9, 12, 18  22:1, 5, 8, 12  26:16, 17, 21 28:10  35:4  43:10, 16, 19  44:6  48:6, 18  49:6  50:10 53:7  58:8  61:15 62:13  63:8  66:8
clarity  15:22
classic  12:14
click  20:16
client  32:18 36:11  40:5  67:8
Come  35:15 36:16  60:13 63:13
comfortable  28:5
coming  51:20 56:9
commission  69:21
Commonwealth 1:16  72:19
communicate  30:6
communicating 21:12
communications 7:13  66:1, 2
companies  14:11 15:2  21:9

company  10:4, 14, 16, 17  11:7, 9, 10 12:9, 12, 16  15:14 26:7, 9  30:17 42:18  53:4
complaint  61:1, 2
complete  55:8
completely  46:7
compliance  43:4, 5
component  13:10
concluded  68:4
confer  67:8
confirm  44:22
confirmation  53:3
confirming  56:22 57:4
confusing  14:7
Connecticut  61:13
considering  13:13
construction 10:16, 17
contacted  19:2, 3 52:16  57:17
contacting  28:11 57:18
contained  48:12
Continued  4:1
contract  12:19 13:11  46:20, 22 47:5
contracting  12:11
contractor  12:14
Contractors 10:18  12:3, 8
conversation  37:5, 7, 9  61:18  62:4
conversations  65:4
copies  42:12
copy  18:12  40:1 45:15  55:15, 18 67:18
correct  15:11 27:8  29:9, 13, 14, 15, 16  35:13  41:6 44:7  47:2, 22 48:7, 18, 19  50:8

57:13  59:1  64:5 65:7  66:2
corrections  69:10
counsel  1:12 4:13  5:5  63:3 65:18  72:10, 13
county  61:4, 5, 6
couple  56:13 62:19  63:5
COURT  1:1  5:3, 11  7:11  19:21 37:10  67:17, 20 72:2
COVID  22:16, 17, 18, 19  23:8  27:15 34:16
cows  26:6
coy  20:18
cr@petersenfirm.c om  2:7
created  11:7, 9
credit  32:6, 7, 8, 9 41:16
crypto  63:21
currency  63:21
customer  6:9 43:18
cycling  32:19
Cyndi  36:15 37:3, 5, 15  52:3, 21
C-Y-N-D-I  37:12
Cyndi's  37:11 41:1

< D >
date  12:5  18:17 24:7  29:13, 14 47:2, 4  58:5 64:10  69:4
dated  46:20 60:22
day  37:16  44:19 57:15  67:19 69:14, 17
days  38:4

day-to-day  11:19 12:7  14:12
dead  55:13
deal  33:19  46:1
dealt  61:5
debit  51:5
decided  10:10 24:21
Decision  32:13
DECLARATION 69:5
declare  69:6
DEFENDANT 63:3
Defendants  1:7 2:9
define  15:13 16:10, 17
defining  14:9
definitely  22:13 28:3  53:21  56:6
definition  14:14
definitively  22:14
department  41:16
deposed  6:2, 17
deposit  44:3, 6, 10, 15  45:11, 16 56:16, 17  66:17
deposited  44:14 45:12
deposition  5:8, 14, 17  6:19, 22  68:3 69:4, 7, 11  70:2 71:2  72:3, 5, 8, 12
deposits  44:17 45:19
depth  26:3
describe  58:11
different  7:14 25:22  32:15  35:9 42:12, 13  47:4 63:11, 12, 14
differently  16:17 23:8  47:6
difficult  12:16

24:22
digits  17:5, 15
directly  37:6, 8
61:1, 2
director  37:2
discussed  51:10
DISTRICT  1:1
Division  1:2
doctored  63:16
document  18:10
21:14  23:14, 17
29:2, 5  35:15, 21
38:10  40:15
46:16  49:12
50:17, 18
documents  7:2, 4,
5  19:5  32:2, 5, 18
35:9, 10  50:10, 11
66:13
doing  25:17  35:5
52:4  59:4  62:14
dollar  31:9
double  17:4, 15
doubt  40:8
download  67:19
dozen  33:3, 10
draw  20:7  36:16
drawn  20:9
drew  20:8
driven  27:15
duly  5:3  72:5

< E >
earlier  34:15
38:12, 13  50:4
57:22  64:3  65:4
66:4
earliest  30:20
67:15
early  12:11  46:3
57:13
easier  14:3  41:15
East  2:12
effort  59:18, 21
either  20:7  27:6

28:9  37:21  39:7
eligible  30:17
Ellen  50:21  51:2,
17, 19
Email  3:12, 19, 20,
21  29:7  30:14, 15,
20  31:7, 15, 17, 22
32:1  34:2, 3, 4
41:14  42:22  43:5
44:15  45:4  48:11
51:17, 18  52:11
53:5, 9, 16, 17, 19
54:3, 5, 16  55:2
56:11  57:5, 6, 8,
10  58:2, 7, 10
65:9, 11  67:18
emailed  52:18
57:3
emailing  53:18
emails  8:4  33:1,
15  44:16  54:2
56:9, 19  66:15
67:10
employed  10:14
72:10, 14
employee  9:15, 17
11:21, 22  21:8
24:4  72:13
employees  7:16
43:15  51:3, 4
ended  6:13  43:18
52:5, 6  53:1, 5
57:14  61:19
ends  51:9
entered  46:21
47:4, 5
entire  69:7
entirely  10:19
entities  39:8
entity  10:19  39:9
equated  56:8
equipment  8:14,
15  13:18  16:12,
16
Eric  28:15

ERRATA  69:1,
11  70:2  71:2
E-signature  3:9,
11, 13
ESQUIRE  2:3, 10
et  1:7
EUBANKS  2:10
3:5  8:4, 9  13:19
15:12, 19  17:6, 9
25:9  30:10, 22
45:17  51:11
55:20  62:18  63:1,
4  64:12, 15  65:17
67:3, 8  68:1
events  21:20  28:7
everybody  40:4
exact  14:21, 22
58:5
exactly  9:13  12:5
16:18  28:1  52:12
64:8, 10
examination  1:12
3:4, 5, 6  5:5  63:3
65:18
examined  5:4
example  13:14
excellent  34:22
excessive  56:21
exchanged  33:1
excuse  59:6
Exhibit  3:9, 10,
11, 12, 13, 14, 15,
16, 17, 18, 19, 20,
21  4:2, 3, 4  19:22
20:1  23:11, 15
26:19  27:17
28:20  29:2  33:20
34:1  35:17, 21
38:6, 10, 19  39:2,
3  42:4, 8  46:7, 11,
15  47:9, 13  49:7,
11  50:13, 17
53:11  54:11, 15
58:13, 17  59:11,
15  60:15, 19
62:20

