**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**(Charlottesville Division)**

| | | |
|---|---|---|
| **LCF GROUP, INC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PIEDMONT POWER SPORTS, INC.,** | ) | **Civil Action No.: 3:22-cv-57** |
| **Et al.,** | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PIEDMONT DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Piedmont Power Sports, Inc. ("Piedmont"), New River Kubota, Inc. ("New River Kubota"), and Jack L. Rickett, Jr. ("Rickett") (collectively "Piedmont Defendants"), pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), file this memorandum in support of *Piedmont Defendants' Motion for Summary Judgment* ("Motion for Summary Judgment") (ECF No. 53).

## I.    MATERIAL FACTS

### A.  Funding Circle Loan

1.      On March 16, 2020, Piedmont entered into a loan agreement with FC Marketplace, LLC, d/b/a Funding Circle ("Funding Circle"), borrowing $300,000 at an interest rate of 19.99% APR to offset economic costs ascribed to the Covid-19 Pandemic ("2020 Funding Circle Loan"). *See* LCF 000032-50, Ex. 1; Rickett Dep. 18:12-21:6, Ex. 2.

2.      In May of 2022, Piedmont received an unsolicited "generic" email from Funding Circle offering to refinance the 2020 Funding Circle Loan at an interest rate in the "range of . . . four to nine or four to ten percent." After expressing interest, Rickett received additional information from a man identifying himself as Funding Circle employee, Jeremy Snyder ("Snyder"). *See* Rickett Dep. 31:4-14, 34:1-35:7, Ex. 2.

3.     Piedmont has since received additional solicitations from Funding Circle for loans for up to $500,000 and at interest rates as low as 7.49% APR. *See* PPS0742-45, Ex. 3.

4.     On June 8, 2022, Snyder sent an email to Rickett which approved refinancing the $207,216.21 remaining on the 2020 Funding Circle Loan, the payoff of another lender's loan to Piedmont ("Samson MCA Loan"), and some additional funding for Piedmont expenses: the represented loan offered Piedmont $350,000 at 4.29% APR ("2022 Funding Circle Loan") with the condition that Rickett submit additional documentation. *See* LCF 000051-53, Ex. 4; PPS0144-156, Ex. 5; Piedmont Defendants' answers to LCF's Rogs at Nos. 8, 14, Ex. 6.   LCF does not have information or documents to dispute this fact. *See* LCF Dep. 130:11-22, Ex. 7.

5.     On June 9, 2022, Rickett signed the 2022 Funding Circle Loan, believing it to be a bona fide offer to lend. *See* LCF 000054-81, Exhibit 8.

6.     On June 10, 2022, as requested by Snyder to complete the funding process, Rickett sent Snyder two pictures of himself holding up his driver's license and a copy of a piece of paper which read, "Jack Rickett Piedmont Power Sports, Inc. 6/10/2022." *See* PPS0329-330, Ex. 9; Rickett Dep. 42:7-43:8, Ex. 2.

7.     Later, on Friday, June 10, 2022, Piedmont's operating account at Truist ending in 4682 ("Piedmont Operating Account") received an incoming wire transfer of $349,570.00, which Rickett believed to be the 2022 Funding Circle Loan, minus fees. Truist identified this wire transfer as "INCOMING WIRE TRANSFER REF# 20220610-00017665." It did not mention or reference the words "Last Chance Funding" or "LCF." *See* June 2022 Piedmont Operating Account Statement, PPS0728-733, Ex. 10; Rickett Dep. 44:2-45:5, Ex. 2.

8.     Monday morning, June 13, 2022, Truist Bank wired $207,216.21 by which Rickett intended to pay off the 2020 Funding Circle loan ("Attempted Payoff"). PPS0104-107, PPS0135-

137, Ex. 11; Answers to LCF's Rogs at Nos. 8, 14, 19, Ex. 6. Snyder told Rickett the payment would make it "easier for [Funding Circle's] accounting department to give credit for [his] loan being paid off." Rickett Dep. 41:10-17, Ex. 2.

**B. The Forged MCA Agreement**

9.     In May 2022, a man identifying himself as Eric Schaefer ("Schaefer") and claiming to own the company SchaeferEnterprises, LLC ("SchaeferEnterprises"), applied to be an Independent Sales Organization ("ISO") with LCF Group, Inc. ("LCF"). LCF produced a purported ISO agent application dated May 25, 2022 and ISO Agent Sales Agreement dated the "25th day of May, 2020[sic]" between itself and "SchaeferEnterprieses[sic] LLC dba Scahefer[sic] Capital Group," ("ISO Agreement"). *See* LCF 00002-00014, Ex. 12.

10.     Around June 8, 2022, through the ISO Agreement, an unknown individual using the identities of the Piedmont Defendants, including the fabricated email address piedmontpowersports@outlook.com (LCF 00030) and phone number 540-558-4208 (LCF 00016), signed a Merchant Cash Advance Agreement ("MCA Agreement") with LCF. LCF Dep. 71:21-25, 81:13-82:18, Ex. 7; LCF 00002-30, Ex. 12; Answers to Piedmont's Rogs No. 4, Ex. 13.

11.     LCF vetted this unknown individual in a recorded merchant interview but did not realize the person on the phone was not Rickett. *See* LCF Dep. 103:8-106:8, Ex. 7; Funding Confirmation Calls LCF01285 and LCF01286, Ex. 14 and 15.

12.     None of Rickett, Piedmont, New River Kubota, nor their agents use the email address piedmontpowersports@outlook.com[1] or the phone number 540-558-4208. *See* Rickett

---

[1] Another fake email ascribed to Piedmont was info@piedmontpowersports.com. LCF discovered this email to be fake as early as June 14, 2022. *See* Microsoft message, LCF 001317-001320, Ex. 16 (sent by LCF on June 14, 2022 in an attempt to contact Piedmont at info@piedmontpowersports.com : message stated "the recipient's domain does not exist").

Dep. 53:14-54:10, Ex. 2; LCF Dep. 126:1-25, Ex. 7; CLEAR Reports, LCF 00274-00331, 00463-00480, and Decision Logic report, LCF 01135, 1142, 1147, 1151, 1197, 1204, 1209, and 1213, Ex. 17; LCF log notes, LCF 001804-001808, Ex. 18.

