**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| THE LCF GROUP, INC., *Plaintiff*, v. PIEDMONT POWER SPORTS, INC., *Defendant*. | CASE NO. 3:22-cv-00057 MEMORANDUM OPINION & ORDER JUDGE NORMAN K. MOON |

Plaintiff The LCF Group, Inc., and Defendant Piedmont Power Sports, Inc., have filed cross motions for summary judgment. Piedmont also moves for leave to amend its answer to LCF's complaint to add the unclean hands defense. The Court will deny their motions for summary judgment because the record contains genuine disputes of material fact. The Court will also deny Piedmont's motion for leave to amend because its proposed amendment would be prejudicial to LCF and futile.

## Background

Fraudsters conjured up a scheme to defraud which depended on both LCF and Piedmont being duped. It succeeded. Specifically, LCF and Piedmont each were induced to enter into distinct agreements by fraudsters. The Court proceeds by discussing these agreements and how they resulted in LCF and Piedmont depositing and transferring funds at issue in this case.

### A. Piedmont's Loan Agreement

Piedmont, a company with about 30 employees, sells items, such as farm equipment, handheld power equipment, and ATVs. Dkt. 54-1 at 6. In March 2020, Piedmont entered into a

bona fide loan agreement with FC Marketplace LLC ("Funding Circle"). Dkt. 54-3. It borrowed $300,000 at an interest rate of 22.97% annual percentage rate ("APR"). *Id.* at 1.

In May 2022, Jack Rickett, the majority owner of Piedmont, received a generic email informing him that Piedmont was eligible to refinance its 2020 Funding Circle loan at an interest rate ranging from four to ten percent. Dkt. 55-2 at 13. The email was sent by an individual who identified as "Jeremy Snyder"[1] and claimed to be a Funding Circle employee. *Id*. After Rickett expressed interest, Snyder emailed Rickett on June 8, 2022, informing him that Piedmont's loan had been approved for $350,000 at 4.29% APR with $207,216.21 to be used to pay off the 2020 Funding Circle loan and $142,783.79 to be the net proceeds for Piedmont. Dkt. 55-4 at 2. The email explained the items required to receive funding, including: (1) current accounts receivable report, (2) recent invoices or accounts payable, (3) DocuSign contract, and (4) bank verification link. *Id.*

Snyder emailed Rickett and requested further documentation: (1) a business tax return; (2) three months credit card processing statements; and (3) a copy of his driver's license or a voided check. *Id.*; Dkt. 55-5 at 1. Rickett emailed the requested documents. Dkt. 55-5 at 3–4. In response, Snyder emailed that the Funding Circle's compliance team needed a "selfie" photo of Rickett holding his driver's license. *Id.* at 5. As requested, Rickett sent Snyder pictures of himself holding his driver's license and a piece of paper which read, "Jack Rickett Piedmont Power Sports, Inc. 6/10/2022." Dkt. 55-9 at 1–2. Snyder also requested that Rickett verify his bank account information electronically, which Rickett completed. *Id.* at 11–12. Snyder emailed

---

[1] The individual used the name, "Jeremy Snyder," and the Court refers to him as such even though this may have been a fictitious name.

Rickett the 2022 Funding Circle agreement, which Rickett electronically signed. Dkt. 54-12 at 1–27. The agreement identified the lender as "Legend Trading LCF Group Inc." *Id.* at 2.

At that time, Rickett believed that Piedmont had entered into its second bono fide loan agreement with Funding Circle. But he later learned in an email sent by Funding Circle on June 21, 2022 that Snyder was not a Funding Circle employee and that "[a]ny communication from 'Jeremy Snyder' is fraudulent and any offers made from this individual on behalf of Funding Circle are not legitimate." Dkt. 55-26 at 1.

