# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### (Charlottesville Division)

| | |
|---|---|
| **LCF GROUP, INC.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.:  3:22-cv-57 |
| ) | |
| **PIEDMONT POWER SPORTS, INC.,** ) | |
| ) | |
| **NEW RIVER KUBOTA, INC.,** ) | |
| ) | |
| **JACK L. RICKETT, JR.,** ) | |
| ) | |
| **SHAEFERENTERPRISES, LLC, and** ) | |
| ) | |
| **ERIC SCHAEFER,** ) | |
| ) | |
| Defendants. ) | |

## JOINT PROPOSED INTEGRATED PRETRIAL ORDER

Piedmont Power Sports, Inc. ("Piedmont") and LCF Group, Inc., both by counsel, file this proposed Integrated Pretrial Order in compliance with Paragraph 25 of the Pretrial Order, ECF 18. For the purposes of preparing for trial, the parties submit the following:

**A. Contested Issues of Law that Require a Ruling Before Trial**

Piedmont filed its Motion in Limine (ECF 76) and Memorandum in Support (ECF 77) identifying deposition testimony Piedmont seeks to introduce at trial. Plaintiff opposes Defendant's Motion in Limine and will be filing such opposition contemporaneous with this filing.

Plaintiff LCF disagrees with the Court's determination to provide a special verdict form permitting assignment of percentage fault as a means of determining which party shall bear what loss associated with the fraud that underlies the case. LCF contends that the Court should direct the jury to consider which party is more at fault for the loss and assign liability for the amount at

issue accordingly without the use of a special verdict form which allows the jury to parcel out liability piecemeal. Nevertheless, LCF will submit its own draft special verdict form for use in the event the Court finds such a form is proper.

However, it is Piedmont's position that such a special verdict form should be employed if, and only if, a jury first determines LCF has succeeded in proving the elements of an unjust enrichment claim against Piedmont.

Piedmont and LCF dispute the elements of an unjust enrichment claim which the jury should consider.

Piedmont contends that the measure of damages for unjust enrichment is limited to the benefit realized and retained by Piedmont. *See Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116, 661 S.E.2d 834 (2008) (*citing Nedrich v. Jones*, 245 Va. 465, 476, 429 S.E.2d 201 (1993)) (holding unjust enrichment requires that "[plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value."); *T. Musgrove Construction Company, Inc. v. Young*, 298 Va. 480, 486 (2020) ("The measure of recovery for unjust enrichment is limited to the benefit realized and retained by the defendant."); Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) ("Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth.…Restitution may strip a wrongdoer of all profits gained in a transaction with the claimant (§§ 3, 51), but principles of unjust enrichment will not support the imposition of a liability that leaves an innocent recipient worse off, apart from costs of litigation, than if the transaction with the claimant had never taken place. *See* § 50(3).").

**B. Essential Elements that a Party Must Prove to Establish Any Meritorious Claims Remaining for Adjudication, and Damages or Other Relief Sought**

Unjust enrichment is the only remaining cause of action. Piedmont contends that to prove unjust enrichment under Virginia law, LCF must prove by a preponderance of the evidence each element of an unjust enrichment claim, or that: (1) it conferred a benefit on Piedmont; (2) that Piedmont knew of the benefit and should reasonably have expected to repay LCF; and (3) that Piedmont accepted or retained the benefit without paying for its value. See *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116, 661 S.E.2d 834 (2008) (*citing Nedrich v. Jones*, 245 Va. 465, 476, 429 S.E.2d 201 (1993)). Damages in an unjust enrichment claim are "limited to the benefit realized and retained by the defendant." *See T. Musgrove Construction Company, Inc. v. Young*, 298 Va. 480, 486 (2020). Piedmont further contends that the Court denied LCF summary judgment on its unjust enrichment claim and, thus, did not decisively find for any element of LCF's unjust enrichment claim as a matter of law. Instead, the Court stated that it was "of the opinion that the jury could decide (1) that LCF should prevail; (2) that Piedmont should prevail, and the parties be left financially where they currently stand; or (3) given the unique facts of this case, that the recovery should be commensurate with each party's fault." *See* Memorandum Opinion and Order, Dkt. No. 73, p. 18.