EXHIBITS  4:13
67:18, 19
existed  65:3
expansion  10:12
11:9  13:17  14:13
expires  69:21
explain  26:2
explanation  41:18
exploring  61:14
extent  66:13

< F >
fact  43:19
fair  13:8  17:16
Fairfax  2:6
Farm  8:14
farmers  26:6
favorable  53:8
FBI  4:4  55:7, 21,
22  60:20  61:1, 3,
6, 7, 13  62:6
fee  19:11  41:22
42:3
feeling  58:12
felt  34:16  59:3
figure  36:15  59:6
file  55:6
filed  7:7, 11
58:18
fill  29:21  50:2
filled  24:5
filling  24:1
fills  20:16
financial  34:17
financially  72:14
find  33:14
first  5:3  16:6, 8
17:17, 18  26:19
29:6  30:6, 16
31:2, 4  34:6
36:10, 17  37:11
39:7, 9  42:16
51:22  64:11
five  6:6  13:7
14:18, 19  15:1

5

Jack L. Rickett, Jr.                                                    5/31/2023

five-minute  35:*14*
flag  56:*7*
flags  52:*15*
flip  24:*18*
follows  5:*4*
foregoing  72:*3, 5*
forgiven  22:*20*
form  13:*19*
formal  31:*20*
  39:*3, 5*
forth  44:*1*  63:*21*
forward  49:*6*
found  52:*4*
founded  11:*16*
  12:*4*
founder  11:*14*
four  6:*6*  20:*19*
  31:*10, 11*  35:*8*
frame  9:*14*
fraud  25:*21*  26:*3*
  43:*22*
fraudulent  25:*8,
16*
French  59:*6*
Friday  44:*12, 19*
  56:*17*
fruition  11:*10*
frustrated  34:*16*
full  18:*8, 9*  31:*6*
  51:*8*  56:*14*  58:*8*
  64:*9*
fund  13:*16*  14:*12*
Funding  7:*21*
  15:*4, 9*  16:*4, 8*
  17:*19*  18:*4, 13, 22*
  21:*9, 12, 17*  22:*1,
5, 8, 12*  26:*16, 17,
21*  28:*10*  35:*4*
  43:*10, 16, 19*  44:*6*
  45:*4, 5*  48:*6, 18*
  49:*6*  50:*10*  53:*6*
  61:*15*  62:*13*  63:*8*
  66:*8*
funds  44:*3*  62:*12*

Further  3:*6*  22:*7*
  62:*16*  65:*17, 18*
  72:*12*

< G >
gained  9:*22*
garage  42:*17, 19*
General  10:*18*
  12:*3, 8*  24:*19*
  28:*4*
generate  20:*7*
generic  31:*8*
gentleman's  61:*10*
getting  22:*20*
  33:*1*  43:*22*  52:*6*
  56:*4*
Give  11:*4*  23:*15*
  24:*14*  41:*16*
  60:*12*
given  40:*4, 14*
  72:*9*
Go  13:*22*  14:*4, 6*
  20:*22*  21:*2*  26:*4*
  45:*22*  61:*9*  67:*9,
11, 17*
God  55:*8*
going  6:*8*  12:*16*
  18:*7*  19:*20*  21:*9,
19*  23:*2, 14*  38:*9*
  42:*2*  48:*16*  49:*10*
  56:*1, 8*  57:*1, 14,
19*  59:*7*  60:*18*
  66:*18*
Google  41:*8*
gotten  62:*4*
ground  11:*10*
GROUP  1:*3, 13*
  7:*16*  36:*11*  37:*15*
  39:*7*  41:*8*  53:*17,
18*  69:*3*
Growth  10:*12*
  11:*8*
guarantee  20:*11*
guess  6:*10*  13:*9*
  27:*7*  39:*3*  41:*2*

43:*8*  61:*16*
guy  34:*22*  60:*8*
guys  45:*18*  50:*19*

< H >
handed  50:*10, 12*
handheld  8:*14*
handwriting
  40:*21*  41:*1*
happen  44:*13*
  50:*8*
hard  34:*19*
hate  45:*7*
head  5:*11*  13:*5*
  17:*21*  23:*4*  32:*11,
17*  52:*16*
hear  36:*10*  39:*11*
  62:*18*
heard  23:*20*
  28:*18*  29:*8*  30:*4,
5*  36:*18*  39:*7, 9*
  41:*9*  52:*9*
held  60:*14*
hell  59:*7*
help  61:*8*
helps  18:*13*
hereof  69:*11*
high  27:*14, 15, 20*
higher  28:*5*
history  30:*18*
  34:*22*  35:*7*
hold  53:*1*
Home  29:*15, 16*
hours  56:*13*

< I >
idea  17:*2*  23:*21*
  49:*4, 5*  66:*9*
identification
  20:*2*  23:*12*  28:*21*
  33:*21*  35:*18*  38:*7*
  42:*5*  46:*8*  47:*10*
  49:*8*  50:*14*  53:*12*
  54:*12*  58:*14*
  59:*12*  60:*16*
impacted  23:*8*

improvements
  16:*16*
include  66:*20*
including  14:*11*
  40:*5*
indicated  69:*10*
indications  43:*22*
individual  6:*8*
  7:*20*  8:*1*  15:*14,
16*  21:*11, 17*  30:*7*
  42:*10*  43:*16*  48:*8*
  53:*2*  54:*17*  61:*12*
individually  13:*21*
info@piedmont
  29:*7*
info@piedmontpo
wersports.com
  53:*21*
information  39:*13*
  48:*19*  61:*20*  62:*9*
initials  36:*5*
insomuch  13:*20*
institutions  34:*18*
instructions  48:*12,
14, 16*  50:*12*
intend  48:*4*
intention  62:*11*
interact  64:*22*
interacted  65:*2, 5*
interaction  33:*9*
  65:*22*  66:*7*
interactions  66:*2*
interest  9:*22*
  10:*13*  11:*5*  27:*18*
  31:*10, 12*  38:*16*
interested  31:*19*
  72:*15*
involved  7:*14*
involving  61:*14*
its  44:*3*