13.    On Friday, June 10, 2022, "LCF Group *transmitted* the sum of $349,570.00" into Piedmont's Operating Account based on representations to LCF by Schaefer, the ISO[2] Agreement, and the MCA Agreement. *See* Answers to Piedmont's Rogs at No. 16 (emphasis added), Ex. 13; LCF Dep. 74:2-6 (emphasis added), Ex. 7; LCF00002-30, Ex. 12; NY Complaint ¶ 32, PPS0499-0516, Ex. 19; LCF 001815, Ex. 20; LCF log notes at LCF 001806, Ex. 18.

14.    LCF referred to Schaefer as a "broker" for Piedmont. LCF Dep. 21:16-19, Ex. 7. LCF claims to have paid SchaeferEnterprises a $17,500 commission for the MCA Agreement and that it had not recovered that sum or determined its whereabouts.[3] *See* LCF Dep. 174:12-21, Ex. 7. *See also* Supplemental Emergency Affirmation of Feldman, LCF 000999-001000, Ex. 21.

15.    Later in the day of June 13, 2022, after the Attempted Payoff, a debit was taken from the Piedmont Operating Account for $13,148.15 with the description "ACH CORP DEBIT 8884992939 Last Chance Fund Piedmont Power Sports CUSTOMER ID 98346593" ("Unauthorized LCF Debit"). *See* PPS0728-733, Ex. 10; LCF Dep. 140:14-18, Ex. 7; Rickett Dep. 36:10-38:5, Ex. 2: Answers to LCF's Rogs at Nos. 8, 12, 18, 19, 20, Ex. 6.

16.    Piedmont called Truist to determine the source of the Unauthorized LCF Debit and obtained contact information for LCF. *See* Rickett Dep. 36:10-38:5, Ex. 2; Answers to LCF's Rogs at No. 8, Ex. 6; LCF log notes at LCF 001806, Ex. 18.

---

[2] LCF describes how ISOs protect communications with merchants and that LCF obtains information about merchants primarily from their ISOs. *See* LCF Dep. 58:16-59:14, Ex. 7.
[3] This payment never went through. LCF retained the money after getting notice that SchaeferEnterprises' account had "closed." *See* LCF Email to eric@schaefercapitalgroup.com, LCF 001452-LCF 001453, Ex. 22.

17.    Piedmont asked LCF about the Unauthorized LCF Debit and was told for the first
time that LCF, and not Funding Circle, had deposited $349,570.00 into the Piedmont Operating
Account the Friday before. *See* Rickett Dep 36:10-38:5, Ex. 2. *See also* LCF Dep. 169:8-18,
171:18-172:11, Ex. 7; Answers to LCF's Rogs at No. 8, Ex. 6.  And LCF informed Piedmont that
Schaefer, through SchaeferEnterprises, had facilitated the MCA Agreement, precipitating the
$349,570.00 deposit. *See* LCF00002-30, Ex. 12; Answers to Piedmont's Rogs at Nos. 2, 6, 16, Ex.
13 (stating "Plaintiff received Piedmont's information needed to process the application for a
merchant agreement from the broker, Schaeffer(sic).")

18.    Rickett emailed Snyder, still masquerading as a Funding Circle employee, who told
him that LCF was a "lending partner." Rickett Dep. 51:22-53:10, Ex. 2; PPS0104-0107, Ex. 23.

19.    Around June 13th-14th, Piedmont employee Cyndi Smith ("Smith") and Rickett,
suspecting Snyder's fraud, tried to stop the Attempted Payoff by contacting Truist. *See* PPS0206-
207, Ex. 24; Rickett Dep. 51:22-53:10, Ex. 2; PPS0718-0721, Ex. 25.

20.    Truist could not stop the wire of the Attempted Payoff. Rickett Dep. 60:3-9, Ex. 2.

21.    Rickett contacted Funding Circle to inquire if the Attempted Payoff satisfied the
balance of the 2020 Funding Circle Loan. A Funding Circle representative told him it did not and
that Jeremy Snyder did not work for Funding Circle. *See* PPS0138-143, PPS0236-0238, Ex. 26.

22.    On June 24, 2022, LCF emailed Schaefer to attempt to coordinate repayment of the
$349,570.00. *See* Rabinovich email, LCF 001450-01451, Ex. 27.

23.    On June 24, 2022, Michael Silva ("Silva"), employee collection agent for LCF,
called Rickett at 1-540-672-1111 and "agreed" that LCF and Piedmont had "been scammed," that
"illegal activity happened" to Rickett, and that "both [LCF and Piedmont had] been affected in a
real derogatory way." *See* Silva-Rickett Recording No. 1, LCF 001816, Ex. 28; LCF 001334-

001335, Ex. 29. Rickett asked Silva to "agree these are the steps we're going to take to work together," to which Silva replied, "absolutely" and "we can work as a team to get this done," speaking about recouping the money taken by Snyder's fraud. *See id.*

24.     Later on June 24, 2022, and in a subsequent phone call, Rickett stated that "what you have [the MCA Agreement] and what I have [the 2022 Funding Circle Loan] are two different things," that LCF did not even have his "right email address," and that he "didn't sign anything with LCF," to which Silva responded, "we know that." *See* Silva-Rickett Recording No. 2, LCF 001815, Ex. 20. The recording of this conversation was forwarded to Feldman, Rabinovich, and Jennifer Lindsey that same day. *See* LCF 001332-001333, Ex. 30.

25.     After Rickett reported the incident to authorities, an FBI agent told him of other investigations involving Funding Circle borrowers. *See* Rickett Dep. 60:18-62:10, Ex. 2; FBI Communications, PPS0239, Ex. 31.

26.     LCF speculated that: "somebody at Funding Circle may have victimized us" and Adam Feldman ("Feldman"), LCF's Chief Legal Officer, stated he had not completely disavowed that theory. *See* LCF Dep. 87:16-90:5, Ex. 7.