**B. LCF's Funding Agreement**

LCF purchases future receivables of businesses that are seeking capital. Dkt. 54 ¶ 2. On May 25, 2022, an individual identifying as "Eric Schaefer" [2] and claiming to own SchaeferEnterprises, LLC applied to be a broker for LCF. Dkt. 55-12 at 1. As part of his application, the individual claiming to be Schaefer listed his company's address and his employer identification number. Dkt. 54-6 at 1. He also sent an image of Schaefer's driver's license to LCF. *Id.* at 2. LCF claims that it was able to use this information "to verify his identity." Dkt. 54 at 5. On May 25, 2022, LCF and SchaeferEnterprises entered into an agreement that permitted SchaeferEnterprises to act as a broker for LCF. Dkt. 54-7 at 1–11. While LCF believed this individual was Schaefer at that time, LCF later learned that the identifying documents used to verify "Schaefer" were obtained through identify theft. Dkt. 54-2.

On June 7, 2022, the individual claiming to be Schaefer applied for funding from LCF on behalf of Piedmont. Dkt. 54-8. The application contained accurate information on Rickett's social security number, birth date, and home address. *Id.*; Dkt. 54-1 at 12. LCF conducted a

[2] The individual used the name, "Eric Schaefer," and the Court refers to him as such even though this was a fictitious name.

background check on Rickett and Piedmont to verify that the application information was accurate. Dkt. 54-9. LCF also had a recorded merchant interview with the individual posing as Rickett. Dkts. 55-14, 55-15.

On June 8, 2022, LCF entered into a Merchant Cash Advance ("MCA") Agreement with whom it believed to be Piedmont. Dkt. 54-10. The agreement was electrically signed by an individual posing as Rickett. *Id.* Under the MCA Agreement's terms, LCF was to purchase $497,000 of Piedmont's future receivables for $350,000, to be paid at a rate of $2,629.63 per day or $13,148.15 per week. *Id.* at 1.

LCF later learned that Piedmont had no knowledge of the MCA agreement at that time and that Rickett did not sign this agreement on behalf of Piedmont. Dkt. 54-1 at 12.

**C. Deposits and Transfers**

On June 10, 2022, LCF deposited $349,570.00 to Piedmont's Truist operating account pursuant to the MCA Agreement. Dkt. 54-13; Dkt. 55-10 at 4. Rickett testified that at that time, he believed the $349,570.00 deposit was from the Funding Circle loan, minus fees. Dkt. 54-1 at 15. LCF's deposit to Piedmont was labeled "INCOMING WIRE TRANSFER REF# 20220610-00017665." Dkt. 55-10 at 4. It did not mention "LCF." *Id.*

Rickett intended to use the loan to repay debts Piedmont owed to Samson MCA and Funding Circle and requested payoff letters for Piedmont's existing loans with Samson and Funding Circle. Dkt. 54-1 at 20; Dkts. 54-4, 54-14. On June 13, 2022, Samson issued a payoff letter to Rickett, stating that Piedmont's loan obligations could be fulfilled with a payment of $88,341.37. Dkt. 54-4. Rickett also received a payoff letter that appeared to be from Funding Circle. Dkt. 54-14. It stated that Piedmont's remaining loan obligation could be satisfied by a payment of $207,216.21. *Id.* Snyder, the individual posing as a Funding Circle employee,

informed Rickett that transferring this payment would make it easier for Funding Circle's accounting department to give credit to Piedmont for paying off its 2020 loan. Dkt. 54-1 at 15. Rickett testified that transferring the payment, rather than just retaining the money to pay off the loan, "made sense to [him,]" but "seemed odd." *Id.*

The "Funding Circle" payoff letter also instructed Piedmont to transfer the money to an account belonging to Legend Trading, a cryptocurrency exchange company. Dkt. 54-14 at 2. Rickett testified that these instructions "didn't jump out at [him]" because he saw "Funding Circle at the top" of the payment letter and all the information listed "seemed correct." Dkt. 54-1 at 16. He claims at that time, he had "no idea who Legend Trading was." *Id.* at 17.

On June 13, 2022 at 2:00 a.m., LCF deducted the first payment of $13,148.15 under the MCA Agreement from Piedmont's Truist operating account. Dkt. 54-16; Dkt. 55-10 at 2.

On that same day, Piedmont transferred $88,341.37 to Samson to satisfy Piedmont's obligation to Samson. Dkt. 54-17. Also, on that same day, Piedmont transferred $207,216.21 to Legend Trading to purportedly satisfy Piedmont's obligation to Funding Circle. Dkt. 55-10 at 3. Rickett claims he set up both transfers on the morning of June 13, 2022. Dkt. 55-6 at 7.