However, LCF contends that this Court has already held that a party asserting a claim for unjust enrichment, at least as it relates to this matter, must prove: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." Memorandum Opinion and Order, Dkt. No. 73, p. 11 (citing *The Christian Broad. Network, Inc.*, 2006 WL

3

2850624, at *8; *Whitehurst v. Cho*, No. 99231., 1992 WL 884510, at *1 (Va. Cir. Ct. Feb. 19, 1992); *cf. Online Res. Corp. v. Lawlor*, 736 S.E.2d 886, 897 (Va. 2013) (upholding a jury instruction for an unjust enrichment claim which in part provided that the defendant "accepted or retained the benefit under circumstances which would make it inequitable for [it] to retain the benefit without paying for its value"); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) (listing similar elements)).

LCF further contends that the Court held that, as a matter of law, "[t]he record undisputedly shows that LCF conferred a benefit upon Piedmont when it deposited $349,570.00 to Piedmont's operating account and that Piedmont knew it had received this benefit." *Id.* As such, LCF contends that the only remaining element at issue before the jury is the third one, and their role is to weigh the equities of the parties and determine which party should bear the loss, or potentially how much of the loss the respective parties must bear. *See Id.* at 11-12.

## C. Essential Elements that a Party Must Prove to Establish Any Meritorious Defense and Material Facts and Theories of Liability or Defense

As Plaintiff, LCF bears the burden of proof to establish all elements of the unjust enrichment cause of action, and it must prove proximately related damages. The Court has already determined that Piedmont has no unclean hands defense available, other than to the extent that it may demonstrate LCF's negligence as part of the Court's suggested equitable comparison of fault to be determined by the jury when assigning the loss according to relative degree of party blame. To the extent that the Court instructs the jury that the determination of the case hinges on the comparative negligence of the parties, it would be Piedmont's burden to demonstrate LCF's acts of commission and omission constituting negligence and the percentage of fault attributable to LCF.

4

**D. Issues of Fact Contested by Each Party**

  **i.   Funding Circle Loan**

  1.  Piedmont contends that it entered into a loan agreement with FC Marketplace, LLC, d/b/a Funding Circle in 2020 to offset economic costs ascribed to the Covid-19 Pandemic ("2020 Funding Circle Loan").

  2.  Piedmont avers that since receiving an offer to refinance the 2020 Funding Circle loan in May of 2022, it has received additional solicitations from Funding Circle for loans for up to $500,000 and at interest rates as low as 7.49% APR. *See* PPS0742-45.

  3.  Piedmont contends that LCF does not have information or documents to dispute the fact that on June 8, 2022, Snyder sent an email to Rickett which approved refinancing the $207,216.21 remaining on Piedmont's 2020 Funding Circle Loan (the "Attempted Payoff"), the payoff of another lender's loan to Piedmont ("Samson MCA Loan"), and some additional funding for Piedmont expenses: the represented loan offered Piedmont $350,000 at 4.29% APR ("2022 Funding Circle Loan") with the condition that Rickett submit additional documentation. *See* LCF 000051-53; PPS0144-156*;* LCF Dep. 130:11-22.

  4.  LCF contends that the 2022 Funding Circle Loan identified "Legend Trading LCF Group Inc." as the lender whereas Piedmont avers that it entered into a loan agreement with Funding Circle alone in 2022, which it later found out to be a fraudulent agreement, orchestrated by a man calling himself Jeremy Snyder ("Synder") and masquerading as a Funding Circle employee.

  5.  Piedmont contends that when Piedmont entered into the 2022 Funding Circle Loan, Piedmont believed that this agreement was a bonified offer to lend from a lender with which it had previously done business.

6. On Friday, June 10, 2022, Piedmont's operating account at Truist ending in 4682 ("Piedmont Operating Account") received an incoming wire transfer of $349,570.00, which Rickett believed to be the 2022 Funding Circle Loan, minus fees. Piedmont contends that Truist identified this wire transfer as "INCOMING WIRE TRANSFER REF# 20220610-00017665." It did not mention or reference the words "Last Chance Funding" or "LCF." *See* June 2022 Piedmont Operating Account Statement, PPS0728-733.

7. Piedmont also contends that Snyder told Rickett the payment would make it "easier for [Funding Circle's] accounting department to give credit for [his] loan being paid off." *See* PPS0104-107, PPS0135-137.