< J >
JACK  1:*11*  3:*3*
  5:*2, 22*  13:*20*
  15:*13*  63:*5*  64:*9*

**Casamo & Associates**          **703 837 0076**          **www.casamo.com**

6

Jack L. Rickett, Jr.                                      5/31/2023

jack@piedmontpo
wer 53:*20* 57:*9*
jack@piedmontpo
wer.com 57:*6*
Jackie 5:*22* 36:*5*
53:*16*, *19*
J-A-C-K-I-E 5:*22*
Janie 1:*14* 72:*2*,
*17*
Jeremy 7:*20* 8:*5*,
*7* 30:*7* 39:*4*
43:*17*, *20* 45:*6*
52:*11*, *20* 54:*18*
55:*2*, *10* 56:*9*, *19*
63:*8*
Jerry 8:*1*
Job 69:*2*
JR 1:*11* 3:*3* 5:*2*
*6*:*1*
July 69:*21*
jump 48:*17*
jumps 29:*6*
June 21:*21* 22:*4*
25:*22* 28:*8* 29:*18*
30:*20* 36:*14* 38:*2*,
*14* 40:*12* 41:*5*
42:*10* 43:*14*, *15*
44:*12*, *21* 46:*4*
49:*16* 58:*1* 66:*15*
67:*10*, *12*, *14*
junior 6:*1*

< K >
keep 12:*16* 57:*19*
kept 12:*12*
kind 17:*1* 34:*20*
58:*7*
knew 23:*2*
know 5:*14* 6:*12*
9:*16* 12:*10* 13:*4*,
*5*, *16*, *20* 14:*7*, *8*,
*10*, *21*, *22* 15:*2*, *15*
16:*15* 17:*15*, *20*
20:*6* 22:*16* 23:*19*
24:*4*, *8* 25:*15*
26:*11* 28:*5*, *15*, *16*,

17 30:*2*, *17* 31:*8*,
*18*, *19* 32:*17*, *18*
33:*7*, *10* 34:*14*, *18*
38:*17* 40:*3*, *4*, *14*
42:*12*, *18* 43:*21*
45:*3*, *8*, *17*, *18*
47:*1* 49:*13* 50:*21*
51:*9*, *21* 52:*3*, *4*, *5*,
*6*, *8*, *15*, *19* 53:*1*, *3*,
*20* 54:*1* 55:*8*, *20*
56:*9*, *12*, *17*, *20*, *22*
57:*17*, *18*, *19* 58:*5*,
*11* 59:*2*, *3* 61:*7*,
*17* 63:*17*, *20* 65:*3*,
*12* 66:*19* 67:*9*, *10*
knowing 51:*19*
knowledge 15:*18*
21:*8* 40:*2* 42:*14*
54:*5*
knows 13:*21*
32:*18*
Kubota 11:*2*, *6*, *7*

< L >
late 44:*11*, *18*
latest 37:*19*
lawyer 33:*18*
60:*10*
lbuntingeubanks@

sandsanderson.com
2:*15*
LCF 1:*3*, *13* 7:*16*
8:*3* 36:*11* 37:*4*,
*15* 39:*6* 41:*8*
52:*5*, *21* 53:*7*, *17*,
*18* 54:*21* 64:*2*
69:*3*
leave 66:*12*
leaving 66:*21*
left 44:*20*, *21*
62:*3*
leg 52:*4*
legal 28:*17*
Legend 39:*6*
41:*8* 48:*13*, *21*

49:*1*, *5*, *21* 65:*1*, *2*,
*5*, *15*, *22* 66:*5*, *8*
lender 39:*6*
lending 52:*13*
53:*7*
letter 4:*3*, *4* 46:*4*,
*13* 48:*9* 55:*22*
59:*16* 60:*19*
61:*19*, *22*
license 12:*15*, *17*
life 14:*3*
light 34:*21*
LINDSAY 2:*10*
7:*22* 14:*5* 30:*9*,
*19* 45:*14* 54:*2*, *10*
55:*17* 62:*9* 65:*20*
66:*12* 67:*17*
link 35:*12* 67:*18*
list 66:*21*
listed 35:*8* 43:*21*
listen 57:*8*
listening 14:*5*
litigation 32:*20*
36:*1*
little 34:*16* 42:*18*
65:*4*
live 26:*5*
loan 13:*13*, *15*
15:*9* 17:*17*, *18*
18:*12* 19:*1*, *4*, *15*
21:*9* 22:*11*, *18*, *19*,
*20*, *22* 24:*2*, *9*
25:*8* 26:*9*, *11*, *14*
27:*12*, *18*, *22* 34:*9*
39:*18* 41:*12*, *16*
43:*10* 44:*4*, *14*
46:*4* 47:*18*, *20*
48:*6*, *7*, *10* 49:*14*
52:*7* 54:*20* 62:*13*
loans 12:*22*
13:*10* 14:*9*, *10*, *15*
15:*3*, *6*, *20* 16:*3*,
*11*, *22* 18:*3* 22:*8*
28:*9*
locked 32:*19*
longer 55:*11*

look 18:*14* 19:*20*
20:*22* 21:*1* 24:*18*,
*20* 25:*1*, *4* 29:*6*
31:*7* 32:*12* 41:*8*
48:*14*, *21* 55:*20*
56:*1* 66:*16*, *19*
67:*15*
looked 33:*13*
38:*22* 48:*16* 49:*1*
58:*4*
looking 11:*8*
27:*17* 38:*20*
45:*20*
looks 18:*15* 20:*9*,
*14* 21:*3* 22:*3*
27:*18* 29:*18* 34:*4*,
*9* 35:*11* 36:*4*
38:*2*, *11* 39:*8*
41:*22* 42:*13*
45:*21* 46:*17*, *19*
47:*13*, *17* 49:*13*
51:*5* 54:*19* 58:*18*
59:*16*
lot 56:*18*
low 34:*13*, *14*
38:*18*
lower 30:*18*
31:*13* 34:*10*
47:*18*
Lynn 5:*22*
L-Y-N-N 5:*22*