27.     A third-party fraudster, using Rickett's doctored pictures, misdirected the Attempted Payoff into a cryptocurrency account at Legend Trading (the "Legend Trading Account"). Rickett Dep. 63:7-66:11, Ex. 2; PPS0329-330, Ex. 9; LCF 000089-000094, Ex. 32.

28.     The Legend Trading Account used Piedmont's name, but no Piedmont Defendants opened or authorized such an account. *See* Rickett Dep. 65:13-16, Ex. 2.

29.     None of the Piedmont Defendants received cryptocurrency from the Legend Trading Account. *See* Rickett Dep. 63:7-66:11, Ex. 2.  Nor did they authorize or use the Legend Trading Account. *See* LCF 000089-94, Ex. 32; LCF Dep. 187:10-188:11, Ex. 7.

6

30.     It was not Rickett's handwriting on the doctored photos submitted to Legend Trading, and LCF has no information to support that those photos, which they received from Legend Trading, contain Rickett's handwriting. *See* LCF Dep. 153:25-154:2, 154:17-20, Ex. 7.

31.     On September 14, 2022, Rickett wired LCF $129,205.34 (the difference between the $349,570.00 deposited in the Piedmont Operating Account and the $207,216.21 taken by the fraudster); the $129,205.34 accounted for the funds Piedmont Defendants used to pay the Samson MCA Loan. Compl. ¶ 60; LCF Dep 140:19-141:5, Ex. 7; LCF 001766-001767, Ex. 33. Resultingly, the amount remaining in dispute with this Court is the $207,216.21.

**C.  LCF Litigation Against Piedmont Defendants**

32.     LCF employees relayed Rickett's communications with Snyder, including Funding Circle documents, to LCF's counsel, Marcella Rabinovich, from the Feldman Law Firm, P.C. *See* Silva Dep. 71:18-24, Ex. 34; LCF001383-001411, Ex. 35; LCF 001630-001632, Ex. 36.

33.     In July of 2022, LCF obtained, *ex parte*, a temporary restraining order ("TRO") in a New York court against the Piedmont Defendants and subsequently froze Piedmont Defendants' operating account and credit card processing account (the "New York Case"). *See* LCF 000979, Ex. 37; LCF 001102-001123, Ex. 38; PPS0499-0516, Ex. 19. *See also* LCF Dep. 156:6-19, Ex. 7.

34.     New River Kubota, Inc., a named party, is an inactive corporation in Virginia as of April 30, 2022: it conducts no business and holds no assets. Rickett Dep. 11:5-13, attached as Ex. 2; New River Kubota SCC filings, Ex. 39. (This information is publicly available with the SCC.)

35.     In the New York Case, Feldman and his firm represented LCF as outside counsel: Feldman did not act in his capacity as Chief Legal Officer. *See* LCF Dep. 163:6-14, Ex. 7.

36.     On August 19, 2022, in the New York Case, Rabinovich admitted in open court
that: "We have a loan agreement signed by someone. We understand it's not with Jack Rickett."
*See* New York Case, NO. 35 at 14, PPS0367-0391, Ex. 40. *See* LCF Dep. 155:11-156:4, Ex. 7.

37.     On September 20, 2022, after a month of interference with Piedmont's business
and cashflow and after incurring over $60,000 in legal fees to hire New York lawyers, a New York
appellate court vacated the TRO. *See* PPS 0710-712, Ex. 41.

38.     On September 28, 2022, LCF filed a notice of discontinuance dismissing the New
York Case without prejudice. *See* PPS 0713, Ex. 42.

39.     That very day, LCF filed its Complaint against Piedmont Defendants in the Western
District of Virginia (the "Virginia Case") (ECF No. 1). The Virginia Case includes a cause of
action for breach of contract and attached the MCA Agreement as Exhibit A.

40.     In November of 2022, LCF obtained from Schaefer an affidavit to substantiate that
he was the victim of identity theft and that he had no connection to LCF or the Piedmont
Defendants. *See* Schaefer Affidavit, LCF 001288-001291, Ex. 43.  Despite Piedmont Defendants'
request for communications with Schaefer, LCF did not produce the Schaefer Affidavit to
undersigned counsel until April 18, 2023, after undersigned counsel learned about it from
Schaefer's counsel. Robertson Email, PPS0748-0749, Ex. 44; LCF's RPDs at No. 15, Ex. 45.

41.     On March 1, 2023, LCF alleged a contract with Piedmont in LCF's answers to
Piedmont's Rogs Nos. 2, 5, 6, and 16. Answers to Piedmont's Rogs, attached as Ex. 13.

42.     On May 24, 2023, Piedmont Defendants conducted the Rule 30(b)(6) deposition of
LCF's corporate representative, Feldman ("LCF Deposition"), who admitted that no "operative"
contract existed between LCF and Piedmont Defendants. *See* LCF Dep. 74:2-6, Ex. 7.

43.     In the LCF Deposition, Feldman also admitted that he used "John Doe," "XYZ Corporation," and "ABC LLC" and referred to Eric Schaefer as a "John Doe" in his New York Affirmation because he did not know the identities of the individuals/entities that participated in the suspected fraud. LCF Dep. 158:13-162:12, 172:12-173:7, 174:22-176:6, Ex. 7.  LCF admitted it had no additional information, other than the advice of counsel, to substantiate that Schaefer and not a "John Doe" transacted the business with LCF when it filed the Virginia Case. *See* LCF Dep. 179:22-182:16, Ex. 7.  LCF "referenced Eric Schaefer or fake Eric Schaefer as a John Doe [in the New York Case] because if he was not actually party to it, a civilian doesn't necessarily need to have himself dragged through the mud particularly when there is not seemingly going to be a benefit to it under the fact pattern [Feldman's] opinion." *See* LCF Dep. 175:22-176:2, Ex. 7.

44.     Rickett had no knowledge of Schaefer prior to the New York Case. *See* Rickett Dep. 28:15-19, Ex. 2.

45.     On June 12, 2023, Schaefer affirmed and supported in deposition testimony the statements made in his affidavit, disavowing all connection to business with Piedmont Defendants and LCF. *See* Schaefer Dep. 13:12-15:16, 29:9-30:25, 31:12-34:1, 43:25-47:9, Ex. 46.