Sometime prior to June 14, 2022, an individual posing as "Jackie Rickett" opened an account named "Piedmontpowersports" with Legend Trading. Dkt. 54-19. On June 14, 2022, Legend Trading received a wire transfer of $207,216.21 from Piedmont. Dkt. 54-20 at 2. The account named "Piedmontpowersports" purchased $207,216.21 of the cryptocurrency Ethereum. *Id.* at 1. On June 15, 2022, the account named "Piedmontpowersports" sent this cryptocurrency Ethereum to another cryptocurrency wallet. Dkt. 54-21.

Legend Trading explained in an email that "Jackie Rickett purchased cryptocurrencies from [it]" and provided onboarding documents and photos of himself. Dkt. 54-19 at 2. The

photos provided depict Rickett holding his driver's license and signs related to Legend Trading. *Id.* at 4–5. It appears that an individual photoshopped the images that Rickett had emailed to Snyder on June 10, 2022. Dkt. 55-9; Dkt. 54-1 at 20 (Rickett explaining during his deposition that the photos sent to Legend Trading appeared to have been photoshopped). While the Legend Trading account used Piedmont's name, Rickett testified that Piedmont did not authorize the account. Dkt. 54-1 at 20–21.

**D. Discovery of Fraudulent Activity**

Rickett claims he first became suspicious of fraudulent activity after LCF withdrew money from Piedmont's operating account on June 13, 2022. Dkt 54-1 at 17. Cyndi Smith, a Piedmont employee, called Truist and discovered that LCF had removed $13,148.15 from Piedmont's operating account. *Id.* at 13–14; Dkt. 55-6 at 2–3. Around June 13–14, 2022, Rickett and Smith tried to stop the transfer of $207,216.21 to Legend Trading by contacting Piedmont's bank, Truist. Dkt. 55-6 at 7; Dkt. 55-25. But Truist was unable to stop it. Dkt. 55-2 at 28; *see* Dkt. 55-24 at 1.

On June 24, 2022, Michael Silva, an LCF employee, and Rickett spoke by phone. Dkt. 55-28. During this call, they "agreed" LCF and Piedmont had "been scammed." *Id.* Later on that same day, and in a subsequent phone call, Rickett stated that "what you have and what I have are two different things," that LCF did not even have his "right email address," and that he "didn't sign anything with LCF," to which Silva responded, "we know that." *Id.* Silva also stated that "we already know that there has been a certain amount of fraud." *Id.*

Rickett reported the incident to law enforcement. Dkt. 54-1 at 19–20. An FBI agent informed him that the FBI was exploring several cases involving Funding Circle borrowers. *Id.* at 20. On September 26, 2022, the FBI sent a letter to Rickett, informing him that he had been

identified as a possible victim of a crime and that his case was currently under FBI investigation. Dkt. 55-31.

In mid-September 2022, Rickett wired LCF $129,205.34, which was the amount remaining from LCF's $349,570.00 deposit to Piedmont. Dkt. 55-33 at 1. In late September 2022, LCF filed this complaint. Under its remaining unjust enrichment/quantum meruit claim, LCF seeks to recover $207,216.51 from Piedmont. Dkt. 54 at 9.

## Cross Motions for Summary Judgment

Both Piedmont and LCF move for summary judgment. Because the record contains genuine disputes of material fact, the Court will deny their cross motions.

### A. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48

F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

When cross-motions for summary judgment are before a court, a court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007) (internal quotation marks omitted)).

**B. Defendant Piedmont's Motion for Summary Judgment**

Piedmont moves for summary judgment on LCF's unjust enrichment/quantum meruit claim. While LCF groups together unjust enrichment and quantum meruit in one claim, each are distinct causes of action with independent elements of proof in Virginia.[3] *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 341 (Va. 2020). The Court thus proceeds by considering each cause of action below.