**ii.    The MCA Agreement**

8. Piedmont contends that LCF produced a purported ISO agent application dated May 25, 2022 and ISO Agent Sales Agreement dated the "25th day of May, 2020[sic]" between itself and "SchaeferEnterprieses[sic] LLC dba Scahefer[sic] Capital Group," ("ISO Agreement"), a document which speaks for itself. *See* LCF 00002-00014.

9. Piedmont also avers that around June 8, 2022, through the ISO Agreement, an unknown individual using the identities of the Piedmont Defendants, including the fabricated email address piedmontpowersports@outlook.com (LCF 00030) and phone number 540-558-4208 (LCF 00016), signed a Merchant Cash Advance Agreement ("MCA Agreement") with LCF. LCF Dep. 71:21-25, 81:13-82:18; LCF 00002-30.

10. None of Rickett, Piedmont, New River Kubota, nor their agents use the email address piedmontpowersports@outlook.com[1] or the phone number 540-558-4208. *See* CLEAR

---

[1] Another fake email ascribed to Piedmont was info@piedmontpowersports.com. LCF discovered this email to be fake as early as June 14, 2022. *See* Microsoft message, LCF 001317-001320.

6

Reports, LCF 00274-00331, 00463-00480, and Decision Logic report, LCF 01135, 1142, 1147, 1151, 1197, 1204, 1209, and 1213; LCF log notes, LCF 001804-001808.

11. Piedmont contends that on Friday, June 10, 2022, "LCF Group transmitted the sum of $349,570.00" into Piedmont's Operating Account based on representations to LCF by Schaefer, the ISO[2] Agreement, and the MCA Agreement. *See* LCF Dep. 74:2-6 (emphasis added); LCF00002-30, Ex. 12; LCF 001815; LCF log notes at LCF 001806.

12. LCF referred to Schaefer as a "broker" for Piedmont. LCF Dep. 21:16-19. Piedmont understood that LCF paid SchaeferEnterprises a $17,500 commission for the MCA Agreement and that it had not recovered that sum or determined its whereabouts.[3] *See* LCF Dep. 174:12-21.

13. Piedmont contends that it was later in the day of June 13, 2022, after the Attempted Payoff, that a debit was taken from the Piedmont Operating Account for $13,148.15 with the description "ACH CORP DEBIT 8884992939 Last Chance Fund Piedmont Power Sports CUSTOMER ID 98346593" ("Unauthorized LCF Debit"). *See* PPS0728-733.

14. LCF contends that it withdrew $13,148.15 from Piedmont's operating account at 2:00 am on June 13, 2022 and the bank did not process the wire transfers authorized by Mr. Rickett to Samson and Legend Trading Inc. until 4:21 pm and 4:22 pm, respectively. Pltf. Exhs. 15, 17, 18.

15. Piedmont also contends that LCF informed Piedmont that Schaefer, through SchaeferEnterprises, had facilitated the MCA Agreement, precipitating the $349,570.00 deposit. *See* LCF00002-30.

---

[2] LCF describes how ISOs protect communications with merchants and that LCF obtains information about merchants primarily from their ISOs. *See* LCF Dep. 58:16-59:14.
[3] This payment never went through. LCF retained the money after getting notice that SchaeferEnterprises' account had "closed." *See* LCF Email to eric@schaefercapitalgroup.com, LCF 001452-LCF 001453.

7

16. Piedmont avers that Rickett emailed Snyder, still masquerading as a Funding Circle employee, who told him that LCF was a "lending partner." *See* PPS0104-0107.

17. Starting on June 13th, Piedmont employee Cyndi Smith ("Smith") and Rickett, suspecting Snyder's fraud, tried to stop the Attempted Payoff by contacting Truist. *See* PPS0206-207; PPS0718-0721.

18. Piedmont contends that Truist could not stop the wire of the Attempted Payoff even though Piedmont immediately requested Truist to do so. Piedmont avers that it only intended and reasonable understood that the Attempted Payoff would go to Funding Circle in order to payoff Piedmont's existing Funding Circle loan.

19. LCF contends Rickett deliberately directed that the Attempted Payoff go to a Legend Trading Account which afterwards disappeared into untraceable cryptocurrency.

20. Piedmont and its agent, Rickett, assert that they do not use cryptocurrency and do not control or possess any accounts at Legend Trading.

21. On June 24, 2022, LCF emailed Schaefer to attempt to coordinate repayment of the $349,570.00. *See* Rabinovich email, LCF 001450-01451.