< M >
mail 62:*5*
Main 2:*12*
making 19:*15*
27:*11*, *12*
manage 12:*7*
March 22:*4*
marked 20:*1*
23:*11*, *15* 28:*20*
29:*1* 33:*20* 35:*17*,
*20* 38:*6*, *9* 39:*2*
42:*4*, *7* 46:*7*, *10*
47:*9*, *12* 49:*7*, *10*
50:*13*, *16* 53:*11*,

**14** 54:*11, 14*
58:*13, 16* 59:*11,
14* 60:*15, 19*
**match** 49:*14*
**matter** 69:*8*
**MCA** 26:*8* 27:*3,
22* 46:*5, 19* 47:*15*
**mean** 13:*14*
20:*21* 21:*3* 25:*3,
4, 20* 29:*6* 32:*16,
18* 45:*6* 47:*1*
51:*8* 54:*7* 56:*6,
13, 21* 58:*11*
63:*21* 66:*1* 67:*3,
5*
**means** 50:*10*
**meant** 28:*12*
**message** 30:*16*
**messages** 7:*13, 15,
18* 8:*1, 7* 33:*14,
19*
**met** 60:*9*
**Michael** 63:*15*
64:*1*
**mid** 30:*11* 46:*4*
**middle** 22:*17*
**minus** 12:*20*
33:*10*
**minute** 24:*14*
56:*1*
**missing** 67:*13*
**mister** 45:*7*
**mode** 55:*9*
**moment** 38:*15*
**Monday** 37:*17, 21*
38:*3* 39:*12* 44:*20*
52:*3* 57:*3, 11*
**money** 6:*9* 19:*8*
27:*2* 32:*19* 44:*22*
45:*11*
**monthly** 19:*14, 16*
**months** 32:*19*
**morning** 44:*20*
57:*14*
**move** 35:*15*

**moved** 49:*6*
**multiple** 18:*3*

**< N >**
**name** 5:*7, 20*
10:*17* 28:*16*
32:*11* 36:*17*
37:*11, 13* 42:*18,
19* 52:*5* 61:*10, 11*
63:*15* 64:*9* 65:*3*
**names** 39:*10, 11*
43:*21*
**necessary** 31:*20*
**need** 5:*13* 35:*9*
67:*1*
**needed** 19:*8*
42:*22* 43:*3*
**negotiate** 19:*4*
**neighborhood**
12:*20*
**neither** 72:*10*
**never** 11:*9, 10*
23:*20* 24:*10, 13*
26:*3, 4* 28:*18*
29:*8, 11* 30:*1, 3, 4,
5* 41:*9* 52:*9* 54:*7*
60:*10* 65:*2, 5, 9,
11*
**New** 7:*5* 11:*2, 6,
7* 32:*20* 39:*18*
**nice** 60:*8, 10*
**nine** 31:*10*
**No._____Change**
70:*3, 7, 10, 13, 16,
19* 71:*3, 6, 9, 12,
15, 18*
**No._____Line**
70:*3, 7, 10, 13, 16,
19* 71:*3, 6, 9, 12,
15, 18*
**nodding** 5:*10*
**Notary** 1:*15* 5:*3*
69:*20* 70:*1* 72:*1,
18*
**note** 42:*18*

**notes** 37:*8, 18*
38:*1*
**Notice** 1:*13* 54:*21*
**NUMBER** 1:*4*
14:*21, 22* 16:*14*
17:*3* 20:*1* 23:*11*
28:*20* 33:*20*
35:*17* 37:*1, 6*
38:*6* 42:*4* 46:*7*
47:*9* 49:*7* 50:*13*
51:*5, 9* 53:*11*
54:*11* 58:*13*
59:*11* 60:*15*
61:*14*
**numbers** 29:*9, 10*
49:*14*

**< O >**
**oath** 69:*13*
**object** 13:*19*
**Objection** 17:*6*
25:*9*
**obtain** 18:*3*
**obtained** 12:*22*
**obvious** 15:*4*
**occur** 9:*12* 44:*17*
**occurred** 43:*20*
61:*17*
**occurring** 52:*19*
**October** 24:*7*
46:*20*
**odd** 38:*18* 41:*20*
43:*12*
**Offer** 3:*14* 31:*6,
19, 20* 33:*2* 34:*6,
8* 38:*11* 39:*3, 5*
69:*12*
**offering** 34:*9*
35:*3, 4*
**office** 44:*21*
57:*14* 61:*13*
**officer** 43:*4, 6*
**oh** 55:*8* 63:*12*
**Okay** 6:*16* 7:*10*
8:*6* 10:*5* 12:*3, 18,
21* 14:*2* 15:*2, 6,*

**21** 16:*11, 20* 17:*4,
14, 16* 18:*3, 7, 20,
22* 19:*7, 14* 20:*14*
21:*5, 20* 22:*7*
23:*7* 24:*1* 27:*8,
11* 30:*6, 22* 31:*15*
32:*5* 33:*11* 34:*22*
36:*10* 37:*15, 22*
38:*2* 40:*15, 21*
44:*2* 47:*8* 51:*22*
56:*16* 57:*22*
**once** 24:*15* 56:*4*
**ones** 7:*6* 8:*3*
30:*21* 52:*7*
**ongoing** 13:*16*
**open** 25:*6* 66:*13,
21*
**opened** 65:*15*
**operations** 11:*19*
12:*7* 13:*17* 14:*12*
**opportunity** 10:*12*
**order** 12:*15*
14:*12* 67:*20*
**original** 16:*5*
18:*12* 21:*15*
34:*14, 15* 37:*5, 8*
42:*15, 16*
**origination** 19:*11*
41:*22* 42:*3*
**Oscar** 53:*2*
**outcome** 72:*15*
**Outlook** 53:*22*
54:*8*
**overview** 16:*20*
**owed** 6:*9*
**Owner** 8:*21, 22*
10:*4, 22* 11:*18*
34:*17* 62:*11*
**ownership** 9:*10*
10:*13* 11:*5* 29:*17*
**owns** 9:*5, 7, 17*