46.     Schaefer affirmed he is not connected to SchaeferEnterprises, he did not sign/see an ISO application/ISO Agreement, none of the contact information in ISO documents belonged to him, to any company he owned or had affiliation with, and that he has never represented himself as LCF's agent. Schaefer Dep. 37:1-41:10, 41:18-43:8, Ex. 46.  The ISO application and ISO agreement don't even spell his name correctly. Schaefer Dep. 5:24-6:5, Ex. 46.

47.     Schaefer also had a Funding Circle loan. *See* Schaefer Dep. 52:24-54:5, Ex. 46.

48.     Schaefer became aware that his identity had been stolen as early as 2020. *See* Schaefer Dep. 23:13-24:13, Ex. 46.

49.     After his deposition, Schaefer produced a voicemail from a New York company in which a man identifying himself as the Vice President of Risk Management for Velocity Capital Group informed Schaefer that his identity was used by a fraudster to set up an ISO to fund various merchants and then steal from them. *See* Schaefer Voicemail, PPS0747, Ex. 47.

50.     On June 12, 2023, in the deposition of Michael Silva ("Silva"), employee collection agent for LCF, he explained that call notes documenting LCF's first phone call with a Piedmont representative stated: "Initial phone call merchant was confused, thought we were calling from Funding Circle. Wasn't sure what was transpiring." *See* Silva Dep. 17:24-18:1, Ex. 34.

51.     Silva admitted to receiving Rickett's communications with Snyder and Funding Circle before LCF filed the New York Case, including an email with a photo attachment of Jack holding up his driving license and a piece of paper reading: 'Jack Rickett, Piedmont Power Sports, Incorporated, 6/10/22.' *See* Silva Dep. 45:13-48:11, Ex. 34.

52.     Describing his interactions with Rickett, Silva testified: "I'm really just trying to extrapolate information out of Rickett, right, in any sort of way possible" and "part of this job means that you have to communicate things without necessarily always communicating things. Right? And I'm trying to communicate to him that we've been taken for a ride . . . in hopes that I can bring him with us to help get our funds back." *See* Silva Dep. 56:9-10, 57:3-15, Ex. 34; Silva Dep. 48:12-49:12, 54:20-57:15, 58:10-59:23, Ex. 34; PPS0166-PPS0205, Ex. 48; LCF 001340-001341, Ex. 49; LCF 001815, Ex. 20; LCF 001816, Ex. 28.

53.     Silva admitted that he made this and other false assertions to pressure Rickett to allow LCF to continue to withdraw funds from the Piedmont Operating Account or otherwise collect from Piedmont Defendants. *See* Silva Dep. 22:23-31:6, Ex. 34.

54.     Silva and LCF confirmed Silva's email address to be msilva@thlcfgroup.com and his phone number to be (954) 740-6999, authenticating his emails and texts. *See* LCF Dep. 134:7-18, Ex. 7; Silva Dep. 12:16-13:25, Ex. 34.

55.     In a personal declaration, Rickett affirmed the extent of the harm and expense LCF caused him and Piedmont by its overly aggressive legal filings and *ex parte* proceedings, based largely on false factual assertions. *See* Rickett Declaration, Ex. 50.

## II.   LEGAL STANDARD

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden to show that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "To defeat a motion for summary judgment, the nonmoving party must go beyond the facts alleged in the pleadings, and rely instead on affidavits, depositions, or other evidence to show a genuine issue for trial." *Heywood v. Va. Peninsula Reg'l Jail Auth.*, 217 F. Supp.3d 896, 899 (E.D. Va. 2016).

"Conclusory statements, without specific evidentiary support, do not suffice, … nor does 'the mere existence of a scintilla of evidence in support of the plaintiff's position.'" *Id.* at 900 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998)). A "genuine" issue is present only if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. A court must enter judgment against a party who fails to establish the existence of an essential element of his claim that he has the burden of proving at trial. *Johnson v. Quinones*, 145 F.3d 164, 166-67 (4th Cir. 1998) (citing *Celotex Corp.*, 477 U.S. at 322).

## III.    ARGUMENT

A.  Fraud in the Inducement

To properly allege fraud: "a plaintiff must plead that there was 'a false representation of a material fact, made intentionally and knowingly, with the intent to mislead.'" *See Sales v. Kecoughtan Hous. Co.*, 279 Va. 475, 481, 690 S.E.2d 91, 94 (Va. 2010) (citations omitted). Also, the misrepresentation must be "of an existing fact and not the expression of an opinion." *Id.* at 481 (citations omitted). Fraud in the inducement requires "'one party induc[ing] the other to perform by concealing some fact which excuses performance by the latter.'" *See Devine v. Buki*, 289 Va. 162, 175, 767 S.E.2d 459, 466 (Va. 2015) (citations omitted). Actions for fraudulent inducement can be supported by concealment of a material fact before the formation of a contract, as well as concealment of a material fact during the performance of the contract. *See id.* at 174-175.

1.  LCF Admits it Did Not Have a Valid Contract with Piedmont

LCF cannot support its claim for fraud in the inducement where it has also admitted that the MCA Agreement is not "operative." LCF Dep. 74:2-6. And, no facts demonstrate that Piedmont or Rickett participated in that forged agreement. The facts point to a third-party fraudster(s) orchestrating the MCA Agreement's formation. *See* Exs. 2, 7, 13, 14, 15, 18, 46. Fraud in the inducement requires that some action or agreement be induced by the Piedmont Defendants.

2.  Schaefer was not an Agent of Piedmont

Fraudulent inducement requires the concealment of a material fact by the Piedmont Defendants. But the Piedmont Defendants did not interact with LCF prior to the $349,570.00 deposit or prior to the formation of the MCA Agreement. LCF offers no facts to show otherwise. The MCA Agreement was not signed by an individual using a valid email address or phone number. LCF admits that all information about Piedmont was submitted to LCF by Schaefer and SchaeferEnterprises as its "broker." *See* Ex. 12, 13. But Schaefer had his identity stolen and

12

SchaeferEnterprises was a sham company formed using his stolen identity. *See* Ex. 46. Schaefer did not act as an agent for Piedmont or submit an MCA Agreement to LCF. Because LCF lacks support for the position that either Piedmont or its agent induced LCF to enter into or perform the MCA Agreement, it cannot sustain its claim of fraud in the inducement.