*1. Quantum Meruit*

Under Virginia law, a quantum meruit claim is established "[w]here service is performed by one, at the instance and request of another," but "nothing is said between the parties as to compensation for such service." *Id.* at 341 (internal quotation marks omitted). Under such circumstances, a court can find an implied contract to award reasonable compensation to the party who performed the service. *Id.* However, the Supreme Court of Virginia has clarified that when a "defendant has not requested the plaintiff's services, a plaintiff's claim is for unjust enrichment." *Id.* Here, the record undisputedly shows that Piedmont did not request LCF's

[3] Both parties agree that Virginia law governs this case.

services rather an individual posing as Piedmont's majority owner, Rickett, fraudulently contracted with LCF. As such, LCF's quantum merit claim fails as a matter of law.

*2. Unjust Enrichment*

Unjust enrichment "is an implied contract action based upon the principle" that one may not "enrich himself unjustly at the expense of another." *CGI Fed. Inc. v. FCi Fed., Inc.*, 519, 814 S.E.2d 183, 190 (Va. 2018) (internal quotation marks omitted). Examples of unjust enrichment include "payment or overpayment under a mistake of fact" or "the acceptance of services without a contract for those services." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020) (citations omitted). The Supreme Court of Virginia has generally adopted a three-part test to establish an unjust enrichment claim: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *Id.* at 650; *T. Musgrove Constr. Co., Inc.*, 840 S.E.2d at 341.

Piedmont claims that LCF's unjust enrichment claim should fail because it did not know that it had received a benefit from LCF. Dkt. 55 at 21. Rather, it believed Funding Circle had made the $349,570.00 deposit into its operating account. *Id.* Thus, according to Piedmont, LCF cannot satisfy the second element of an unjust enrichment claim because it did not reasonably expect to repay the funds *to LCF* at the time it received them. *Id.*

LCF, however, contends that courts have phrased the second element of an unjust enrichment claim differently when it comes to quasi-contractual claims. Dkt. 62 at 5. To support its argument, LCF cites cases explaining that a party satisfies the second element by showing "knowledge on the part of the defendant of the conferring of the benefit." *See The Christian Broad. Network, Inc. v. Busch*, No. 2:05-cv-558, 2006 WL 2850624, at *8 (E.D. Va. Oct. 3,

2006); *Nossen v. Hoy*, 750 F. Supp. 740, 745 (E.D. Va. 1990); *United Co. v. Keenan*, No. 1:06-cv-71, 2007 WL 9782462, at *24 (W.D. Va. Oct. 12, 2007); *see also Provident Life & Acc. Ins. Co. v. Waller*, 906 F.2d 985, 993 (4th Cir. 1990) (characterizing the second element of the equitable remedy of unjust enrichment and quasi-contract as "the defendant should reasonably have expected to pay"). Therefore, according to LCF, it can satisfy the second element by showing that Piedmont "should reasonably have expected to repay the benefit without specifying exactly which party [it was] expected to repay." Dkt. 62 at 5.

The Court agrees with LCF. An action in equity—such the unjust enrichment claim here––does not require mechanical application of rules. *See Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946) ("Equity eschews mechanical rules; it depends on flexibility."). "[F]lexibility inherent in equitable procedure enables courts to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices." *Holland v. Florida*, 560 U.S. 631, 650 (2010) (internal quotation marks and citations omitted) (cleaned up).

The Third Restatement also has warned that factor tests for determining whether the receipt of a benefit gives rise to liability in restitution "are not helpful" and "can lead to serious error." Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011); *see James G. Davis Constr. Corp.*, 841 S.E.2d at 647 (citing the Third Restatement when discussing an unjust enrichment claim). The Third Restatement has even explained that if the second element "is taken to mean that a defendant cannot be liable in restitution for benefits of which the defendant was unaware . . . it is *plainly incorrect*." *Id.* (emphasis added). Moreover, the Court finds no Supreme Court of Virginia case stating that a party may only succeed on an unjust enrichment claim if the recipient was aware who had conferred the benefit at the time it was received. For

these reasons, Piedmont not knowing that it should reasonably have expected to repay LCF at the time it received the benefit is *not fatal* to LCF's unjust enrichment claim.

Considering that equitable relief is meant to be flexible depending on the circumstances of each case, the Court finds it appropriate that LCF must establish the following elements, adopted by other courts applying Virginia law, to succeed on its unjust enrichment claim:

> (1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring or the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for value.