22. On June 24, 2022, Michael Silva ("Silva"), employee collection agent for LCF, called Rickett at 1-540-672-1111 and "agreed" that LCF and Piedmont had "been scammed," that "illegal activity happened" to Rickett, and that "both [LCF and Piedmont had] been affected in a real derogatory way." *See* Silva-Rickett Recording No. 1, LCF 001816; LCF 001334-001335. Rickett asked Silva to "agree these are the steps we're going to take to work together," to which Silva replied, "absolutely" and "we can work as a team to get this done," speaking about recouping the money taken by Snyder's fraud. *See id.*

23. Later on June 24, 2022, and in a subsequent phone call, Rickett stated that "what you have [the MCA Agreement] and what I have [the 2022 Funding Circle Loan] are two different things," that LCF did not even have his "right email address," and that he "didn't sign anything with LCF," to which Silva responded, "we know that." *See* Silva-Rickett Recording No. 2, LCF 001815.

24. After Rickett reported the incident to authorities, an FBI agent told him of other investigations involving Funding Circle borrowers. *See* FBI Communications, PPS0239.

25. LCF speculated that: "somebody at Funding Circle may have victimized us" and Adam Feldman ("Feldman"), LCF's Chief Legal Officer, stated he had not completely disavowed that theory. *See* LCF Dep. 87:16-90:5.

26. A third-party fraudster, using Rickett's doctored pictures, misdirected the Attempted Payoff into a cryptocurrency account at Legend Trading (the "Legend Trading Account"). *See* PPS0329-330; LCF 000089-000094.

27. The Legend Trading Account used Piedmont's name, but no Piedmont Defendants opened or authorized such an account.

28. None of the Piedmont Defendants received cryptocurrency from the Legend Trading Account. Nor did they authorize or use the Legend Trading Account. *See* LCF 000089-94; LCF Dep. 187:10-188:11.

29. It was not Rickett's handwriting on the doctored photos submitted to Legend Trading, and LCF has no information to support that those photos, which they received from Legend Trading, contain Rickett's handwriting. *See* LCF Dep. 153:25-154:2, 154:17-20.

30. On September 14, 2022, Rickett wired LCF $129,205.34 (the difference between the $349,570.00 deposited in the Piedmont Operating Account and the $207,216.21 taken by the

9

fraudster). Piedmont contends that the $129,205.34 accounted for the funds Piedmont Defendants used to pay the Samson MCA Loan. Compl. ¶ 60; LCF Dep 140:19-141:5; LCF 001766-001767. Resultingly, the amount remaining in dispute with this Court is the $207,216.21.

31. On May 24, 2023, Piedmont Defendants conducted the Rule 30(b)(6) deposition of LCF's corporate representative, Feldman ("LCF Deposition"), who admitted that no "operative" contract existed between LCF and Piedmont Defendants. *See* LCF Dep. 74:2-6.

32. LCF corporate deponent Feldman stated that he used "John Doe," "XYZ Corporation," and "ABC LLC" and referred to Eric Schaefer as a "John Doe" in his New York Affirmation because he did not know the identities of the individuals/entities that participated in the suspected fraud. LCF Dep. 158:13-162:12, 172:12-173:7, 174:22-176:6.

33. On June 12, 2023, Schaefer affirmed and supported in deposition testimony the statements made in his affidavit, disavowing all connection to business with Piedmont Defendants and LCF. *See* Schaefer Dep. 13:12-15:16, 29:9-30:25, 31:12-34:1, 43:25-47:9.

34. Schaefer affirmed he is not connected to SchaeferEnterprises, he did not sign/see an ISO application/ISO Agreement, none of the contact information in ISO documents belonged to him, to any company he owned or had affiliation with, and that he has never represented himself as LCF's agent. Schaefer Dep. 37:1-41:10, 41:18-43:8. The ISO application and ISO agreement don't even spell his name correctly. Schaefer Dep. 5:24-6:5.

35. After his deposition, Schaefer produced a voicemail from a New York company in which a man identifying himself as the Vice President of Risk Management for Velocity Capital Group informed Schaefer that his identity was used by a fraudster to set up an ISO to fund various merchants and then steal from them. *See* Schaefer Voicemail, PPS0747.