**< P >**
**p.m** 57:*11* 68:*3*
**PAGE** 3:*2* 19:*19*
60:*1* 70:*3, 7, 10,*

*13, 16, 19* 71:*3, 6, 9, 12, 15, 18*
**paid** 19:*12, 13* 41:*16*
**paper** 43:*1, 2, 6* 50:*3* 64:*4, 7*
**part** 17:*10* 20:*11* 32:*20* 39:*19*
**particular** 21:*14* 27:*14* 56:*7* 57:*16* 58:*22* 59:*2, 7* 61:*16*
**parties** 1:*17* 7:*14* 14:*10* 72:*11, 14*
**partners** 52:*13* 53:*7*
**party** 13:*16*
**pay** 34:*22* 41:*12* 47:*18* 48:*5* 49:*14* 62:*12*
**paying** 31:*13* 47:*20*
**payment** 30:*18* 59:*18*
**payments** 19:*14, 16* 27:*11*
**payoff** 46:*4, 12* 48:*9* 50:*11*
**PC** 2:*11*
**PENALTY** 69:*5, 6*
**people** 26:*5* 43:*22*
**percent** 9:*4, 7, 19, 22* 10:*2, 22* 27:*19* 29:*17, 19* 31:*11* 34:*10* 62:*2*
**percentage** 9:*3* 28:*2*
**period** 22:*15* 33:*4, 12* 55:*14*
**PERJURY** 69:*5, 6*
**person** 36:*14*
**personal** 15:*18, 20*
**Petersen** 2:*4*
**phone** 29:*9, 10* 30:*14* 33:*5, 8, 16* 37:*1* 53:*9* 55:*13*

56:*19, 21, 22* 61:*9, 12* 65:*9, 11*
**Photos** 3:*15* 42:*9, 13, 15*
**photoshopped** 63:*17*
**picture** 64:*8*
**pictures** 62:*20* 63:*6, 7, 11, 14, 16* 64:*3, 16, 20*
**piece** 13:*18* 43:*1, 2, 6*
**pieces** 61:*15* 64:*6*
**PIEDMONT** 1:*6* 8:*16, 19, 22* 10:*14, 20* 11:*14, 21, 22* 12:*21* 13:*21* 14:*14* 15:*17* 16:*2, 21* 17:*18* 19:*17* 21:*7, 11* 22:*10, 18, 19, 22* 24:*4, 5, 8* 26:*8* 27:*2, 12* 28:*8* 29:*7* 40:*16* 44:*2* 47:*5, 14* 54:*6, 9* 58:*20* 59:*17* 62:*11* 64:*9* 65:*6* 69:*3*
**Piedmont's** 45:*12* 56:*18*
**place** 34:*19* 64:*19, 21*
**Plaintiff** 1:*4, 13* 2:*2* 5:*5* 65:*18*
**Plaintiff's** 19:*22* 23:*15* 29:*2* 35:*20* 38:*10* 42:*8* 46:*11, 15* 47:*13* 49:*11* 50:*16* 53:*14* 54:*14* 58:*16* 59:*14* 60:*19*
**PLC** 2:*4*
**pleadings** 7:*7, 10*
**please** 5:*20* 15:*13* 68:*1*
**plus** 12:*20* 33:*10*

**point** 5:*13* 32:*12, 14* 49:*4* 55:*8* 57:*16* 58:*22* 59:*2, 7* 66:*9*
**pointed** 39:*17*
**police** 55:*5, 6, 15* 57:*18* 58:*2, 3, 4* 61:*4, 5, 6*
**position** 8:*19* 15:*17*
**positive** 12:*5*
**possession** 40:*14*
**Post-It** 42:*18*
**potential** 66:*14*
**potentially** 66:*22*
**POWER** 1:*6* 8:*14, 16, 19, 22* 10:*14, 20* 11:*14, 21* 12:*1, 21* 14:*15* 15:*17* 16:*2, 22* 17:*18* 22:*10* 26:*8* 40:*16* 44:*2* 47:*14* 54:*6, 9* 58:*20* 62:*12* 64:*9* 69:*3*
**PPE** 22:*18, 19, 22*
**predicated** 14:*14*
**preparation** 7:*2* 66:*18*
**prepare** 6:*19*
**present** 1:*17*
**pretty** 44:*18*
**previously** 32:*13* 34:*11*
**primarily** 16:*13*
**prior** 6:*22* 9:*18, 20* 10:*1, 3* 12:*21* 14:*15* 15:*7* 16:*3, 7* 21:*20, 21* 28:*7, 11, 18* 30:*21* 33:*1* 41:*7* 43:*20* 48:*6* 61:*1* 62:*13* 66:*15* 67:*10, 12*
**problem** 56:*15*
**proceeds** 48:*5*

**process** 5:*18* 45:*5* 57:*1, 17* 61:*8*
**produce** 30:*21* 55:*18*
**produced** 8:*2, 8* 40:*16, 18* 45:*18* 50:*19, 21* 67:*12*
**profession** 8:*11*
**program** 20:*15*
**provide** 48:*9*
**provided** 35:*11*
**provider** 32:*10*
**providing** 35:*11*
**Public** 1:*15* 5:*4* 69:*20* 70:*1* 72:*1, 18*
**pull** 57:*20* 58:*9* 59:*18*
**purchase** 16:*12*
**purchased** 9:*21*
**purchasing** 13:*18* 16:*16*
**purpose** 19:*20*
**purposes** 14:*9*
**pursuant** 1:*13*
**put** 33:*9*
**putting** 39:*8*

**< Q >**
**question** 5:*15* 13:*9* 14:*2, 9* 16:*20* 17:*12* 23:*22* 65:*14, 20*
**questions** 5:*9, 15, 17* 61:*17* 62:*17, 19* 63:*5* 65:*17* 66:*11*
**quick** 35:*14* 60:*12*
**quite** 12:*15* 25:*22* 63:*12*
**quotes** 21:*8*