B. Statutory Conspiracy

Statutory conspiracy requires "[a]ny two or more persons . . . combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business, or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." *See* Va. Code § 18.2-499(A).

1. Piedmont Defendants Did Not Communicate with Schaefer or SchaeferEnterprises, LLC

To sustain an action for statutory conspiracy, LCF would need to identify "two or more persons" who participated in a conspiracy to harm its business. *See* Va. Code § 18.2-499(A). New River Kubota is an inactive corporation. *See* Ex. 2, 39. Rickett is principal of Piedmont who is alleged to have acted as such and so is not an independent co-conspirator with Piedmont. And Schaefer affirmed that he did not know of or interact with Rickett or Piedmont but was the victim of identity fraud himself. Schaefer had no connection to SchaeferEnterprises. *See* Ex. 46. Rickett, likewise, confirmed in his deposition testimony that he did not know of or interact with Schaefer or SchaeferEnterprises before the LCF litigation. *See* Ex. 2. LCF has no evidence to show otherwise and even admitted it did not want to drag Schaefer "through the mud . . . under the fact pattern." *See* Ex. 7. LCF has not supported that more than one person participated in anything, much less a statutory conspiracy, and so there is no genuine issue of material fact to deny summary judgment in favor of Piedmont Defendants at this juncture.

13

2. <u>LCF Cannot Prove Piedmont Defendants Set Out to Cause LCF Harm</u>

An action for statutory conspiracy requires more than a "scintilla" of evidence to prove that Piedmont Defendants "willfully and maliciously" sought to harm LCF. *See* Va. Code § 18.2-499(A). These facts simply do not exist. Piedmont Defendants did not know of LCF prior to the forged MCA Agreement, the incoming wire to Truist Bank, or the Unauthorized LCF Debit. *See* Ex. 2, 6, 7. LCF does not support its legal conclusion that Piedmont Defendants set out to cause it harm and cannot substantiate that they retain the $349,570.00 deposit into the Piedmont Operating Account. A fraudster absconded with $207,216.21 through a Legend Trading Account, while Rickett returned to LCF the remaining balance of $129,205.34. LCF's claim for statutory conspiracy cannot prevail on the immutable facts of this case.

C. <u>Breach of Contract</u>

"The elements of a breach of contract action are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Young-Allen v. Bank of Am., N.A.*, 298 Va. 462, 469, 839 S.E.2d 897, 901 (2020). Without a "meeting of the minds" a valid contract cannot be formed. *See Phillips v. Mazyck*, 273 Va. 630, 643 S.E.2d 172 (Va. 2007).

1. <u>LCF Admitted the MCA Agreement Was not "Operative"</u>

Feldman, in LCF's Corporate Deposition, admitted on the record that LCF did not consider the MCA Agreement to be "operative." LCF Dep. 74:2-6. Absent an "operative" contract, no breach exists. The contract claim should be dismissed on that statement alone.

2. <u>LCF and Piedmont Defendants Did Not Interact Prior to the Alleged Contract.</u>

i. <u>No Meeting of the Minds Existed Prior to the MCA Agreement</u>

The formation of a valid, express written contract requires a meeting of the minds. Where the proffered parties do not know of each other, it is not possible for them to achieve this "meeting of the minds." *See Phillips v. Mazyck*, 273 Va. 630, 643 S.E.2d 172 (Va. 2007). The undisputed and indisputable material facts are that LCF did not interact with Piedmont Defendants or their agent prior to the creation of the MCA Agreement; LCF's agents were communicating with the mastermind(s) behind this mess who posed as Snyder of Funding Circle and fake Schaefer of SchaeferEnterprises. Piedmont did not ratify the MCA Agreement either, as LCF used false contact information to affirm the fake deal. SchaeferEnterprises and Schaefer were not valid agents for Piedmont. Neither Piedmont Defendants, nor an agent, agreed to the terms of the MCA Agreement. Instead, Piedmont believed itself to be reaching vastly more favorable terms by refinancing an existing loan with lender Funding Circle, which is evident from Piedmont Defendants' interactions with Snyder. *See* Ex. 4, 5, 6, 8. LCF does not have information or documents to dispute this fact. *See* Ex. 7. The parties did not intend to do business with one another. Because of this, the contract claim fails, and summary judgment must be entered for Piedmont Defendants.

  ii. <u>No Offer or Acceptance Occurred.</u>

Likewise, with no true interactions between Piedmont Defendants or their agent and LCF, LCF cannot prove that the MCA Agreement reflects a valid accepted offer. Receipt of the LCF funds alone, without knowledge of the terms of the MCA Agreement, cannot effectuate such acceptance. On the contrary, Piedmont Defendants actions disavowed acceptance. Without offer and acceptance, LCF's breach of contract claim cannot prevail, and summary judgment should be granted in favor of Piedmont Defendants.

D. <u>Conversion</u>

Under Virginia law, conversion requires:

> 'any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith.'   Thus, a plaintiff asserting a conversion claim must prove by a preponderance of the evidence (i) the ownership or right to possession of the property at the time of the conversion and (ii) the defendant's conversion by the wrongful exercise of dominion or control over the plaintiff's property, depriving plaintiff of possession.

*See Federal Insurance Company v. Susan M. Smith, et al.*, 144 F.Supp. 2d 507, 518 (E.D. Va. 2001). "The mental state required for conversion is purely and simply a specific intent to appropriate the property. Knowledge that the property belongs to another, or that the appropriation is unauthorized by the owner, is not necessary." *See Gordon v. Pete's Auto Service of Denbigh, Inc.*, 837 F.Supp. 2d 581, 585 (E.D. Va. 2011) (citations omitted). And, "[a] plaintiff cannot bring a claim for conversion unless he has a property interest in and is entitled to immediate possession of the converted item." *Worldcom, Inc. v. Boyne*, 68 Fed. Appx. 447, 454 (4th Cir. 2003) (citations omitted). In other words, a plaintiff lacks standing in a conversion claim where the plaintiff has no property interest at the time of conversion. *See CB & PB Enterprises, LLC v. McCants*, 76 Va. App. 407, 414 (2023) (citations omitted).