*The Christian Broad. Network, Inc.*, 2006 WL 2850624, at *8; *Whitehurst v. Cho*, No. 99231., 1992 WL 884510, at *1 (Va. Cir. Ct. Feb. 19, 1992); *cf. Online Res. Corp. v. Lawlor*, 736 S.E.2d 886, 897 (Va. 2013) (upholding a jury instruction for an unjust enrichment claim which in part provided that the defendant "accepted or retained the benefit under circumstances which would make it inequitable for [it] to retain the benefit without paying for its value"); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) (listing similar elements). The record undisputedly shows that LCF conferred a benefit upon Piedmont when it deposited $349,570.00 to Piedmont's operating account and that Piedmont knew it had received this benefit.

However, the record reflects a genuine dispute of material fact regarding the third element. A jury, not the Court, will need to weigh the evidence and draw inferences regarding whether the benefit was accepted or retained under circumstances making it inequitable for Piedmont to retain the benefit without payment for its value. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). As discussed, this case centers on two innocent parties who were both defrauded by fraudsters not

before this Court. Thus, in evaluating whether circumstances make it *inequitable* for Piedmont to have retained LCF's benefit, a jury will also need to consider the principle that "[w]here one of two innocent parties must suffer by a fraud perpetrated by another, the law imposes the loss upon the party who, by his misplaced confidence, has enabled the fraud to be committed." *Sager v. W.T. Raleigh Co.*, 150 S.E. 244, 248 (Va. 1929). Or in other terms, the party "who has put it within the power of the third person to commit the wrong must suffer the loss." *Rayder v. Ahtna Gov't Servs. Corp.*, No. 1:05-cv-1251, 2006 WL 3000457, at *4 (E.D. Va. Oct. 19, 2006).[4]

Both parties claim the other party is at fault for causing the fraud. Piedmont claims LCF should bear the loss for failure to detect the fraud before transferring the funds to Piedmont. It claims that LCF failed to "exercise due diligence in selecting the 'brokers' they enlist in the process for approving merchants for Merchant Cash Advance products, such as the MCA Agreement." Dkt. 60 at 7. According to Piedmont, LCF, as the "sophisticated financial services business," "had more opportunity and expertise to both gather information and to check and catch potential fraud." *Id.* Piedmont further claims that the broker agreement with the individual posing as Schaefer contained "several red flags that could have alerted LCF to potential fraud," including "the misspelling of Schaefer's name on the [] Agreement, the sloppiness of Schaefer's name not being capitalized in several places, and their haste to approve the [] agreement on the

[4] Many other courts have reiterated this principle. *See, e.g.*, *Bank of Pittsburgh v. Neal*, 63 U.S. 96, 111 (1859) ("[W]here one of two innocent parties must suffer, through the fraud or negligence of a third party, the loss shall fall upon him who gave the credit."); *Citizens Sav. Bank, F.S.B. v. Verex Assur., Inc.*, 883 F.2d 299, 302 (4th Cir. 1989) ("Where one of two innocent persons will suffer for the wrongful act of a third, the one who was most at fault in letting it be brought about will be required to bear the loss.") (internal quotation marks omitted) (cleaned up); *Midfirst Bank, SSB v. C.W. Haynes & Co.*, 893 F. Supp. 1304, 1318 (D.S.C. 1994), *aff'd*, 87 F.3d 1308 (4th Cir. 1996) ("[W]here one of two innocent parties must bear a loss occasioned by the fraud of a third party, the loss should fall upon the party whose active conduct or passive negligence enabled the third party to commit the fraud.").

same day it was signed by the fake Schaefer." *Id.* at 8. It also claims that LCF "could have and should have taken the time to run background checks on 'Schaefer' but didn't." *Id.* It further argues that the MCA Agreement "contained false phone numbers and email addresses" and that "LCF failed to conduct a simple internet search to determine the phone number for Piedmont, displayed prominently at the top of Piedmont's website." *Id.*