10

36. On June 12, 2023, in the deposition of Michael Silva ("Silva"), employee collection agent for LCF, he explained that call notes documenting LCF's first phone call with a Piedmont representative stated: "Initial phone call merchant was confused, thought we were calling from Funding Circle. Wasn't sure what was transpiring." *See* Silva Dep. 17:24-18:1.

37. Describing his interactions with Rickett, Silva testified: "I'm really just trying to extrapolate information out of Rickett, right, in any sort of way possible" and "part of this job means that you have to communicate things without necessarily always communicating things. Right? And I'm trying to communicate to him that we've been taken for a ride . . . in hopes that I can bring him with us to help get our funds back." *See* Silva Dep. 56:9-10, 57:3-15; Silva Dep. 48:12-49:12, 54:20-57:15, 58:10-59:23; PPS0166-PPS0205; LCF 001340-001341; LCF 001815; LCF 001816.

38. Silva and LCF confirmed Silva's email address to be msilva@thlcfgroup.com and his phone number to be (954) 740-6999, authenticating his emails and texts. *See* LCF Dep. 134:7-18; Silva Dep. 12:16-13:25.

**E. Any Contested Issues of Law that do Not Require a Ruling Before Trial**

None.

**F. Any Stipulations**

   **i. Parties**

1. The LCF Group, Inc. is a corporation formed under the laws of the State of New York and maintains a principal place of business at 12555 James Madison Highway, NY, 22960.

2. The LCF Group, Inc. is engaged in the business of purchasing future receivables of businesses that are seeking additional capital.

3.     Piedmont Power Sports, Inc. ("Piedmont") is a corporation formed under the laws of the Commonwealth of Virginia and founded in 2006 by Jack Rickett, Jr. ("Rickett").

### ii.    Prior Funding For Piedmont

4.     Prior to the transactions at issue in this matter, Rickett had previously secured funding from Samson MCA, Inc. ("Samson") and Funding Circle.

5.     On or about October 27, 2021, Mr. Rickett, on behalf of Piedmont, entered into a contract with Samson to secure business funding.

### iii.   Funding Circle Loan

6.     On March 16, 2020, Piedmont entered into a loan agreement with FC Marketplace, LLC, d/b/a Funding Circle ("Funding Circle"), an agreement which speaks for itself ("2020 Funding Circle Loan").

7.     In May of 2022, Piedmont received an unsolicited "generic" email from Funding Circle offering to refinance the 2020 Funding Circle Loan at an interest rate in the "range of . . . four to nine or four to ten percent." After expressing interest, Rickett received additional information from a man identifying himself as Funding Circle employee, Jeremy Snyder ("Snyder").

8.     On June 8, 2022, Snyder sent an email to Rickett which approved refinancing the $207,216.21 remaining on the 2020 Funding Circle Loan, the payoff of another lender's loan to Piedmont ("Samson MCA Loan"), and some additional funding for Piedmont expenses: the represented loan offered Piedmont $350,000 at 4.29% APR ("2022 Funding Circle Loan") with the condition that Rickett submit additional documentation. The email specified that $207,216.21 was to be used to pay off the prior Funding Circle loan and $142,783.79 was to be the net proceeds for Piedmont.

12

9. On June 9, 2022, Rickett e-signed a new loan agreement with Funding Circle under the terms offered by Snyder previously.

10. On June 10, 2022, as requested by Snyder to complete the funding process, Rickett sent Snyder two pictures of himself holding up his driver's license and a copy of a piece of paper which read, "Jack Rickett Piedmont Power Sports, Inc. 6/10/2022."

11. Later, on Friday, June 10, 2022, Piedmont's operating account at Truist ending in 4682 ("Piedmont Operating Account") received an incoming wire transfer of $349,570.00.

12. At about the same time, Mr. Rickett requested payoff letters for his existing loans with both Samson and Funding Circle.

13. On June 13, 2022, Samson issued a payoff letter stating that Piedmont's loan obligations could be satisfied by a payment in the amount of $88,341.37.

14. Also on June 13, 2022, Snyder sent a purported payoff letter from Funding Circle stating that Piedmont's remaining loan obligation could be satisfied by a payment in the amount of $207,216.21.

15. On June 13, 2022, Rickett authorized Truist Bank to wire $207,216.21 by which Rickett intended to pay off the 2020 Funding Circle loan ("Attempted Payoff").

16. Also on June 13, 2022, Rickett authorized a wire transfer from Piedmont's bank account to Samson in the amount of $88,341.37 to satisfy Piedmont's obligation to Samson.