**< R >**

9

Jack L. Rickett, Jr.                                    5/31/2023

raise  26:6
Randy  9:6, 15
range  14:20  19:8
23:6  31:9, 10, 13
rate  27:14, 18
30:18  31:10, 12
38:16  47:19
rates  27:15
reach  6:14  21:22
22:5  30:14  37:1
61:7
reached  30:11
31:2, 4  35:2  55:7
read  24:11  68:1
69:7, 8
reading  42:2  57:7
reads  25:4
really  6:12  17:15
20:19  23:3  25:15
27:9  32:16  33:16
40:3  56:14
reask  14:2
reason  10:5, 10
22:5  28:16  40:8
47:3, 6  70:6, 9, 12,
15, 18, 21  71:5, 8,
11, 14, 17, 20
reasoning  62:14
reasons  16:14
21:22  25:20
recall  15:2  16:17
19:2  20:12  21:10
22:6  24:1  25:17
26:13  27:2, 13
31:8, 11  32:11, 22
33:16  35:10
36:21  40:6, 7, 11,
13  41:17  42:1, 2
44:10, 16  45:2
46:12  50:18
51:18, 19  52:22
53:18  55:12
56:20  57:10, 20
61:10, 11  62:4, 8

receive  15:20
21:8  44:2, 14
56:18
received  13:15
14:10, 15  15:3, 6,
9, 10, 20  16:3, 9
22:8  23:1  26:11
27:2  34:3, 5, 6
38:14  39:4  44:5,
10  45:1, 3, 14
50:3  55:18  56:16
58:1  60:20  61:22
receiving  51:16,
18  61:19
recess  60:14
recognize  29:2, 5
35:21  38:10  41:1
46:16  47:16
49:12  50:17  54:3
recollection  18:20
46:21  47:2
reconstructure
54:22
record  5:12, 21
44:15  45:10, 11,
15  47:13  66:17
72:9
records  44:13
45:19, 22  66:18
red  52:15  56:7
reduced  72:7
reference  21:14,
15  52:14
referenced  38:1
referencing  39:16
referring  16:12
refinance  16:6
18:6  28:8  30:18
31:7  62:12, 15
refinancing  35:3,
4  39:19  44:4
48:5
reflected  5:11
refresh  18:20
46:20  47:1
Registration  70:1

related  17:1
72:10
relation  26:8
relationship  61:6,
7
relative  72:13
relevant  62:20
remainder  9:5
48:5
remember  21:19
23:3  26:12  27:10,
13, 16  28:4  32:16
35:1  36:8  37:7
39:16  42:20
44:19  48:20  50:9
51:14  52:12
54:10  58:5  62:2
rental  13:10
rephrase  15:21, 22
report  55:6, 15,
21  58:4
Reporter  1:15
5:3  19:22  67:17,
20  72:2
reporter's  5:12
37:10
representing  7:21
request  46:4
48:1  49:15  50:2,
20
requested  32:2
46:12  66:4
requesting  32:1
requests  32:3, 4
rescind  52:17
research  36:16
respective  1:17
respond  31:15, 21
responded  32:1
52:11  53:6
response  41:13, 15
result  6:11, 13
60:3, 5
RETAINED  4:13
retaining  41:12

returns  32:6
review  7:2  39:13
revisited  7:12
Richmond  2:14
RICKETT  1:11
3:3, 9, 10, 11, 12,
13, 14, 15, 16, 17,
18, 19, 20, 21  4:2,
3, 4  5:2  6:1, 2
8:11  14:3  16:2
20:1  21:4  23:11
25:5  28:20  33:20
35:17  36:5  38:6
42:4  46:7  47:9
49:7  50:13  53:11,
16, 19  54:11, 17
58:13  59:11
60:15  64:9
R-I-C-K-E-T-T
6:1
right  18:16  21:7
32:11  34:11
38:21  44:5  47:21
51:17  56:5, 14
58:8  62:3  66:6,
12
River  11:2, 6, 7
Road  2:5
ROBERTSON
2:3  3:4, 6  5:6, 8
7:22  8:6, 10  14:1
15:15, 21  16:1
17:7, 11  19:21
20:3  23:13  25:11,
13  28:22  30:13,
19  31:1  33:22
35:14, 19  38:8
42:6  45:14, 21
46:2, 9  47:11
49:9  50:15  51:13,
15  53:13  54:13
55:17, 22  56:2
58:15  59:13
60:12, 17  62:16,
21  64:14  65:19

Jack L. Rickett, Jr.                                                    5/31/2023

66:*10*  67:*5, 14, 22*
**rock**  34:*19*
**roughly**  31:*18*
**rounded**  43:*7*
**running**  11:*19*
  16:*21*

**< S >**
**safe**  17:*4, 14*
  29:*21*
**sales**  8:*12*
**Samson**  26:*7, 22*
  27:*1, 3, 22*  28:*9*
  46:*5, 19*  47:*5, 14,*
  *21*  50:*11*  54:*20*
  62:*13*
**Sands**  2:*11*
**save**  69:*9*
**saves**  20:*15*
**saw**  32:*13*  48:*17,*
  *18*  49:*6*  67:*11*
**saying**  15:*19*
  26:*22*  42:*22*
**says**  18:*18*  19:*10*
  29:*11, 17*  36:*5*
  39:*6*  42:*3*  46:*19*
  51:*21*  53:*16*  54:*1,*
  *20*
**Schaeffer**  28:*15*
  30:*4*
**screen**  18:*8, 9*
  50:*7, 9*
**scroll**  18:*13*  64:*12*
**scrolled**  24:*11*
**se**  34:*21*
**second**  11:*4*
  23:*15*  42:*21*
  59:*22*  64:*11, 13*
**secure**  17:*17, 18*
**secured**  18:*13*
  26:*13*
**security**  39:*18*
**see**  8:*7*  18:*9, 10*
  19:*6*  23:*17, 18*
  24:*19*  25:*6*  34:*21*
  36:*1, 4*  43:*8*