In general, conversion under Virginia law "applies only to tangible property." *See United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994). To be subject to a conversion claim, intangible property rights must "arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond." *See id.* And with respect to bank deposits, "[t]he general rule is that 'the relation between a general depositor and the bank in which his deposit is made is simply that of debtor and creditor. *The moneys deposited immediately become the property of the bank, and the latter becomes [a] debtor of the depositor*.'" *See Arch Insurance Co. v. FVCbank*, 881 S.E.2d 785, 793 (2022) (citations omitted) (emphasis added).

1. <u>LCF Intentionally Deposited Money into the Piedmont Operating Account</u>

LCF willingly entered into the MCA Agreement, believing Piedmont was of like mind. It is undisputed that LCF intended to enter into the MCA Agreement and intended to and did perform according to its terms. *See* Ex. 13. Critically, LCF intended to purchase Piedmont's future receivables with the transferred funds. *See* Ex. 12. After receiving the signed MCA Agreement, LCF deposited $349,570.00 into the Piedmont Operating Account on June 10, 2022, planning to debit money from that same account each week, beginning with June 13, 2022. On the other side of the transaction, Piedmont's use of the funds was not limited by either the fake Funding Circle cash-out refinance transaction or the fake MCA Agreement. Once the money was in its general deposit account at Truist Bank, Piedmont could use them as it saw fit, insofar as it knew. Of course, after both parties discovered the fraud on June 13, 2022, the funds at issue had already been lost earlier that day due to Snyder's scam. *See* Ex. 2, 6, 7, 9, 11, 32.

2. Piedmont Defendants Did Not Wrongfully Exercise Dominion/Control of LCF Property.

LCF's deposit of $349,570.00 into the Piedmont Operating Account and the parties' independent misunderstandings of the transaction which persisted until they each discovered the scam AFTER the $207,216.21 was gone from the control of either party disqualify the application of conversion. At the time LCF made the deposit, LCF relinquished its property rights in that money in exchange for expected future payments from Piedmont receivables. To state a claim for conversion under Virginia law, a plaintiff must plead "(i) the ownership or right to possession of the property at the time of the conversion and (ii) the wrongful exercise of dominion or control by defendant over the plaintiff's property, thus depriving plaintiff of possession." *Airlines Reporting Corp. v. Pishvaian*, 155 F.Supp.2d 659, 664 (E.D. Va. 2001).

> A plaintiff seeking recovery on a claim of conversion must prove that the defendant converted it by "any" wrongful exercise of dominion or control that deprived the plaintiff of his rightful possession.

*Kindred v. McLeod*, No. 3:08CV00019, 2010 WL 4814360, at *8 (W.D. Va. Nov. 19, 2010)

At the time of the alleged conversion, LCF claimed no ownership or right to possession. It claimed that right only after it learned that Piedmont had not signed the MCA Agreement and would not permit weekly ACH debits; LCF claimed such ownership and right to possession only after the money was no longer within Piedmont Defendants' possession or control. Piedmont Defendants did not solicit the funds from LCF, did not know the funds belonged to LCF, believed it was paying off Funding Circle, and only found out after the funds went through its Truist account that its beliefs were founded on Snyder's purposeful fraud. Their activities in handling the money were not wrongful exercises of dominion or control depriving LCF of rightful possession. If the word "wrongful" is to have meaning, Piedmont Defendants' activities must be examined under the attendant circumstances, and the element of wrongful exercise is not present and cannot be proven.

3.  The Money at Issue is Ineligible to be the Subject of a Conversion Claim.

Under Virginia law, "money can only be the subject of a conversion claim in limited circumstances, including when it is part of a segregated or identifiable fund." *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1019–20 (E.D. Va. 2018) (citations omitted). A segregated or identifiable fund is "one separate from the defendant's general funds and one to which plaintiff is entitled." *Id.* By depositing money without limitation or instruction into the Piedmont operating account, which contained Piedmont's other funds, the deposit belonged to the bank in which it was deposited, as "moneys deposited immediately become the property of the bank, and the latter becomes [a] debtor of the depositor." *See Arch Insurance Co. v. FVCbank*, 881 S.E.2d 785, 793 (2022). Piedmont had a right to use the commingled money in its account as soon as it was deposited. And that is precisely what Piedmont did when it authorized Truist to make the Attempted Payoff of existing 2020 Funding Circle Loan and the payoff of a Samson MCA Loan.

4. Facts Debunk LCF's Pleading of Conversion

LCF, in its claims of conversion, pled that "Piedmont Power Sports and Mr. Rickett obtained Plaintiff's funds under false pretenses." *See* Compl. ¶ 94. And LCF alleges that "Piedmont Power Sports and Mr. Rickett used a trading account with non-party Legend Trading, Inc. to convert Plaintiff's funds into untraceable Cryptocurrency." *See* Comp. ¶ 95. Yet, Piedmont Defendants did not communicate with LCF prior to the $349,570.00 deposit; they had no interactions or communications with their supposed agents, Schaefer/SchaeferEnterprises; and Piedmont Defendants did not open or control the Legend Trading account, which was the vehicle by which Snyder turned dollars into the cryptocurrency he absconded with. LCF's allegations in its conversion claims are disproven by the undisputed material facts.

For these reasons, conversion is not a provable claim, and there is no genuine issue of material fact on which LCF can rely to avoid summary judgment.

E. Unjust Enrichment/*Quantum Meruit*

LCF combined two causes of action as Count IV of the Complaint.  Unjust enrichment (equitable) and quantum meruit (legal) each have independent elements of proof.  What they have in common is LCF can demonstrate neither against the Piedmont Defendants.