LCF counters that Piedmont should bear the loss caused from the fraud. LCF claims that "Rickett and Piedmont misplaced their confidence in the individual representing themselves as Jeremy Snyder and, in so doing, ignored many indicators that [] Snyder was not who he said he was and moved forward with multiple transactions resulting in $207,216.21 in losses." Dkt. 54 at 13. According to LCF, Snyder purportedly "reached out to [] Rickett without speaking with him previously and claimed that Funding Circle was willing to refinance its existing loan with Piedmont with 22.97% APR to one with 4.29% APR for no discernable business reason." *Id.* at 13. LCF also claims that Rickett failed to investigate why the lender was Legend Trading on the 2022 Funding Circle Agreement or question why Snyder instructed him to wire $207,216.21 to Legend Trading. *Id.* at 13–14. LCF further claims that "LCF withdrew a total of $13,148.15 from Piedmont's bank account prior to [] Rickett authorizing the wire transfers to Samson and Legend Trading." *Id.* at 14. Therefore, according to LCF, but for Rickett's "misplaced confidence" in Snyder, "neither party would have suffered losses from this fraud." *Id.*

Ultimately, the record contains genuine disputes on who should bear the loss. As such, a jury will need to weigh the parties' evidence and draw inferences to determine whether Piedmont or LCF—or both—failed to act reasonably in preventing the fraud and who, if either, was most at fault for enabling the fraud.

**C. Plaintiff LCF's Motion for Partial Summary Judgment**

LCF moves for partial summary judgment on its unjust enrichment claim. As discussed, the record contains genuine disputes as to what inferences may be drawn from the uncontradicted evidence on the third element of LCF's unjust enrichment claim, and as such, the Court will deny LCF's motion. *See Anderson*, 477 U.S. at 255.

**Motion for Leave to Amend**

Piedmont asserts that LCF's unjust enrichment claim is barred by the doctrine of unclean hands. Dkt. 55 at 23–25. But it failed to assert this as an affirmative defense in its answer to LCF's complaint and now moves for leave to amend its answer to add the defense. For the following reasons, the Court will deny its motion.

**A. Legal Standard**

Under Fed. R. Civ. P. 8(c), "a party must affirmatively state any avoidance or affirmative defense" in response to a pleading. But "a party may amend its pleading only with the opposing party's written consent or the court's leave" under Fed. R. Civ. P. 15(a). A court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a court "'may deny a motion to amend when the amendment would be prejudicial to the opposing party" or "the amendment would be futile.'" *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (quoting *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010)). Under Rule 15(a), a "proposed amendment is futile when it is clearly insufficient or frivolous on its face." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019).

**B. Discussion**

Piedmont's proposed amendment seeks to add the doctrine of unclean hands as an affirmative defense to its answer. "The doctrine of unclean hands is an ancient maxim of equity courts." *Cline v. Berg*, 639 S.E.2d 231, 233 (Va. 2007) (internal quotation marks omitted). This defense "prevents a plaintiff from obtaining equitable relief if the plaintiff has been 'guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.'" *Worldcom, Inc. v. Boyne*, 68 F. App'x 447, 451 (4th Cir. 2003) (unpublished) (quoting *Richards v. Musselman*, 267 S.E.2d 164, 166 n.1 (Va. 1980)); *see also Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (noting "the equitable maxim that 'he who comes into equity must come with clean hands'"). Application of this doctrine "turns upon the facts of each particular case and is therefore left to the sound discretion of the fact finder." *Cline*, 639 S.E.2d at 234. But it should not be applied "when the result would be inequitable or violate public policy." *Id.*

Piedmont argues that LCF had unclean hands in bringing this suit. It specifically claims that LCF's agent, Silva, held discussions with Rickett in mid-June 2022 "to get [Rickett] to confirm information LCF could use to collect against" Piedmont. Dkt. 60 at 11. LCF purportedly used this information to seek and obtain an *ex parte* temporary restraining order ("TRO") from a New York court and subsequently froze Piedmont's accounts through the TRO. Dkt. 55 at 24. Piedmont also accuses LCF of using "underhanded pressure tactics" and "dishonest" means to collect the transmitted funds from Piedmont in the New York case. *Id.* at 25; *see* Dkt. 60 at 13 (alleging LCF "intentionally engaged in aggressive and dishonest collection tactics against Piedmont [] in an effort to recover that sum while knowing that Piedmont [] no longer possessed and did not benefit from it").