17. Sometime on June 13, 2022, LCF deducted $13,148.15 from Piedmont's Operating Account, a transaction which Piedmont did not authorize (the "Unauthorized LCF Debit").

    **iv.**   **The MCA Agreement**

18.     In May 2022, a man identifying himself as Eric Schaefer ("Schaefer") and claiming to own the company SchaeferEnterprises, LLC ("SchaeferEnterprises"), applied to be an Independent Sales Organization ("ISO") with LCF Group, Inc.

19.     Around June 8, 2022, through the ISO Agreement, an unknown individual using the identities of the Piedmont Defendants signed a Merchant Cash Advance Agreement ("MCA Agreement") with LCF.

20.     LCF conducted a background check on Piedmont and Rickett and subsequently spoke to an unknown individual in a recorded merchant interview but did not realize the person on the phone was not Rickett.

21.     On Friday, June 10, 2022, "LCF Group transmitted the sum of $349,570.00" into Piedmont's Operating Account.

22.     LCF referred to Schaefer as a "broker" for Piedmont.

23.     Neither Rickett, nor any agent of Piedmont had knowledge of or interaction with Schaefer and/or SchaeferEnterprises and did not authorize any individual to sign the MCA Agreement on Piedmont's behalf.

24.     Piedmont first called Truist to determine the source of the Unauthorized LCF Debit and obtained contact information for LCF..

25.     Piedmont asked LCF about the Unauthorized LCF Debit and was told for the first time that LCF, and not Funding Circle, had deposited $349,570.00 into the Piedmont Operating Account the Friday before.

26.     Rickett emailed Snyder, still masquerading as a Funding Circle employee, who told him that LCF was a "lending partner."

14

27. Starting on June 13th, Piedmont employee Cyndi Smith ("Smith") and Rickett, suspecting Snyder's fraud, tried to stop the Attempted Payoff by contacting Truist.

28. Rickett contacted Funding Circle to inquire if the Attempted Payoff satisfied the balance of the 2020 Funding Circle Loan. A Funding Circle representative told him it did not and that Jeremy Snyder did not work for Funding Circle.

29. After Rickett reported the incident to authorities, an FBI agent told him of other investigations involving Funding Circle borrowers.

30. On September 14, 2022, Rickett wired LCF $129,205.34 (the difference between the $349,570.00 deposited in the Piedmont Operating Account and the $207,216.21 taken by the fraudster).

31. In November of 2022, LCF obtained from Schaefer an affidavit to substantiate that he was the victim of identity theft and that he had no connection to LCF or the Piedmont Defendants.

32. Schaefer affirmed he is not connected to SchaeferEnterprises, he did not sign/see an ISO application/ISO Agreement and that he has never represented himself as LCF's agent.

33. Schaefer also had a Funding Circle loan.

34. Schaefer became aware that his identity had been stolen as early as 2020.

**G. Any Special Voir Dire Questions**

1. Who is your current employer?

2. Do you know Kenneth Lohr?

3. Are you, or have you been, a small business owner?

4. Have you ever received a business loan before?

5. Have you ever been delinquent on a loan or been the target of debt collection?

15

Dated: September 5, 2023                                             It is SO ORDERED.

Date: _____

_____
UNITED STATES DISTRICT COURT JUDGE

I ask for this:

_____/s/_____
Andrew Biondi, Esq. (VSB No. 48100)
Lindsay K. Bunting Eubanks, Esq. (VSB No. 94686)
**SANDS ANDERSON PC**
1111 East Main Street, Suite 2400
P.O. Box 1998
Richmond, VA 23218-1998
Phone: (804) 648-1636
Fax: (804) 783-7291
E-mail: ABiondi@sandsanderson.com
E-mail: LBuntingEubanks@sandsanderson.com
*Attorneys for Defendant Piedmont Power Sports, Inc.*

Seen and agreed:

_____/s/_____
J. Chapman Petersen, Esq. (VSB No. 37225)
Christopher Robertson, Esq. (VSB No. 93732)
Chap Petersen & Associates, PLC
3970 Chain Bridge Road
Fairfax, Virginia 22030
Phone: (571) 459-2512
Fax: (571) 459-2307
E-mail: jcp@petersenfirm.com
E-mail: cr@petersenfirm.com
*Counsel for Plaintiff, The LCF Group, INC.*