44:*13*  49:*1*  61:*7*
  66:*17*  67:*11, 15*
**seeing**  24:*14, 16*
  36:*8*  39:*16*  50:*18*
  51:*8, 20*
**seek**  22:*7, 9*
**seeking**  24:*8, 9*
**seen**  8:*3*  26:*4*
  30:*1, 3*  63:*10*
**sell**  8:*13*  10:*5, 7,*
  *10*  26:*5*
**send**  52:*10*  63:*7*
**sending**  53:*5*
  54:*2*  57:*10*
**sense**  41:*18, 20, 21*
**sent**  25:*18*  32:*4,*
  *5*  39:*14*  41:*5*
  42:*9*  50:*20*  53:*17*
  55:*21*  56:*11*
  63:*15, 19*  64:*19,*
  *21*  65:*9, 11*
**separate**  10:*19*
**September**  60:*22*
**series**  5:*9*
**service**  43:*18*
**serviced**  12:*18*
**settlement**  6:*14*
**shaking**  5:*10*
**share**  18:*7*  23:*16*
  60:*18*
**shared**  18:*10*
**sharing**  24:*17*
**Sharpie**  42:*19*
**sheet**  32:*7*  69:*1,*
  *11*  70:*2*  71:*2*
**short**  55:*14*
**show**  23:*14*  34:*1*
  35:*20*  38:*9*  42:*7*
  49:*10*  50:*6*
**showed**  26:*17, 19*
  30:*3*  38:*11, 13, 15*
  50:*4*  64:*8*
**showing**  29:*1*
  34:*1, 2*  44:*13*
  45:*16, 19*  46:*10*
  47:*12*  50:*9, 16*

53:*14*  54:*14*
  58:*16*  59:*14*
**shown**  39:*15*
**sick**  58:*12*
**side**  41:*17*
**sign**  29:*4*  36:*6, 7,*
  *9*  39:*18, 20*  68:*2*
**signature**  20:*4, 15,*
  *17*  21:*1*  24:*20, 21*
  25:*1, 3, 4*  59:*9, 22*
**SIGNATURE:**____

____**DATE**  70:*22*
  71:*21*
**signatures**  20:*6*
**signed**  21:*22*
  22:*4*  40:*5, 9, 17,*
  *20*  52:*7*  69:*14*
**signing**  20:*12*
  40:*6, 7, 11*  41:*7*
**Silva**  63:*15*  64:*1*
**similar**  12:*22*
  21:*3*  27:*22*  28:*1*
  61:*16*
**sir**  5:*19*  7:*9*  9:*8,*
  *11*  10:*21*  11:*1, 13*
  12:*2*  19:*13, 18*
  22:*21*  27:*21*  31:*5,*
  *14*  38:*5*  49:*20*
**sit**  22:*13, 14*
**situation**  28:*17*
  52:*1*
**small**  34:*16, 18*
**smaller**  43:*6*
**Smith**  37:*14*
**Snyder**  7:*20*  8:*2,*
  *5, 8*  28:*11*  30:*7,*
  *20*  31:*4*  32:*22*
  34:*7*  35:*2*  39:*4,*
  *14*  41:*10*  42:*9, 10*
  43:*17, 21*  45:*4, 6*
  48:*8, 9*  52:*20*
  54:*18*  55:*2, 10*
  56:*19*  63:*8*  66:*14,*
  *15*

**Soderquist**  9:*6, 15,*
  *16, 21*  10:*3*
**sold**  8:*16*
**sole**  8:*22*  10:*4*
**sooner**  58:*3*
**sorry**  17:*10*
  23:*22*  24:*11*  30:*8*
  31:*3*  38:*22*  54:*17*
  57:*7*
**sort**  13:*17*  16:*20*
  20:*7*  24:*17*  67:*6,*
  *7*
**sounds**  31:*12*
**speak**  6:*21*  13:*21*
  33:*4*  37:*3, 15*
  43:*15*
**speaking**  43:*18*
  53:*1*  54:*10*
**specific**  16:*18*
  51:*11*
**speculate**  13:*6*
  17:*2*  41:*2*
**speculation**  25:*10*
**spell**  5:*20*  37:*11*
**Splash**  3:*10*
  23:*19*  24:*2, 13*
  25:*2*
**split**  9:*9*
**spoke**  21:*18*  33:*7*
  37:*4, 7*  52:*20, 21*
  57:*2, 3*  61:*21*
  62:*6*
**sporadically**  12:*13*
**SPORTS**  1:*6*
  8:*17, 20*  9:*1*
  10:*15, 20*  11:*14*
  12:*1, 22*  14:*15*
  15:*17*  16:*2, 22*
  17:*18*  22:*11*  26:*8*
  29:*8*  40:*16*  44:*2*
  47:*14*  54:*6, 9*
  58:*20*  62:*12*  64:*9*
  69:*3*
**SSI**  29:*13*
**started**  22:*2*  32:*1*
  52:*10*  56:*3, 9*

**starting** 28:*19*
34:*20*
**State** 12:*14*
**statement** 45:*20*
67:*4*
**STATES** 1:*1*
**stenographically**
72:*7*
**steps** 31:*19*
**stock** 9:*17* 10:*3,
7, 10*
**stop** 52:*17, 19*
59:*17, 21* 60:*6*
**stopped** 59:*5, 8*
**story** 52:*6*
**Street** 2:*12*
**strike** 34:*13*
43:*12*
**struggle** 16:*17*
33:*16*
**submitted** 19:*5*
**Subscribed** 69:*17*
**Suite** 2:*13*
**sure** 9:*14* 15:*19*
16:*18* 33:*15*
45:*13, 22* 48:*11*
55:*16* 66:*19*
67:*13*
**suspicious** 52:*1,
10* 56:*4*
**suspiciously** 34:*13,
14*
**sworn** 5:*3* 69:*17*
72:*5*

**< T >**
**take** 5:*8, 13, 16*
16:*2* 20:*22* 35:*10,
14* 60:*12*
**taken** 1:*13* 14:*11*
16:*22* 19:*15*
42:*15* 69:*7* 72:*3,
6, 12*
**talk** 33:*18* 60:*10*
**talked** 66:*14*

**talking** 27:*20*
46:*3* 59:*17*
**tasks** 35:*9*
**tax** 32:*6*
**Taylor** 50:*21*
51:*2, 17, 20*
**tell** 5:*20* 11:*2*
19:*7* 20:*20* 21:*19*
26:*7* 30:*1* 40:*3*
43:*3* 62:*1*
**telling** 52:*8*
**ten** 13:*7* 31:*11*
60:*13*
**term** 51:*12*
**terms** 8:*14* 19:*4*
53:*8*
**testified** 5:*4* 56:*3*
58:*1* 64:*3* 66:*4*
**testify** 15:*17*
**testifying** 15:*13,
16*
**testimony** 72:*4, 6,
9*
**text** 7:*12, 15, 18,
22* 8:*7* 33:*14, 19*
**texting** 33:*11*
**texts** 66:*15*
**Thank** 5:*7*
**thereto** 72:*14*
**thing** 13:*18* 29:*6*
43:*2*
**things** 24:*15*
25:*21* 42:*13*
66:*21*
**think** 6:*12, 13*
8:*2* 13:*7* 14:*18*
16:*20* 20:*21*
22:*14* 32:*7, 13, 14*
38:*20* 43:*21*
50:*20* 55:*17* 56:*3,
7, 21* 57:*16, 20, 22*
60:*9* 66:*14* 67:*1,
14*
**thinking** 35:*1*
56:*20* 58:*5*

**third** 13:*16* 14:*10*
**thought** 38:*17*
**three** 32:*3, 4*
56:*13*
**threw** 56:*7*
**time** 6:*16* 9:*14*
10:*11* 12:*18*
16:*21* 17:*1* 22:*3,
16* 24:*9* 27:*14*
28:*6* 33:*4, 12*
34:*20* 39:*7, 9*
41:*10, 19* 43:*9*
46:*3* 48:*4, 15, 21*
49:*3* 50:*8* 52:*15*
54:*21* 55:*6, 11, 14*
56:*8* 62:*6, 8*
**times** 14:*7* 33:*7*
**timestamp** 57:*12*
**today** 5:*7* 6:*19*
9:*4* 25:*21* 26:*1*
60:*7*
**top** 13:*5* 17:*21*
23:*3* 24:*12* 32:*11,
17* 48:*18*
**town** 26:*5* 61:*4*
**Trading** 39:*6*
41:*8* 48:*14, 22*
49:*1, 5, 21* 65:*1, 2,
5, 15* 66:*1, 6, 9*
**transaction** 32:*7*
36:*22* 47:*16* 67:*7*
**transcript** 67:*21*
69:*7*
**transfer** 3:*17, 18*
41:*11* 47:*14, 17*
48:*2* 49:*13, 16*
50:*2, 5* 51:*6* 66:*5*
**transfers** 52:*17*
67:*6*
**true** 49:*22* 69:*9*
72:*8*
**Truist** 4:*3* 59:*17*
**try** 55:*2*
**trying** 16:*6* 18:*5*
20:*18* 33:*13*
51:*13* 52:*16, 18,*

**22** 53:*3* 57:*18, 19*
59:*6, 17, 20*
**Tuesday** 37:*21*
38:*3* 55:*13* 57:*21*
**tunnel** 34:*21*
**turned** 61:*19*
62:*8*
**two** 24:*15, 18*
32:*3* 64:*16, 18*
**type** 50:*7*
**typed** 50:*4*
**typewriting** 72:*8*

**< U >**
**understand** 20:*21*
**understandable**
23:*10*
**understanding**
11:*3* 19:*11* 40:*17*
41:*4* 51:*19* 69:*12*
**UNITED** 1:*1*
**units** 13:*11*
**use** 48:*4* 51:*12*
53:*19* 54:*9* 62:*12*
**usually** 50:*6* 67:*6*

**< V >**
**VA** 2:*6*
**verbally** 5:*10*
**Verbatim** 1:*15*
**verification** 35:*12*
**versions** 63:*10*
**VIRGINIA** 1:*1,
16* 2:*14* 7:*6*
12:*15* 61:*3* 72:*19*
**voicemail** 62:*3*
**vs** 1:*5* 69:*3*

**< W >**
**want** 9:*13* 12:*6*
17:*21* 20:*21* 23:*6*
26:*2* 30:*11* 31:*10,
18* 32:*6, 11* 36:*13*
44:*11* 57:*2* 62:*21*
67:*2, 20*

wanted  19:*7*
38:*17*  54:22
wants  24:*21*
way  19:*21*  25:*4*
43:*7*  59:*3*  62:*1*
**Wednesday**  1:*9*
55:*13*  58:*6*  59:*1*
69:*4*
weekly  54:*20, 22*
weird  56:*14*
**Well**  8:*6*  9:*21*
13:*9*  14:*20*  20:*12*
24:*17*  37:*4*  43:*18*
44:*16*  45:*10*  49:*3*
52:*6*  61:*3*  64:*22*
went  7:*12*  51:*6*
52:*17*  54:*21*
56:*13*  61:*18*  66:*5*
we're  27:*17*
34:*19*  52:*6*  66:*21*
**WESTERN**  1:*1*
we've  26:*4*  39:*2*
52:*9*  54:*7*  67:*12*
**Whichever**  37:*20*
**Wire**  3:*17, 18*
41:*4*  47:*14, 17*
48:*1, 12*  49:*13, 15,*
*17*  50:*2, 5, 11*
51:*6*  52:*17*  57:*4,*
*13*  58:*9*  59:*18, 19*
60:*3*  66:*5*  67:*6*
**Withdrawal**  4:*2*
36:*12, 19*  37:*16*
52:*2*  56:*4, 12*
58:*19*
withdrawals  45:*19*
withdrawn  36:*20*
**WITNESS**  3:*2*
30:*9*  72:*4, 6, 9*
work  12:*13*
36:*14*  52:*4*  53:*10*
worked  53:*4*
55:*11*  59:*4*  61:*13*
working  5:*16*
works  64:*2*

**WPI**  51:*21*
wrap  5:*15*
write  64:*6*
written  42:*13*
wrong  18:*2*
wrote  57:*5*

**< Y >**
**Yeah**  14:*22*
25:*15*  29:*8, 11*
38:*22*  42:*2*  51:*8*
55:*7, 12*  58:*11*
years  6:*6*  16:*15*
20:*19*
**York**  7:*5*  32:*20*

**< Z >**
zero  8:*14*
**Zoom**  1:*14*  24:*15*