1. Elements of Unjust Enrichment

Under Virginia law, a three-part test governs unjust enrichment claims: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *See James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 841 S.E.2d 642 (Va. 2020). Unjust enrichment "rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 165

(4th Cir. 2012) (citations omitted). "As matter of law, an enrichment cannot be unjust if the defendant has 'a bona fide hostile claim of right' to whatever benefit was allegedly bestowed on him." *See James G. Davis Construction Corp. v. FTJ, Inc.*, 298 Va. 582, 602 (2020). "In the context of commercial disputes involving goods or services, one is enriched only if his economic position has been measurably improved. If a defendant's economic position is exactly the same after the plaintiff's actions as before, the expenses incurred by the plaintiff in taking such actions are irrelevant." *See id.* at 601. And "[t]he measure of recovery for unjust enrichment is limited to the benefit realized and retained by the defendant." *See T. Musgrove Construction Company, Inc. v. Young*, 298 Va. 480, 486 (2020) (emphasis added).

2. Elements of *Quantum Meruit*

*Quantum meruit* is a cause of action "available when (1) the parties contract for work to be done, but the parties did not agree on a price, (2) the compensation mentioned is too indefinite, (3) there is a misunderstanding as to the price to be paid, or, (4) in some instances, the contract is void and of no effect." *See T. Musgrove Construction Company, Inc. v. Young*, 298 Va. 480, 486 (2020) (citations omitted). Unlike the measure for unjust enrichment, which "is limited to the benefit realized and retained by the defendant," the "measure of recovery for *quantum meruit* for a contract implied in fact is the reasonable value of the services provided." *Id.* at 486 (citations omitted). And the "remedy available to the plaintiff in *quantum meruit* is an award of damages amounting to the reasonable value of the work performed, less the compensation actually received for that work." *See id.* at 157 (citations omitted).

3. *Quantum Meruit* fails because these Parties did not Contract

The very first element of this claim is not and cannot be met. Piedmont Defendants did not contract to do business with LCF. LCF Dep. 74:2-6. A fraudster, pretending to be Schaefer,

submitted the MCA Agreement to LCF, purporting to be representing Piedmont Defendants. It is

factually unsupported that LCF contracted with the Piedmont Defendants. Without this element,

LCF cannot prevail on a *quantum meruit* cause of action.

4. <u>The Matter Disputed is Not Indefinite or Misunderstood Pricing for Services.</u>

*Quantum meruit* presupposes two parties having intentionally conducted business.

*Quantum meruit* is not applicable when one of side of the transaction (Piedmont Defendants) did

not know what company they were dealing with or the nature and terms of the contract (MCA

Agreement) that the party on the other side of the transaction (LCF) had performed. *Quantum*

*meruit* causes of action "fill in the blanks" on a price term for contracts performed. That is not

what is before the Court. *Quantum meruit* cannot be used to fill in the entire contract – parties,

terms of performance, and price. It simply has no application here.

5. <u>Piedmont Defendants Did Not Know of Benefit Being Conferred by LCF</u>

It is not disputed that LCF willingly deposited $349,570.00 into the Piedmont Operating

Account on June 10, 2022. Piedmont Defendants, however, did not know that it was LCF making

this deposit at the time it held the "benefit" of this money. Piedmont's Operating Account listed

the deposit as ""INCOMING WIRE TRANSFER REF# 20220610-00017665:" it did not mention

or indicate a connection to LCF. *See* Ex. 10. Even when Snyder identified LCF as a lending partner

of Funding Circle, it was a lie and that identification occurred after the Attempted Payoff. *See*,

Ex. 2, 11. Unjust enrichment operates when the party receiving the benefit is aware of the party

providing it. Those are not the facts of this case.

6. <u>Piedmont Defendants Retained No Benefit</u>

Because the MCA Agreement was not "operative," LCF alleges in the alternative to its

breach of contract claim a right to recover under the equitable theory of unjust enrichment. But

unjust enrichment hinges on Piedmont Defendants having "accepted or retained the benefit without paying for its value." *See James G. Davis Constr. Corp. v. FTJ, Inc.*, 298 Va. 582, 841 S.E.2d 642 (Va. 2020). LCF withdrew $13,148.15 from the Piedmont Operating Account on June 13, 2022, and Piedmont paid LCF $129,205.34 in September of 2022. So, at most, $207,216.21 is at play. LCF admits this in its Complaint. *See* Complaint ¶¶ 91, 92.

But that remaining $207,216.21, intended to pay off the 2020 Funding Circle Loan, did not do so and, instead, got wired to the cryptocurrency account of a fraudster. Piedmont Defendants remain obligated to repay and continue to repay that original loan. Ignoring the evidence of third-party fraud, LCF seeks to cast its own mistake as a benefit bestowed upon Piedmont Defendants, asking that equity intervene to leave it unscathed by this scam and give it judgment for the remainder of its transfer. Yet, instead of benefitting from that $207,216.21, Rickett lists the costs to himself and his company resulting from the LCF deposit and LCF's subsequent sharp collection and litigation tactics. Considering the $207,216.21 remained commingled in the Piedmont Defendants' Operating Account from a Friday afternoon until a Monday morning when a wire transmitted that sum to a fraudster-controlled Legend Trading Account, it cannot be demonstrated that Piedmont Defendants accepted or retained benefit. Piedmont Defendants' "economic position" was not even "exactly the same after the plaintiff's actions as before," it was considerably worse. *See James G. Davis Construction Corp. v. FTJ, Inc.*, 298 Va. 582, 601 (2020). As Rickett describes in his Declaration, the LCF transfer caused him a year of business loss, expense, and misery. *See* Rickett Declaration, Ex. 50. "The measure of recovery for unjust enrichment is limited to the benefit realized and retained by the defendant." *See T. Musgrove Construction Company, Inc. v. Young*, 298 Va. 480, 486 (2020). There was no benefit to Piedmont Defendants.

22

7.  <u>Because of Unclean Hands, LCF Cannot Recover</u>[4]

LCF has acted with unclean hands, and so its unjust enrichment claim, based on principles of equity, should be barred.  The unclean hands doctrine is generally expressed as follows:

> the complainant seeking equitable relief must not have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.  Equity will not give relief to one seeking to restrain or enjoin a tortious act where he has himself been guilty of fraud, tortious conduct, or the like in respect of the same matter in litigation.

*Richards v. Musselman*, 221 Va. 181, 185, 267 S.E. 2d 164, 166 n.1 (1980) (citations omitted). (citations omitted). "A court in equity 'will not relieve against conditions brought about by the improper conduct of the party seeking relief." *See Cline v. Berg*, 273 Va. 142, 148 (2007) (citations omitted). And "[a]pplication of the doctrine turns upon the facts of each particular case and is therefore left to the sound discretion of the fact finder. *See id.* at 148 (finding a "circuit court abused its discretion in failing to apply the 'clean hands' doctrine")(citations omitted).

Before depositing the $349,570.00 on June 10, 2022, LCF agents recorded a merchant interview with the "fake" Rickett. The fraudster on the call used fake email addresses and phone numbers to identify himself. LCF possessed reports containing valid email addresses and telephone numbers belonging to Piedmont Defendants but did not crosscheck the information from the fake Rickett.  LCF recorded the call and, at all relevant times, had access to the recording. Around June 14, 2022, and after the Attempted Payoff, both LCF and Piedmont/Rickett discovered the fraud.

---

[4] On June 14, 2023, the Piedmont Defendants filed a *Motion for Leave to Amend Piedmont Defendants' Answer to Add an Affirmative Defense* (ECF No. 44) and memorandum in support (ECF No. 45) to add the affirmative defense of unclean hands. The timing of the motion depended in part on facts discovered after finishing depositions and the close of discovery on June 12, 2023, including some discovered in LCF's last document production made on June 23, 2023. The Motion is currently pending, but due to the deadline to file a summary judgment motion, the Piedmont Defendants have included the affirmative defense of unclean hands and its factual support, subject to the Court's ruling on the Motion.

LCF collection agent, Silva, initiated communications with Rickett using Piedmont's valid contact information. Recorded phone conversations between Silva and the real Rickett made obvious that the prior merchant interview was with a fraudster: the real Rickett's voice was clearly distinguishable in its accent, tone, and inflection from the fake Rickett. On June 24, 2022, Silva forwarded one of these conversations with the real Rickett to other LCF employees, including Feldman, Rabinovich, and Jennifer Lindsey.

In his communications with Rickett and as early as June 24, 2022, Silva pretending to help Rickett, "agreed" that LCF and Piedmont had "been scammed," that "illegal activity happened" to Rickett, and that "both [LCF and Piedmont had] been affected in a real derogatory way." Rickett asked Silva and Silva agreed to work together with Rickett to find Snyder and to put right Snyder's fraud. Silva admitted he knew that LCF did not have a valid contract with Piedmont: he was "really just trying to extrapolate information out of Rickett . . . in any sort of way possible." *See* Silva Dep. 56:9-10, 57:3-15.

And, in July of 2022, LCF used information Silva acquired from Rickett to file an *ex parte* TRO, freeze Piedmont's accounts, and cripple Piedmont's business. LCF named "John Doe," "XYZ Corp." and other anonymous parties in the New York Case and attached affirmations to support its *ex parte* claims of fraud and conspiracy, etc., committed by Piedmont Defendants. LCF's attorney, Rabinovich, admitted in a hearing on the TRO in the New York Case, that LCF understood it had no valid contract with Piedmont, and LCF did not attach the MCA Agreement to the New York Complaint. After Piedmont Defendants incurred approximately $60,000 in legal fees, the New York appellate court vacated the TRO. In September of 2022, LCF filed this case, adding to its fraud and conspiracy claims a claim for breach of contract on the MCA Agreement.

24

Knowing all of this, LCF makes specious claims even now. LCF's actions amount to underhanded pressure tactics. LCF has unclean hands where its agents used all means possible, including dishonest ones, to collect. This Court should not hesitate to find that LCF's Unjust Enrichment count should be barred by the doctrine of unclean hands.

F.  New River Kubota is Factually Uninvolved.

New River Kubota is an inactive corporation organized by Rickett. Its inactive status with the Virginia Corporation Commission began in April of 2022, before any of the facts alleged in this lawsuit took place.  That company is not involved in the facts and has no place in this lawsuit and so should be dismissed as a defendant.

## IV.    CONCLUSION

WHEREFORE, Piedmont Defendants respectfully request that this Honorable Court grant their *Motion for Summary Judgment* and dismiss all counts in the Complaint against the Piedmont Defendants with prejudice.

Dated:  June 28, 2023                                    Respectfully submitted,

**PIEDMONT POWER SPORTS, INC.,
NEW RIVER KUBOTA, INC., AND
JACK L. RICKETT, JR.**

By Counsel

    */s/   Lindsay K. Bunting Eubanks*
Andrew Biondi, Esq. (VSB No. 48100)
Lindsay K. Bunting Eubanks, Esq. (VSB No. 94686)
SANDS ANDERSON PC
1111 East Main Street, Suite 2400
P.O. Box 1998
Richmond, VA 23218-1998
Phone: (804) 648-1636
E-mail: ABiondi@sandsanderson.com
E-mail: LBuntingEubanks@sandsanderson.com
*Counsel for Piedmont Power Sports, Inc., New River Kubota, Inc., and Jack L. Rickett, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th of June 2023, I electronically filed the foregoing using the

Court's CM/ECF system, which will then send a notification of electronic filing (NEF) to all those

persons subscribed to receive such notices.

      */s/   Lindsay K. Bunting Eubanks*
Andrew Biondi, Esq. (VSB No. 48100)
Lindsay K. Bunting Eubanks, Esq. (VSB No. 94686)
**SANDS ANDERSON PC**
1111 East Main Street, Suite 2400
P.O. Box 1998
Richmond, VA 23218-1998
Phone: (804) 648-1636
E-mail: ABiondi@sandsanderson.com
E-mail: LBuntingEubanks@sandsanderson.com
*Counsel for Piedmont Power Sports, Inc., New River Kubota, Inc.,*
*and Jack L. Rickett, Jr.*