To the extent that Piedmont is seeking to add an unclean hands defense related to LCF's litigation tactics, such an amendment would be prejudicial to LCF. *See Davison*, 912 F.3d at 690. Piedmont's motion comes after the close of discovery and close to when trial is scheduled. LCF did not have notice that its litigation tactics in another court proceeding would be part of this litigation. As a result, such an amendment would change the nature of the litigation and be prejudicial to LCF. *See, e.g.*, *Equal Rts. Ctr.*, 602 F.3d at 603 (holding district court did not abuse its discretion in denying leave to amend based on prejudice when the proposed amendment came after the close of discovery, "on the eve of the deadline for dispositive motions," and "would change the nature of the litigation").

The Court will also deny the proposed amendment for futility. *See Davison*, 912 F.3d at 690. A defendant raising an unclean hands defense—such as Piedmont here—"must demonstrate a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." *Worldcom, Inc.*, 68 F. App'x at 451 (internal quotation marks omitted). The Supreme Court of Virginia has stated:

> [T]he maxim that a party must come into a court of equity with clean hands *only applies to the particular transaction under consideration*, for a court will not go outside of the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must have been done to the defendant himself and must have been in regard to the matter in litigation.

*Perel v. Brannan*, 594 S.E.2d 899, 908 (Va. 2004) (internal quotation marks omitted) (emphasis added). In essence, the "misconduct relied on must relate directly to the matter in litigation." *Richards*, 267 S.E.2d at 167 (internal quotation marks omitted). "It is not sufficient that the wrongdoing is remotely or indirectly connected with the subject of the suit." *Id.*

Piedmont fails to state "a close nexus between" LCF's alleged "unethical conduct" and the transactions on which LCF seeks relief. *Worldcom, Inc.*, 68 F. App'x at 451. LCF's alleged

wrongdoing occurred *after* the transactions at issue. And its purported wrongful litigation tactics, at most, are "indirectly connected with the subject of the suit." *Richards*, 267 S.E.2d at 167. Thus, Piedmont's proposed amended to add the unclean hands defense would be futile.

Piedmont also appears to argue that LCF acted with unclean hands by failing to realize that the individual posing as Schaefer was a fraudster when he applied to be a broker for LCF. To the extent that Piedmont seeks to add an unclean hands defense based on this conduct, the Court finds such an amendment would be futile. Piedmont claims that LCF acted negligently in failing to confirm the identity of the fraudster, but LCF claims the same about Piedmont. The record undisputedly reflects that Piedmont failed to identify that the individual claiming to be Snyder was not a Funding Circle employee. Piedmont also failed to question Snyder's request to send its loan payment to Legend Trading, a cryptocurrency account. Ultimately, both Piedmont and LCF were duped by fraudsters. As such, under the facts of this case, it would be inequitable to allow Piedmont the ability to assert an unclean hands defense against LCF when it too failed to discover the fraud before it suffered a loss. *See Cline*, 639 S.E.2d at 234 (providing that an unclear hands defense should not be applied "when the result would be inequitable"). Even though it is unable to assert the unclean hands defense, Piedmont's argument and evidence regarding LCF's failure to detect the fraud may still be presented to the jury on the issue of whether the benefit was accepted or retained under circumstances making it inequitable for Piedmont to retain the benefit without payment for its value—the third element of LCF's unjust enrichment claim.

Accordingly, the Court will deny Piedmont's motion to amend because its proposed amendment would be prejudicial to LCF and futile. *See Davison*, 912 F.3d at 690.

## Conclusion

For the above reasons, the parties' cross motions for summary judgment are **DENIED**. Dkts. 52, 53. Piedmont's motion for leave to amend its answer to add an affirmative defense is also **DENIED**. Dkt. 44. At this point, the Court is of the opinion that the jury could decide (1) that LCF should prevail; (2) that Piedmont should prevail, and the parties be left financially where they currently stand; or (3) given the unique facts of this case, that the recovery should be commensurate with each party's fault.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to all counsel of record.

Entered this 21st day of August, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE